# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2007 JUN 22  A 9: 53

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| ANTONIO D. DAVIS  #212703 | ) |
| Full name and prison number | ) |
| of plaintiff(s) | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD ALLEN, ALABAMA DEPARTMENT | ) |
| OF CORRECTIONS, DEBORAH STUTTS, | ) |
| JEFFERSON COUNTY PROBATION AND PA- | ) |
| ROLE OFFICE AND THE ALABAMA BOARD | ) |
| OF PARDONS AND PAROLES | ) |
| Name of person (s) who violated | ) |
| your constitutional rights. | ) |
| (List the names of all the | ) |
| persons.) | ) |

CIVIL ACTION NO. 2:07-CV-574-MEF
(To be supplied by Clerk of
 U.S. District Court)

**DEMAND FOR JURY TRIAL**

I.   PREVIOUS LAWSUITS
   A.   Have you begun other lawsuits in state or federal court dealing with the same or similar facts involved in this action?   YES ( XXX)   NO (    )

   B.   Have you begun other lawsuits in state or federal court relating to your imprisonment?   YES (    )   NO ( XXX)

   C.   If your answer to A or B is yes, describe each lawsuit in the space below.  (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

      1.   Parties to this previous lawsuit:

         Plaintiff(s) _____ANTONIO D. DAVIS_____

         Defendant(s) _____ALABAMA DEPARTMENT OF CORRECTIONS_____



SCANNED
KR 6/22/07

2. Court (if federal court, name the district; if state court, name the county) _____

MONTGOMERY COUNTY CIRCUIT COURT

3. Docket number _____ CV 2005-2463 _____

4. Name of judge to whom case was assigned _____

CIRCUIT JUDGE TRUMAN M. HOBBS, JR.

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) _____

CASE DISMISSED.  APPEAL DISMISSED.

6. Approximate date of filing lawsuit ___ SEPTEMBER 29, 2005 ___

7. Approximate date of disposition _____ JUNE 16, 2006 _____

II. PLACE OF PRESENT CONFINEMENT ___ DRAPER CORRECTIONAL CENTER ___

_____ " ___ " _____

PLACE OF INSTITUTION WHERE INCIDENT OCCURRED _____

_____

III. NAME AND ADDRESS OF INDIVIDUAL(S) YOU ALLEGE VIOLATED YOUR CONSTITUTIONAL RIGHTS.

|  | NAME | ADDRESS |
|---|---|---|
| 1. | RICHARD ALLEN, ADOC COMMISSIONER | |
| 2. | ALABAMA DEPARTMENT OF CORRECTIONS | |
| 3. | DEBORAH STUTTS | |
| 4. | JEFFERSON COUNTY PROBATION AND PAROLE OFFICE | |
| 5. | ALABAMA BOARD OF PARDONS AND PAROLES | |
| 6. | | |

IV. THE DATE UPON WHICH SAID VIOLATION OCCURRED ___ APRIL 15, 2004 ___

STILL REMAIN TO THE PRESENT DATE AND CONTINUES

2

V.  STATE BRIEFLY THE GROUNDS ON WHICH YOU BASE YOUR ALLEGATION
THAT YOUR CONSTITUTIONAL RIGHTS ARE BEING VIOLATED:

SEE ATTACHED COMPLAINT

GROUND ONE: _____

_____ " " : _____

SUPPORTING FACTS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____ " _____ " _____

GROUND TWO: _____

_____ " _____ " _____

SUPPORTING FACTS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

3

VI. STATE BRIEFLY EXACTLY WHAT YOU WANT THE COURT TO DO FOR YOU. MAKE NO LEGAL ARGUMENT. CITE NO CASES OR STATUTES.

SEE ATTACHED COMPLAINT

_Antonio D. Davis_
Signature of plaintiff(s)

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on ___6 - 18 - 07___ .
(Date)

_Antonio D. Davis_
Signature of plaintiff(s)

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA


ANTONIO D. DAVIS.                    )

    Plaintiff.                   )

                       )

vs.                                  )     Civil Action No. **2:07cv574-MEF**

                       )

RICHARD ALLEN.                       )
ALABAMA DEPARTMENT OF
CORRECTIONS.                         )
DEBORAH STUTTS.
JEFFERSON COUNTY PROBATION           )
AND PAROLE OFFICE. AND
THE ALABAMA BOARD OF PARDONS         )
AND PAROLES.
                       )

    Defendant.                   )


## CIVIL RIGHTS COMPLAINT
## WITH A JURY DEMAND


This is a Section 1983 action filed by Antonio D. Davis, a State prisoner, alleging violation of his constitutional rights and seeking declatory judgment and injunctive relief.  The Plaintiff requests a trial by jury.


### JURISDICTION


This is a civil rights action under 42 U.S.C. Section 1983.  This Court has jurisdiction under 28 U.S.C. Section 1343.  Plaintiff also invokes the pendent jurisdiction of this Court.


### PARTIES


1.  Plaintiff Antonio D. Davis is presently incarcerated under the custody and control of the Alabama Department of Corrections ("ADOC") at Draper Correctional Center ("DCC") in Elmore. Alabama.

2.   Defendant Richard Allen is the Commissioner of the ADOC to serve as and exercise the authority, function and duties of the commissioner of corrections as that position otherwise exists under the laws of Alabama, and is responsible for administering and exercising direct and effective control over penal and corrections institutions throughout the State of Alabama. He is sued in his individual and official capacities.

3.   Defendant ADOC is the department that is responsible for the management, supervision and control all penals and correctional institutions and prisoners in their custody. The is also responsible for the placement and security control of all prisoners based upon its prescribed criterias pursuant to its classification manual. The ADOC is being sued in its official capacity.

4.   Defendant Deborah Stutts is a probation/parole officer employed by the Alabama Board of Pardons and Paroles ("Board") in Jefferson County that prepared the 'presentence investigation report' ("PSI") upon Plaintiff's criminal case, and submitted the same to the ADOC and the Board to be placed in Plaintiff's files for a summary review of the criminal case. She is being sued in her individual and official capacities.

5.   Defendant Board is charged with the duty of determining what prisoners serving sentences in the jail and prisons of the State of Alabama may be released on parole and when and under what conditions; and charged with the duty of supervising all prisoners released on parole from the jails or prisons of the state; and of lending its assistance to the courts in the supervision of all prisoners placed on probation by courts exercising criminal jurisdiction; and making such investigations as may be necessary in connection therewith, of determining whether violation of parole or probation conditions exist in specific cases, deciding, in the case of parolees, what action should be taken with reference thereto, causing, in the case of probationers, reports of such investigations to be made to the judges of the courts having jurisdiction of the probationers; and of aiding parolees and probationers to secure employment. The Board is being sued in its official capacity.

6.   All Defendants have acted under 'color of State law' during all times relevant to this complaint.

2.

## FACTS

7.    On September 6, 2000, the Plaintiff entered a negotiated guilty plea for murder in violation of § 13A-6-2 Code of Alabama, 1975 and was sentenced by the Circuit Court of Jefferson County to a term of twenty (20) years to serve in the State penitentiary.

8.    On April 6, 2004, the Plaintiff appeared before a review committee employed by the ADOC that recommended your Plaintiff to be placed in a lower custody level [minimum custody] and to be placed at a lower level institution [level II]. The Plaintiff signed the said recommendation upon the progress review form which was submitted before the Central Review Board whom disapproved the said recommendation. However, upon the said form which contained false statement that your Plaintiff struck the victim (Gary Wade) with a pistol where the force caused a piece of the pistol to break off and afterwards shot the victim with the pistol upon the head. The foresaid purported fact was quoted from the PSI and relied upon as being true. (See Exhibit A)

9.    On September 22, 2005, the Plaintiff filed a common law writ of certiorari before the Circuit Court of Montgomery seeking relief to have the false statement removed from his files, and the case number is CV 2005-2463.

10. On June 16, 2006, the Circuit Court of Montgomery entered an order that dismissed said case, and your Plaintiff filed a timely notice of appeal and request to proceed in forma pauperis.

11. On July 20, 2006, the Plaintiff received two (2) correspondences, one from the official court reporter Judy E. Shelton, whom stated that there was no transcript testimony, and the other from the circuit clerk Melissa A. Rittenour, whom stated that the trial court granted in forma pauperis on appeal, but requires the payment of $135.00 by August 15, 2006 for the clerk's record. [1]

---

[1] The appeal filing fee is $100.00. The Plaintiff was granted from the inception of the case to proceed in forma pauperis and granted the same again on appeal. The Plaintiff could not pay the $135.00 payment to obtain the clerk's record for appellate review, and appeal was dismissed by the Alabama Civil Appeals Court whom refused to acknowledge your Plaintiff was indigent.

12.  The Plaintiff asserts that he did not strike the victim (Gary Wade) with the pistol at any time prior to shooting him as alleged by the Defendants. (See Exhibit B)

13.  The Plaintiff asserts that at his preliminary hearing where testimony was offered by eyewitness (DonaldDavis) whom testified that the Plaintiff struck the victim with his fist and not the pistol.   (See Exhibit C)

14.  The Defendant's postition is that the Plaintiff "pistol-whipped the victim until part of the pistol broke off." This false statement was prepared in the PSI report.  (See Exhibit D)

15.  The Plaintiff submit medical records conducted by the Jefferson County medical examiner's office as evidence to support that its findings does not indicate that the victim was "pistol-whipped." (See Exhibit E)

16.  The Plaintiff submit investigation report prepared by the Birmingham Police Department that does not indicate that the victim was "pistol-whipped." (See Exhibit F)

17.  The Plaintiff submit his post-arrest interview with the Birmingham Police Department that does not indicate the victim was "pistol-whipped." (See Exhibit G)


## CLAIMS FOR RELIEF

18.  Defendant's Allen and ADOC be held liable for relying its decision upon untrue or false statements to deny him eligibility for meeting the criterias to minimum custody or lower level placement of institution.  Its decision was made arbitrarily and capricious in violation of due process of law pursuant to the Fourteenth Amndment to the United States Constitution.

19.  Defendant Stutts be held liable for preparing the PSI that contained untrue and false statements where no documentary evidence exist that supports the notion that Plaintiff struck the victim with the pistol prior to shooting him.  Defendant Stutts deprived Plaintiff's substantive due process right under the Fourteenth Amendment to the United States Constitution.

20. Defendant Board has yet to render a decision to grant or deny Plaintiff's parole. However, its decision shall be influenced upon the untrue and false statement contained in the PSI that alleged Plaintiff struck the victim with his pistol with enough force that caused piece of the gun to break off, thus causing the crime to be more aggravated and heinous. The Board's decision shall violated Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution.

## RELIEF REQUESTED

21. Wherefore, Plaintiff request that the Court grant the following relief:

A.    Issue a declaratory judgment stating that:

1. Defendants violated the United States Constitution and State law when they failed to prepare a true and accurate statement and failed to correct the same when informed that it was incorrect, and still remain to rely upon the false statement.

B.    Issue an injunction ordering that defendants or their agents:

1. Investigate the cause of the false information and expunge the same upon all files and records that contain Plaintiff's criminal case.

2. Prepare a true and correct PSI that reflects the actual facts of the case involved.

3. To reconsider the recommendation of lower level custody (minimum) and lower level institution (Level II) upon the true and correct PSI report.

C.    Grant any and all attorney fees.

D.    Grant such other relief as it may appear that Plaintiff is entitled. Also, the cost of this civil action be taxed against the defendants jointly or severally.

5.

WHEREFORE, premises considered, the Plaintiff prays that this Honorable Court grant the relief sought herein for the injury inflicted or caused by the defendants or their agents.

Done this the 19 day of June, 2007.

Respectfully Submitted,

*Antonio D. Davis*

Antonio D. Davis, pro se
A.I.S. No. 212703
Draper Correctional Center
P.O. Box 1107
Elmore. AL. 36025-1107

c

## VVERIFICATION

I, Antonio D. Davis, declare under the penalty of perjury pursuant to 28 U.S.C. Section 1746 that the facts complained herein is true and correct to the best of my knowledge.

*Antonio D. Davis*

Antonio D. Davis, pro se

ALABAMA DEPARTMENT OF CORRECTIONS    PROGRESS REVIEW FORM — A
(COU122)

AIS #: 00212703        SSN: 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    RACE/SEX: B/M    DATE OF BIR
NAME: DAVIS, ANTONIO DEMETRIUS                CUSTODY: MED9  SECURITY LE
INST: DRAPER CORRECTIONAL CENTER              TIME SRVD: 03Y07M11 LAST DI
CRME: MURDER                                  MIN REL DT: 08/24/2020 ACTIV

DISC: HAS RECEIVED NO DISCIPLINARIES PRL CONS_____/2007 EDUCAT LEV: 12

WL/PGM: JFI refinishing 1-03 student _____ after will complete in 5-04,
                                  PRI OCCUP: LABORER  GENERAL

RECOMMENDED INSTITUTION: Special Review Dr. Level 2    RECOMMENDED CUSTODY: Min

JUSTIFICATION: Inmate is being considered for a less restrictive placement
per directive of the Director of Classification. Detail reflect
inmate and Victim getting into an argument after the witness
and inmate had been skating around Club. The argument escalated
into a fight. Inmate left and came back to the Victim's residence
w/a pistol. Inmate pistol whipped the Victim until part of the
pistol broke off. Inmate then stepped back and shot the Victim
once in the head. The Victim died at the scene.

I CERTIFY ENEMY LIST ____ REVIEWED AND UPDATED         APP. S/L:  4/12/04

CLASSIFICATION SPECIALIST    4-12-04 DATE    WARDEN OR DESIGNEE  4/12/04 DATE

PSYCHOLOGIST/PSYCHOLOGIST'S ASSOC.  DATE   CLASSIFICATION COORDINATOR  DATE

CENTRAL REVIEW BOARD ACTION

___ APPROVED  X DENIED; DIVERTED TO:      REASONS: ____ prone to violence
Prior Att. Murder reduced to   Assault. Used firearm in commission
w/7" head of pistol whipped, then shot victim in the head 4-14-04
                                          CRB MEMBER _____ DATE

___ APPROVED  X DENIED; DIVERTED TO: ____  REASONS: agree w/comm
Nature of offense constitute
restrict                                   CRB MEMBER _____ DATE

___ APPROVED ___ DENIED; DIVERTED TO: ____ REASONS: _____
_____
                                          CRB MEMBER _____ DATE

FINAL DECISION: INST DCC  CUSTODY Min  DATE 4/15/04

DATE INMATE INFORMED: _____  INMATE'S SIGNATURE: Antonio Davis

LPR 11-03 LRA 11-00 level 4 afforded
DL# AL55722336 expired      I can do regular work    ENTERED TERMINAL DATE D BY
DNA 11-1-00                 I am not only mil etc's rendition. A.D.

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABMA

ANTONIO D. DAVIS,

    Plaintiff,

vs.                     Civil Action No. 2:07-CV-514-MEF

RICHARD ALLEN,
ALABAMA DEPARTMENT OF CORRECTIONS,
DEBORAH STUTTS,
JEFFERSON COUNTY PROBATION & PAROLE OFFICE, et al.,

## AFFIDAVIT

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | ss: Affidavit of Antonio D. Davis |
| COUNTY OF ELMORE | ) | |

    Before me, the undersigned Notary Public, in for said State and County, personally appeared Antonio Demetrius Davis, whom is known to me as such, first being duly sworn and depose and state the following:

    On September 6, 2000, I entered a negotiated guilty plea for murder in violation of §13A-6-2 Code of Alabama, 1975 for a sentence term of twenty (20) years in the State penitentiary.

    On April 6, 2004, I appeared before a board of personnels employed by the Alabama Department of Corrections pursuant to a "special review" that recommended lower custody level (minimum) and to be placed at a lower level institution (Level II). I was required to sign a blank "progress review form". After a period of time, I received a copy of the said form that was filled out, and specifically stated that I got into an argument with the victim in my case which escalated into a fight; and I left and came back with a pistol; and that I 'pistol whipped' the victim until a part of the pistol broke off; and I stepped back and shot the victim once in the head.

*EXHIBIT B*

On April 29, 1997, Gary Wade (victim) and I got into an argument that escalated into a fight. I left and came back with a pistol wherein I was enraged and under the influence of alcohol. I exchanged a few more words with Gary Wade and I punched him with my fist and shot him once upon the head area. I did not at no time strike Gary Wade with the pistol on any part of his body before or after the pistol discharged. The presentence investigation (PSI) was incorrectly prepared and contains false information. Specifically, that I allegedly struck Gary Wade with the pistol to the point that part of the pistol broke off. This is untrue and incorrect. There is no evidence whatsoever to support the foresaid notion. However, there is court documents or transcript from the preliminary hearing that offers the eyewitness (Donald Davis) whom was present throughout the entire incident. Donald Davis is related to Gary Wade as 'half brothers' and he was specifically asked by the prosecutor whether or not I struck Gary Wade with the pistol and affirmatively answered "no." Donald Davis informed the said that I struck Gary Wade with my fist.

AFFIANT FURTHER SAYETH NAUGHT!

SWORN TO and SUBSCRIBED before me this 7 day of March, 2007.

_Antonio D. Davis_
Affiant

_Jerome Pace_
Notary Public

My Commission Expires March 25, 2008

My Commission Exp:_____

2.

EXHIBIT B

DAVIS PRELIMINARY HEARING
PAGE 1

ERM:  I'm going to record this.

DA:  If there is a stipulation for the court as to the identity of the victim in this case which is very vague, ____gunshot wound to the head and this incident happened in the Birmingham District of Jefferson County.  State your name please.

DD:  Donald Davis.

DA:  And Mr. Davis ____on April 29, 1997,____April 28, 1997, did you have an occasion to see Gary Wade?

DD:  Yes.

DA:  And how do you know Gary Wade?

DD:  It's my brother.

DA:  Is he a half brother?

DD:  Yes.

DA:  And what name did he go by?

DD:  Gary.  They called him Gabe.

DA:  Gabe?  And that was like a nickname?

DD:  Yes.

DA:  OK.  On the early morning hours of April 29, 1997 did you have an occasion to be at the house where Gabe was?

DD:  Yes.

DA:  Can you tell us what happened _____at that time?

DD:  That guy right there, Tony, yeah Antonio.

DA:  Are you kin to Antonio?

DD: No.

DA:  OK.  And you and Antonio, had yall been together earlier  that evening?

DD:  Yes.  We had been over at his mother's house working on her car and then we was out riding around and came back, they start arguing with me, Tony jumped up in the middle, I guess he thought Gary was arguing with him but it wasn't...

*ExHIBIT C*

DAVIS PRELIMINARY HEARING
PAGE 2

DA:

DD: Yes.

DA: And was there anyone else there with yall at that time?

DD: Yeah, J_____. J_____ Foster.

DA: _____together, it was an argument between who first?

DD: Me and Gabe.

DA: You and Gabe?

DD: Yeah.

DA: After yall got into an argument what _____happened next?

DD: Nothin, Tony just jumped up and started arguing with him and Tony just start arguing, and he went to harrassing him, and stopped that, he left out the house, went up there and got the gun, come back punched him a couple times, and then he shot him.

DA: And _____

DD: Tony.

DA: The man who is sitting here?

DD: Yeah.

DA: OK. Once the argument insued between Tony and Gabe, was there any words exchanged before he went out of the house?

DD: He was harassing him, no I don't believe so.

DA: OK. When he went out of the house, how long did he stay out of the house?

DD: It couldn't have been no more than about 10 seconds or something like that.

DA: OK. Once he went out of the house what did you find about him different when he came back in the house?

DD: He had a gun in his hand, and he was pointing it.

DA: OK. Who did he point it at first?

DD: He pointed it first at Kenneth(?).

DAVIS PRELIMINARY HEARING
PAGE 3

DA:  OK.  What did he tell Kenneth when he pointed it at him?

DD:  That he was gonna bust him if he moved.

DA:  OK.  And where was Kenneth at this time?

DD:  Sitting on the couch by the door.

DA:  And _____told him that, who did he point the gun at next?

DD:  Then he pointed the gun at me.

DA:  OK.  And what did he tell you?

DD:  He told me he was gonna bust me.  He told me that three times.

DA:  OK.  And where were you in proximity to Gary and Kenneth at that time?  Were yall in the same rooom?

DD:  Yeah. I was like standing in the bedroom door, then I started walking towards him and he pointed the gun at me like three times and when I took a step to him, and he raised the gun and said, "I'm gonna bust you,"  I took another step, "I'm gonna bust you,".  I was like, "Tony! What's wrong, man?"  "I'm gonna bust you Don."

DA:  And after he said that three times....

DD:  Then I walked back, he held a gun on Gabe, punched him___ and then pulled the trigger, that's what he did.

DA:  Ok, when he punched him, did he hit him with the gun?

DD:  No.  With his fist.

DA:  Did you see the part of the gun_____.

DD:  What do you mean by that?

DA:  Did you see the features of the gun?

DD:  No.

DA:  You didn't.

DD:  No.

DA:  After he punched him a few times, tell us how he shot him.

DD:  Right there in the head.  He pulled the trigger, pow.  He put the gun down there and shot him, boom.

DAVIS PRELIMINARY HEARING
PAGE 4

DA:  In the head?

DD:  Yeah, and that was it.

DA:  OK.  And _____.

DD:  Right by the bathroom, it's a little hallway like.  The bathroom here and my bedroom here, and he was standing right in the doorway.

DA:  And you could see into the livingroom from that area.

DD:  Yeah.

DA:  Once Tony shot him, what do you think happened next?

DD:  Then he said, "Oh I done shot Gary,"  I say, "No you didn't, you killed my brother."  For no reason.

DA:  And then what did you do?

DD:  I don't know, I just...my mind just...

DA:  OK.  At that point, did Tony leave, or did he stay in the house?

DD:  He left.  He left.

DA:  And did the police come at that time?

DD:  Yeah.

DA: There's no further questions at this point, your honor.

ERM:  Mr. Davis, what time that day did you and Tony first get together?

DD:  About 1:00, 12:30-1:00 that afternoon.  His mother had called over to the house saying her car wouldn't start up.  So I got and went over to his mother's house, cranked her car up for her.  Then we left, and did a little bit of drinking....

ERM:  Prior to this incident happening, you and Antonio, your family and Antonio's family were friends, is that not true?

DD:  Correct.

ERM:  Alright.  As a matter of fact, yall still stay in ____with his mother, is that correct?

DAVIS PRELIMINARY HEARING
PAGE 5

DD: Yeah.

ERM: Alright. When yall got together around 1:00 to work on her car, was that over at her house?

DD: Yeah.

ERM: How long did yall work on the car that day?

DD: Until probably about 4:30 or 5:00, right around in there.

ERM: Alright. What was wrong with it that you know?

DD: I really didn't know, it was a deisel, I, like, told them when I first went over there, I really didn't think I could start the car, but then I thought about something else might've been_____with the starter fluid so I went and bought some of that and the car cranked up.

ERM: So you got it running?

DD: Yeah.

ERM: And it was 4:00 or 4:30 when yall got through. Where did yall go then?

DD: Ah, ok. Where did we go? We went, we went to the store, that's where we went after that, we went to the store.

ERM: Did yall buy, what did yall buy at the store?

DD: Two fifths of Grape Rose.

ERM: Is that wine?

DD: Yes.

ERM: Who all was with you? Just you and Antonio?

DD: Just me and Antonio.

ERM: Did yall drink the two fifths of Grape Rose?

DD: Yes.

ERM: When did yall get through drinking the two fifths?

DAVIS PRELIMINARY HEARING
PAGE 6

DD:  Probably about 6:00 or 6:30, I really don't know the time, but it was still daylight then.  We went down, somewhere down on the other side of...I don't know the street, but it's a little apartment complex down at ____Gardens down there, they had went and ah...bought some kind of liquor.  I don't know what he was drinking.  Two other guys.  And we just stood around talking to them and then we went and got...the guy got in the car with us...

ERM:  Were yall drinking down there too?

DD:  Yeah.

ERM:  What were yall drinking down there?

DD:  The Rose.

ERM:  Yall hadn't finished the Rose?

DD:  NO.

ERM:  OK.  When you finished drinking the Rose, did yall get anything else to drink?

DD:  Yes.

ERM:  When was that and where did you get it?

DD:  I don't know where they got it...The guy that was with...that Tony had picked up down there, he went and bought a fifth, and another liter of Red Rose.

ERM:  Did yall drink that?

DD:  Yes we did.

ERM:  When did yall finish drinking that other fifth and that other liter of Red Rose?

DD:  Probably about....I think it was about....about an hour after...there was...maybe two hours.

ERM:  So it was about 8:00?

DD:  Yeah, I figure it was about 8:00 or 9:00.

ERM:  Did yall drink anything else?

DD:  Yes.

ERM:  Where did yall go to get it?

DAVIS PRELIMINARY HEARING
PAGE 7

DD:  We went and bought another thing of Rose.

ERM:  Another fifth or another liter?

DD:  It was a pint.

ERM:  It was a pint.  Was that Red Rose?

DD:  No.  Yeah that was the Red again.

ERM:  OK.  And where did yall drink that?

DD:  It was about 11:00 or 11:30 when we was drinking on that.

ERM:  Alright.  Did yall drink anything else?

DD:  No.  We was...we had that when we came to the house.

ERM:  OK.

DD:  And so, why we came to the house, we had left with a guy name Carlton.  He was with us in the car at the time when we went and bought that last one just before he shot my brother.

ERM:  Who is Carlton?  Who is he?

DD:  He stay like two doors away from his mother, grandmother.

ERM:  Is Carlton his first name or his last name?

DD:  His first name.

ERM:  Do you know his last name?

DD:  I think it's Finley.

ERM:  Alright.  Yall came to your house and yall had that pint of Red Rose that yall were drinking then, is that right?

DD:  Yeah, because the cops was following us when we was drinking it so when we got in the parking lot, we just got out the car and started walking.  After that.

ERM:  That was about 11:00 or 11:30?

DD:  That was probably about 12:00.

ERM:  OK.  About 12:00.  And when you got to your house, who was there?

DAVIS PRELIMINARY HEARING
PAGE 8

DD: Gary and Kenneth.

ERM: Gary and Kenneth?   Did they know Antonio and did he know them?

DD: Yeah.

ERM: And had they known one another a long time?

DD: Well just as long as we been up here.

ERM: Which is how long?

DD: Gary probably beeen up here about a year and a half, probably. And I haven't been up here about a year.

ERM: Alright.  But yall were all friends.

DD: Yeah.

ERM: Kenneth was a ___? ____?

DD: No.

ERM: What was he doing?

DD: He was sitting on the couch.

ERM: When yall walked in did Gary get on to you about smoking his cigarettes and yall had some kind of argument?

DD: Yeah.

ERM: What was it about?

DD: Just nothing.  He just normally argue with me like every day or every other day he argue with me.

ERM: He hadn't been drinking though, had he?

DD: No.

ERM: But you had?

DD: Right.

ERM: Alright.  Do you remember what the argument was about?

DD: What that me and Gary had?

DAVIS PRELIMINARY HEARING
PAGE 9

ERM: Yeah.

DD: No. What brothers would normally have. Just like you go on argue with your brother when he did something you thought was wrong.

ERM: But you don't remember what it was?

DD: Probably cigarettes or something like that.

ERM: Well. Did you argue back?

DD: No I wasn't going to argue back, I just looked at him and laughed and start walking toward the bathroom.

ERM: And you went in another room didn't you?

DD: Right.

ERM: Do you know whether Gary accused Antonio of smoking his cigarettes?

DD: No. He didn't accuse him.

ERM: While you were out of the room could you hear him?

DD: No, I didn't hear that.

ERM: OK. But what I mean is while you were out of the room, you would not have been able to hear sny discussion the two of them had while you were gone. Is that correct?

DD: They were arguing, they weren't discussing. They weren't talking low, they were arguing loud, sir.

ERM: OK. What were they arguing about?

DD: I don't know why Tony start arguing with Gary. They arguing about something that happened four or five months ago.

ERM: You don't know what it was?

DD: I don't have no idea. He know. He know.

ERM: How long were you in the bathroom?

DD: Long enough to use the bathroom and come back out.

ERM: Alright, when you came back out, what was happening?

DD: They was wrestling on the floor. They were at each other...

DAVIS PRELIMINARY HEARING
PAGE 10

ERM:  They were fighting.

DD:  No, wrestliing...yeah, you could call it fighting if that's what you call it, I call it wrestling.

ERM:  OK.  The two of them were down in the floor.

DD:  Yeah.  Then they got up, looked at each other, about ten seconds Tony looked at Gabe, Gabe looked at Tony, he walked out the house and then he ran back in with the gun.

ERM:  You weren't in there when they started wrestling were you?

DD:  Yeah.  When they started wrestling....This is what happened:

ERM:  Alright.

DD:  They was standing up by the couch.  Alright.  And they were in each other's face.  Then they ran into my next door neighbor's wall which knocked down they stuff.  Then I told them, "Yall need to stop."  They was on the floor.  Then Tony pushed him back towards the couch.  Then they was on the floor.  They got up, Tony looked at him, Gary looked at him, and then he walked out the door and come back with the gun.

ERM:  _____.  When they were standing there arguing, isn't it true that Gary rushed Tony?  ___him all the way up against the other wall, and that's when they ended up in the floor?

DD:  Alright.

ERM:  Is that true?

DD:  They was wrestling, yeah.

ERM:  Isn't it true that Gary rushed Tony right until he was up against the wall and that's when they went to the floor.  They wrestled on the floor and then Tony shoved Gary back toward the couch and that's when they separated.

DD:  Alright.

ERM:  Is that correct?

DD:  Correct.

ERM:  So Gary was the first one to engage in any physical touching of the other.  He rushed Tony and knocked him up against the wall, isn't that the way it started?

DD:  No.

DAVIS PRELIMINARY HEARING
PAGE 11

ERM:  How did it start?

DD:  Tony started it.

ERM:  Well, didn't you testify just a minute ago that Tony was rushed against the far wall?

DD:  They was wrestling, right.  They was both touching each other at the same time.  Gary did not grab him or touch him before Tony...they both ran, and they was wrestling to the wall, and they came back and fell on the floor.

ERM:  So they just decided at the same time to start that?  Is that what you are saying?

DD:  Yeah.

ERM:  They both got up and Tony went outside?

DD:  Right.

ERM:  Do yall have a porch outside the house, was he out on the porch?

DD:  You could say...yeah there's a porch.  It's just like a little concrete slab, that's all it is.

ERM:  Well isn't that where he went?  Out there on the concrete slab?

DD:  Yeah, he went outside.  Then he came back.

ERM:  I understand.  But he wasn't out there but about 10 seconds was all he was out there then?

DD:  Yeah, that's all prob...

ERM:  He wasn't out there long enough to go to the car or go next door or go over to a friend's house or anything then?

DD:  No, I don't believe so.

ERM:  He wasn't out there long enough to go somewhere else and get a gun, was he?

DD:  He had the gun.

ERM:  He already had it?

DD:  He had the gun with him.

DAVIS PRELIMINARY HEARING
PAGE 12

ERM:  How did you know that?

DD:  I seen it with him all day that day.  Yeah.

ERM:  Where did he have it?

DD:  He had it in his..he had it in his back.

ERM:  In the back of his waistband?  In his pants?

DD:  Right.

ERM:  You had seen it earlier that day.

DD:  Right.

ERM:  So we're not talking about him going outside and going somewhere and getting a gun and coming back, he already had a gun.

DD:  He went out the door and come back in the door with the gun.

ERM:  Alright.  But he had the gun all the time.

DD:  He had the gun all the time.

ERM:  He came back in when you were in the doorway of the bedroom next to the room where Gabe is.

DD:  Gabe was in the bathroom, I was in my bedroom, correct.

ERM:  And Kenneth was on the couch?

DD:  Correct.

ERM:  And after he came back in did he first point the gun at Gary?

DD:  No.

ERM:  He didn't?

DD:  No.

ERM:  Is it your testimony that he first pointed the gun at Kenneth?

DD:  Correct.

ERM:  Told Kenneth he would bust him if he came any closer?

DD:  If he got up he would bust him.  He was sitting down.

DAVIS PRELIMINARY HEARING
PAGE 13

ERM:  Then he pointed it at you.

DD:  Right, cause I was walking towards him.

ERM:  Were you on one side of the room and Kenneth on the other side and Gary somewhere in the middle?

DD:  I'm right here and Gary's standing like right there.

ERM:  Where's Kenneth?

DD:  Kenneth sitting right about where you sitting at.

ERM:  And where was Antonio then?

DD:  He was standing about right there in the middle pointing the gun at everybody.

ERM:  So who would be between...would Gabe be between you and Kenneth or you in between Gary and Kenneth or would Kenneth be between you and Gary.

DD:  I would be between Gary and Kenneth.  I would say that.  In the angle that...You need to come to my apartment and look and then you would understand what I'm saying.

ERM:  Yes sir.

DD:  But me and Gary was standing like side by side, Kenny he_____.

ERM:  How close together were yall?  Was it a small room?

DD:  How close?  I'd say like maybe four feet apart maybe.

ERM:  OK.  Did you have a gun?

DD:  No.

ERM:  Did Kenneth have a gun?

DD:  No.

ERM:  Did Gary have a gun?

DD:  No.

ERM:  And your testimony is that after he pointed his pistol at Kenneth he told he'd bust him, then you took a step toward him and he pointed it at you.

DD:  Right.

DAVIS PRELIMINARY HEARING
PAGE 14

ERM: And he told you three different times, "I'll bust you if you come any closer."

DD: Right. I took three steps. Each time I took a step he pointed that gun at me.

ERM: Is it your testimony that he approached Gary and pulled a pistol on him?

DD: After he came in the house?

ERM: Yes.

DD: Yeah.

ERM: How close was he to Gabe while he held the pistol on him?

DD: From about...from here to about right there. Maybe five feet. Four or five feet.

ERM: Was there a time, according to your testimony earlier, that he held a pistol on Kenneth and also hit Kenneth with his fist?

DD: He didn't hit Kenneth.

ERM: I meant Gary. I beg your pardon. He held the pistol on Gary and hit Gary with his fist?

DD: Right.

ERM: How many times did he hit him?

DD: Three times.

ERM: _____he was holding the gun while he was hitting him.

DD: Right here.

ERM: He was holding the gun at his head?

DD: Righ here, pointed it at his head, right.

ERM: How far was the pistol from Gary while he was puching him with his other fist?

DD: About like that.

ERM: About six inches.

DD: Like that.

DAVIS PRELIMINARY HEARING
PAGE 15

ERM: Where was he hitting Gary?

DD: In the face.

ERM: Was it with his right hand or his left hand or do you recall?

DD: With his right hand.

ERM: He was hitting him with his right hand in the face, he was holding the pistol with his left hand.

DD: Right.

ERM: After he hit him the third time, what if anything happened then?

DD: He pulled the trigger.

ERM: And what did he do when he pulled the trigger?

DD: "Oh, I done shot Gary." That's the exact words came out his mouth. "No, you killed my brother," that's what I told him.

ERM: Let me ask you this: Considering that this on tape, isn't it possible that while he was hitting your brother that the gun went off accidently?

DD: NO! NO! NO!

ERM: Would that not explain his response when he looked at you and said..

DD: NO!

ERM: "Oh, I done shot Gary."

DD: No that wasn't it. He wanted to shoot my brother. He wanted to do that. Cause he had all the opportunities to stop before it even got that far. He wanted to do that.

ERM: He hit him three times while he was holding the pistol on him.

DD: Right.

ERM: Was that three quick times, or was there a space in between or just pap,pap, pap.

DD: There you go, that's how it is.

ERM: Like that?

DAVIS PRELIMINARY HEARING
PAGE 16

DD:  Like that.

ERM:  And the next thing that happened, the gun goes off?

DD:  Then he held the gun then he just did like that.

ERM:  Tell me what he did.

DD:  He hit him 3 times and he pulled the trigger.  I was like,"You killed my brother."  You know you did it!  And it wasn't no accident.  It was no accident.  That what he want you to.... but it was not an accident.  Ain't no way.  No accident.

ERM:  What did he do at that point?

DD:  After he shot my brother?  He stared there.  Then he went out the door, got in the car with some little girl, I don't know her name, and they left.

ERM:  What happened with the gun?

DD:  He took the gun with him.

ERM:  Did part of the gun fall off in the floor?

DD:  Aint no part of the gun fell off in the floor...no.

ERM:  If it did, you didn't see?

DD:  The gun aint fell apart.

ERM:  Was there another gun there?

DD:  No there was no nother gun in the house.

ERM:  The gun that he fired do you know if it was an automatic or a revolver.

DD:  Automatic.

ERM:  What color was it?

DD:  Brown and black.

ERM:  Brown and black.  Can you describe it any further.

DD:  380. Luger.

ERM:  Have you had occasion to see that gun, or a gun similar to that since that incident occurred?

DAVIS PRELIMINARY HEARING
PAGE 17

DD: No, I haven't seen the gun since that.

ERM: Your description of the gun is from your memory of what happened that night.

DD: And before. He always flashed the gun around.

ERM: So you knew it.

DD: Yeah.

ERM: How old was Gary?

DD: 29, I believe.

ERM: Is it your testimony that this pistol was no more than 6 inches from him when he was shot?

DD: Correct.

ERM: Would Kenneth have been on Antonio's left at the time this happened.

DD: Yes, I would say so.

ERM: Would you have been on Antonio's right?

DD: Correct.

ERM: And that's when _____up there hitting him. Gary.

DD: Yeah.

ERM: Thank you Mr. Davis.

DD: Yeah.

JUDGE: Anything else you want_____you may leave or you may remain in the courtroom, it's up to you.

ERM: Judge, I don't recall whether the state _____or not but we did have a situation_____copies of_____not going to call any witnesses_____.

Judge: _____to the Grand Jury_____.

DD: Correct.

PRESENT OFFENSE

County, Court, And Case Number:

Jefferson County CC 97-5660

Offense:

Murder

Sentence:

20 Years

Date Of Sentence:

9-6-2000

Details Of Offense:

According to a report in the District Attorney's files, on April 29, 1997, at about 1:06 am, Gary Wade and Kenneth Foster are at Wade's apartment. Antonio Davis and Donald Davis entered the apartment. They had been riding around and drinking. A fight broke out between Antonio Davis and Wade. They pushed each other around for a while and then Antonio Davis left. He returned a short time later with a pistol. Antonio Davis pointed the pistol at Donald Davis and Foster, telling them to stay out of it. Antonio Davis then went to Wade and pistol-whipped him with such force that part of the pistol broke off. Antonio Davis then took a step back and shot Wade once in the head. Wade dies at the scene. Antonio Davis then ran from the apartment. Someone called the police and told them what happened. Antonio Davis was arrested.

Subject's Statement:

Davis is unavailable for comment.

Case Status Of Co-Defendants:

None indicated

Victim Notification Information:



Victim Impact:

*A*

Location Of Offense:

Birmingham, Alabama

*EXHIBIT D*

**JEFFERSON COUNTY CORONER**
**MEDICAL EXAMINER OFFICE**
**1515 South 6th Avenue**
**Birmingham, Alabama 35233**

AUTOPSY NO: 97-568

NAME:  **GARY WADE**

DEATH:     Date:  __4/29/97__

Hour:  __0110__

AUTOPSY:  Date:  __4/29/97__

Hour:  __0800__

AGE: 29   RACE: Black   SEX: Male   HEIGHT: inches   WEIGHT: pounds

PATHOLOGIST: __Dr. Falzon/Dr. Simmons__     DEPUTY CORONER: __Ronnie Williams__

### FINAL ANATOMICAL DIAGNOSIS

1.   Penetrating gunshot wound to the head with subsequent perforation of the left cerebral hemisphere.

2.   Superficial lip mucosal lesions and skin abrasion foci as described.

CAUSE OF DEATH:     Gunshot wound to the head.

MANNER OF DEATH:    Homicide.

Andrew L. Falzon, M.D.              5/7/97
**Andrew L. Falzon, M.D.**
**Forensic Pathology Fellow**

Gary T. Simmons, M.D.              5/7/97
**Gary T. Simmons, M.D.**
**Associate Coroner/Medical Examiner**

GTS/cy

*EXHIBIT E*

97-568
GARY WADE

**DESCRIPTION OF CLOTHING:** The decedent has on a white T-shirt. There is diffuse blood staining involving the right upper shoulder area which extends down the right axillary line covering a total are measuring approximately 14 x 12 inches. This staining also involves the entire right sleeve. The front of the shirt is otherwise remarkable for widely scattered blood stains which are documented photographically with the front of the shirt in total being approximately 25% involved by blood staining. The back of the shirt is remarkable for diffuse blood staining involving the right half of the back. Additionally, along the entire inferior aspect of the right sleeve and extending approximately half way down the right axillary line there is an approximate 14 inch long defect. The back of the shirt is otherwise remarkable for irregular blood staining involving the left back which is discontinuous with the back of the shirt in total being approximately 70% involved by blood staining.

The decedent has on a pair of tan boxer type shorts. The shorts are remarkable for generally circular discontinuous blood staining on the front of the shorts, particularly on the right side. The front of the shorts in total are approximately 25% involved by such blood staining. Essentially the entire back of the shorts are involved by blood staining with essentially the only spared areas being the waistband focally and the left lateral side focally. Additionally, the blood staining overlying the left lateral buttock region has a somewhat linear pattern type arrangement covering a total area measuring approximately 7 x 4 inches. This is all documented photographically.

**EXTERNAL EXAMINATION:** This is the body of a 67 inch 132 pound black male. The head is covered by short black hair with there being a penetrating gunshot wound injury in the region of the forehead at the approximate hairline which will be subsequently described. Additionally, involving the right forehead there is a .4 inch superficial laceration. The eyes are brown with the conjunctivae and sclerae being unremarkable. The sclerae however do appear to be slightly "muddy". The nasal septum is intact to inspection. The nose is intact to palpation. The teeth are natural and are intact. There is a .3 x .1 inch area of maroon discoloration involving the buccal mucosa of the lower lip in the

1

97-568
GARY WADE

approximate midline with there being a .3 inch laceration with a surrounding .5 inch contusion on the buccal mucosa in the region of the left corner of the mouth. There is a neatly trimmed facial mustache and goatee with a moderate amount of growth of hair overlying the chin. The ears are remarkable for there being blood coming out of both external auditory canals. Overlying the right chin there is a 1.5 x 1.0 inch area contains discontinuous somewhat linear scars.

The skin of the neck is remarkable for there being .1 and .2 inch superficial abrasion foci on the left side of the lower neck immediately superior to the left clavicle.

The chest and abdomen are unremarkable.

The genitalia are remarkable for depigmentation focally involving the glans penis and the foreskin. This pigmentation appears to be natural in etiology.

All of the extremities are intact to palpation. There is a trivial roughly circular scar involving the lateral aspect of the left upper arm with there being .7 x .1 inch area of faint maroon discoloration overlying the left biceps. The left upper extremity is otherwise unremarkable. The fingernails extend .1 inch past the fingertips and generally have dirt underneath them with the fingernails generally being intact and unremarkable. Involving the dorsal aspect of the dorsal aspect of the right hand there is a .2 inch abrasion foci. The right upper extremity is otherwise unremarkable.

Overlying the region of the right knee there is a 3.5 x 1.5 inch area containing discontinuous approximate .3 to .6 inch abrasions. Overlying the region of the left knee there is a 3 x .6 inch area containing discontinuous abrasions. The lower extremities are otherwise remarkable for there being a coroner's tag around the left foot identifying the decedent as Gary Wade. Additionally, on the dorsal aspect of the left foot immediately proximal to the left toe there are .2, .2, and .1 inch superficial abrasion foci.

2

97-568
GARY WADE

The back is remarkable for there being 1.5 x .4 inch abrasion overlying the right upper shoulder immediately lateral to which there are superficial .4 and .2 inch abrasions. Immediately to the left of the midline of the back there is a 2.7 inch linear scar with the buttocks and anus being unremarkable.

There are no palpable axillary lymph nodes with there being "shotty" inguinal lymph nodes. There are no acute needle puncture marks or track marks appreciated.

**EVIDENCE OF INJURY:** Located 3.3 inches below the top of the head and centered .3 inch to the left of the midline there is a 2.2 x 1.1 inch stellate skin gunshot wound. Along the superior border of this stellate wound there is .35 x .15 inch focal area of soot/gunpowder residue deposition with there being a .45 x .15 inch area of soot/gunpowder residue deposition laterally on the skin of the edge of the wound. Along an inferior skin flap there is a .25 inch roughly circular abrasion. When the skin flaps are re-approximated this abrasion is separated from the inferior edge of the apparent main entrance defect by an approximate .15 inch segment of skin. In the soft tissue immediately underlying the wound track there is obvious gunpowder residue deposition. There is no obvious significant gunshot residue deposition on the outer table of the skull. There is a .6 x .4 inch underlying bony defect in the skull with inward beveling. There are no bony fractures directly radiating from the entrance gunshot wound. Additionally, on the inner aspect of the calvarium there is approximately a .7 x .3 inch band of light gunpowder residue deposition immediately to the right of the entrance defect. This is documented photographically. Additionally, immediately superior to the main entrance defect on the inner table of the calvarium there is approximately a .3 inch area of light brown apparent gunpowder residue deposition separated from the main entrance defect by a .2 inch segment of uninvolved bone. There is a rim of gunpowder residue deposition on the outer aspect of the dura around an underlying corresponding defect in the dura. There is however no significant gunpowder residue deposition on the corresponding inner aspect of the dura. There is an underlying gunshot wound track which enters the medial aspect of the left frontal lobe. The wound track is essentially horizontal and moves to the left through the

3

97-568
GARY WADE

white matter of the anterior aspect of the left cerebral hemisphere. The wound track leaves the left cerebral hemisphere laterally at the approximate level of the basal ganglia (in the coronal plane). The projectile then apparently ricochets along the inner aspect of the skull with the projectile being recovered superficially embedded in the medial aspect of the region of the pole of the left occipital lobe. There is no definitive intraparenchymal wound track connecting where the wound track exits the left cerebral hemisphere to where the projectile is subsequently recovered in the medial aspect of the left occipital lobe. The brain is furthermore remarkable for there appearing to be punctate hemorrhages within the pons and, to a greater extent, within the medulla. The dura is reflected revealing extensive fractures involving the anterior middle cranial fossae bilaterally as well as hairline type fractures involving both middle cranial fossae. The skull is otherwise intact, including the calvarium.

**INTERNAL EXAMINATION:** There no significant pleural or abdominal fluid accumulations. The rib cage and vertebral column are intact. There are a few flimsy left sided pleural adhesions.

**NECK:** A stepwise neck dissection is performed. It is unremarkable. The hyoid bone and thyroid cartilage are intact. The tongue is unremarkable to external and internal examination.

**CARDIOVASCULAR SYSTEM:** The epicardial surface of the 300 gram heart is unremarkable. The coronary artery ostia are unremarkable. The coronary arteries are widely patent. The myocardium is homogeneously maroon and is unremarkable with the valves being unremarkable. The aorta is free of any significant atherosclerosis.

**RESPIRATORY SYSTEM:** The larynx and trachea are generally maroon. The secondary bronchi of the 430 gram right lung and 400 gram left lung are remarkable for being moderately to completely occluded by mucoid maroon material. The pulmonary vasculature is unremarkable with the pulmonary parenchyma on internal examination otherwise being unremarkable.

**HEPATOBILIARY SYSTEM:** The 1530 gram liver has an intact

4

97-568
GARY WADE

capsule.  The parenchyma internally is brown and of unremarkable consistency with no gross fatty change or fibrosis.  The gallbladder is present and is unremarkable.

**SPLEEN:**  The 70 gram spleen has an intact capsule with homogeneously maroon parenchyma upon internal examination.

**ENDOCRINE SYSTEM:** The adrenals are unremarkable to external and internal examination.  The pancreas is of normal size with lobulated tan parenchyma.  The thyroid gland is of normal size with spongy maroon parenchyma.

**GASTROINTESTINAL TRACT:** The esophageal, gastric, and duodenal mucosae are unremarkable.  The small and large bowels are unremarkable to external and internal examination.  An appendix is present.

**GENITOURINARY SYSTEM:** The right and left kidneys are 110 grams apiece.  The cortical surfaces are smooth and internally the cortices and medullary rays are unremarkable.  The bladder mucosa is tan and unremarkable with the prostate gland being of normal size with spongy tan parenchyma.  The testes are unremarkable to external and internal examination.

**CENTRAL NERVOUS SYSTEM:** There are no galeal hemorrhages except for those immediately associated with the previously described gunshot wound injury.  The brain in the fresh state is 1200 grams. The brain upon internal examination is completely unremarkable except as was previously described.

97-568
GARY WADE

## CASE SUMMARY

An autopsy was performed on the body of Gary Wade on 4/29/97 at the Jefferson County Coroner/Medical Examiner Morgue after due authorization by the Jefferson County Coroner/Medical Examiner.

Examination revealed the presence of penetrating gunshot wound injury to the head with subsequent perforation of the left cerebral hemisphere. Also present were superficial lip mucosal lesions and skin abrasion foci as described. No other significant gross findings were appreciated with microscopic studies still pending at this time. Toxicological studies were negative for ethanol and drugs of abuse.

It is our opinion on the basis of the history and postmortem findings that the cause of death is best listed as gunshot wound to the head with the manner of death being homicide.


_Andrew L. Falzon_ MD 5/7/97
Andrew L. Falzon, M.D.
**Forensic Pathology Fellow**

_Gary T. Simmons_ jr 8/7/97
Gary T. Simmons, M.D.
**Associate Coroner/Medical Examiner**


GTS/cy

# CORONER/MEDICAL EXAMINER
## JEFFERSON COUNTY, ALABAMA

*Copy*

FILE NO:  97-568

AUTOPSY: _____ YES _____ NO

EXTERNAL ONLY: _____ YES _____ NO

BY:  DR. SIMMONS
          Pathologist

IMMEDIATE CAUSE OF DEATH _____

(1) DUE TO: _____

(2) DUE TO: _____

MANNER OF DEATH: _____

DECEDENT  GARY WADE                    AGE/RACE/SEX  29 B/M   MARITAL STATUS _____

ADDRESS  1737 33RD. ST. NO. B'HAM. 35234                    D.O.B.  07-29-67

DATE OF INJURY  04-29-97        TIME APPROX. 0105   HOW INJURED  G.S.W. (HEAD)

INJURY AT WORK?  NO    PLACE OF INJURY  RESIDENCE

DATE & TIME FD.  SEE TIME OF INJURY        TIME LAST SEEN ALIVE _____

DATE & TIME OF DEATH  04-29-97 PRO. 0110    PLACE OF DEATH  SCENE

CONDITION OF PREMISES  SEE NARRATIVE    RIGOR _____ LIVOR _____ TEMP  WARM

HOSPITAL CHART # _____    GUN TYPE  H-380-A    SCENE VISITED  YES  TIME  0126

| 04-29-97 | RONNIE WILLIAMS |
|----------|-----------------|
| Date     | Deputy Coroner  |

## PARTICULARS SURROUNDING DEATH

File        97-568

Page No.        1

See attached sheet for "Particulars Surrounding Death"

MEB-1 (REVISED 81)

PARTICULARS SURROUNDING DEATH

File        97-568

Page No.        2

ACCORDING TO POLICE; A WITNESS STATED THAT DEC AND THE SUSPECT WERE
ARGUING AND FIGHTING. SAID WITNESS STATED THAT HE GOT UP TO SEE WHAT WAS
GOING ON WHEN HE SAW THE SUSPECT SHOOT DEC. POLICE AND PARAMEDICS WERE
CALLED AT THAT TIME AND DEC WAS PRONOUNCED DEAD ON THE SCENE. DEC AND THE
SUSPECT WERE SAID TO HAVE BEEN STANDING APPROX. 3' APART AT THE TIME OF
THE INCIDENT.

SCENE EXAMINATION: DEC WAS OBSERVED IN A SITTING POSITION ON THE HALL
FLOOR, JUST OUTSIDE THE BATHROOM DOOR. HIS BACK WAS RESTING AGAINST A
CLOSET DOOR. A DEFECT CONSISTENT WITH A GUNSHOT WOUND WAS NOTED TO HIS
HEAD. BLOOD SPATTERS IN THE HALLWAY WERE CONSISTENT WITH DEC BEING IN A
STANDING POSITION, NEAR THE BATHROOM DOORWAY, FACING THE HALL AT THE TIME
OF THE SHOOTING. WHEN DEC WAS MOVED, A SPENT CASING (WINCHESTER 380) WAS
OBSERVED NEAR WHERE HIS RIGHT ARM WAS RESTING. A PIECE OF THE SUSPECT
WEAPON (PART OF THE TRIGGER GUARD) WAS OBSERVED NEAR WHERE HIS LEFT ARM
WAS RESTING.

NO CLOTHING NEEDED TO BE RETAINED AS EVIDENCE. 

# JEFFERSON COUNTY CORONER/ MEDICAL EXAMINER OFFICE

## BODY DIAGRAM

Front

Back



Decedent's Height _67_ inches

Weight _132_ pounds

Name _Gary Wade_ _(97-568)_

Examined By _____ Date _____

CORONER-21

# UAB   The University of Alabama at Birmingham
### Department of Pathology
### Division of Forensic Pathology
### Toxicology Section

## TOXICOLOGICAL ANALYSIS REPORT

NAME:  Wade, Gary                          CASE NO:  97-568

RECEIVED FROM:  Jefferson County Medical Examiner - Dr. Simmons

RECEIPT DATE:    5/1/97              REPORT DATE:  5/2/97

ANALYSIS OF SPECIMENS REVEALED THE FOLLOWING:

| SPECIMEN | ANALYSIS | METHOD | RESULTS* |
|----------|----------|--------|----------|
| Blood | Ethanol | GC | ND |
| Urine | DA | EMIT | NDD |

DA =  Drugs of abuse (Amphetamine, Barbiturates, Benzodiazepines, Cocaine
         Metabolite, Opiates, Propoxyphene, Tricyclic Antidepressants)
NA  =  Not analyzed
ND  =  Not detected
NDD =  No drugs detected
P    =    Present, not quantified
QNS =  Quantity not sufficient for analysis
*Units = Alcohol and Volatiles, gm/dL; Blood, mg/L; and Tissue, mg/kg.

C.A. Robinson, Ph.D., DNBCC
Director, Forensic Toxicology



# BIRMINGHAM POLICE
## INCIDENT/OFFENSE REPORT

| | | |
|---|---|---|
| 1. ☐ INCIDENT | PAGE / OF / | 2. CASE # 9 7 0 4 7 8 6 2 8 |
| 2. ☒ OFFENSE | | 3. SFX |
| 3. ☐ SUPPLEMENT | | |
| 4. ☐ INTELLIGENCE | | |

| 4. ORI # | 5. DATE AND TIME OF THIS REPORT | 6. COMMAND | 7. IF SUPPLEMENT |
|---|---|---|---|
| 0 0 1 0 2 0 0 | 04 29 97 0300 MT | North | ORIGINAL OFFENSE DATE M D Y |

UNIT # 1 2 3 1

| 8. REPORTED BY ☐ 1. VICTIM | 9. ADDRESS HOUSE NO./STREET NAME/STREET TYPE/STREET DIRECTION/APT./CITY/ZIP | 10. PHONE (HOME) |
|---|---|---|
| OR ☐ 2. | | |

| 12. VICTIM (LAST, FIRST, MIDDLE NAME) | 13. ADDRESS HOUSE NO./STREET NAME/STREET TYPE/STREET DIRECTION/APT./CITY/ZIP | 14. PHONE (HOME) |
|---|---|---|
| Wade, Gary | 1737 33rd St No. Bham 35234 | |

| 15. EMPLOYER/SCHOOL | 16. OCCUPATION | 17. ADDRESS HOUSE NO./STREET NAME/STREET TYPE/STREET DIRECTION/APT./CITY/ZIP | 18. PHONE (BUS.) |
|---|---|---|---|
| | | | |

| 19. ☐ 1. RESIDENT ☐ 2. NON-RESIDENT | 20. INJURY ☒ Y ☐ N | 21. RACE ☐ 1. W ☒ 2. B ☐ 4. I | 22. SEX ☒ 1. M ☐ 2. F | 23. HGT | 24. WGT | 25. DOB 01 29 87 | 26. AGE 24 | 27. OFFENDER KNOWN TO VICTIM ☒ 1. Y ☐ 2. N | 28. VICTIM WAS (EXPLAIN RELATION) Cousin | 29. CODE 1 6 |
|---|---|---|---|---|---|---|---|---|---|---|

| 30. TYPE INCIDENT OR OFFENSE ☒ 1. FEL. ☐ 2. MISD. Homicide | 31. DEGREE | 32. NCIC/UCR 0 9 1 | 33. STATE CODE/LOCAL ORDINANCE |
|---|---|---|---|

| 34. TYPE INCIDENT OR OFFENSE ☐ 1. FEL. ☐ 2. MISD. | 35. DEGREE | 36. NCIC/UCR | 37. STATE CODE/LOCAL ORDINANCE |
|---|---|---|---|

| 38. PLACE OF OCCURRENCE HOUSE NO./STREET NAME/STREET TYPE/STREET DIRECTION/APT. 1737 33rd St No. Bham 35234 | 39. SECTOR N 1 2 3 1 |
|---|---|

| 40. POINT OF ENTRY ☐ 1. DOOR ☐ 2. WINDOW ☐ 3. ROOF ☐ 4. OTHER | 41. METHOD OF ENTRY ☐ 1. FORCIBLE ☐ 2. NO FORCE ☐ 3. ATT. FORCIBLE | 42. ASSAULT ☐ 1. SIMPLE ☒ 2. AGGR. | 43. TREATMENT FOR ASSAULT INJ. ☐ 1. YES ☒ 2. NO | 43.1 HOSP. |
|---|---|---|---|---|

OCCURRED ON OR BETWEEN

| 44. M D Y 04 29 97 | 45. MT 0100 | 46. ☐ 1. S ☐ 2. M ☒ 3. T ☐ 4. W ☐ 5. T ☐ 6. F ☐ 7. S | 47. LIGHTING ☒ 1. NATURAL ☐ 2. MOON ☐ 3. ART. EXT. ☐ 4. ART. INT ☐ 5. UNK. | 48. WEATHER ☒ 1. CLEAR ☐ 2. CLOUDY ☐ 3. RAIN ☐ 4. FOG ☐ 5. SNOW ☐ 6. HAIL ☐ 7. UNK. | 49. PREMISE ☐ 1. HWY.-ST.-ALLEY ☐ 2. RAILROAD ☒ 3. RESIDENCE ☐ 4. CHURCH ☐ 5. SCHOOL ☐ 6. CONVENIENCE ☐ 7. INDUSTRIAL | ☐ 8. SERVICE STA. ☐ 9. BANK ☐ 10. DRUG STORE ☐ 11. APT./TWN. HSE. ☐ 12. SHOPPING CENTER ☐ 13. PARKING LOT ☐ 14. OTHER COMMER. ☐ 15. OTHER | 50. CODE |
|---|---|---|---|---|---|---|---|
| 51. M D Y | 52. MT | 53. ☐ 1. S ☐ 2. M ☐ 3. T ☐ 4. W ☐ 5. T ☐ 6. F ☐ 7. S | | | | | |

| 54. VERIFY FOR RAPE EXAM ☐ 1. Y ☐ 2. N | 55. TREAT. FOR RAPE INJURY ☐ 1. Y ☐ 2. N | 56. CIRCUMSTANCES/LOCATION CODE FOR RAPE/HOMICIDE | 57. CODE H 0 1 |
|---|---|---|---|

| 58. WEAPON USED ☒ 1. FIREARM ☐ 2. KNIFE ☐ 3. HANDS, FISTS, ETC. ☐ 4. OTHER DANGEROUS | 59. DESCRIPTION OF WEAPONS/TOOLS USED IN BLOCK 58 380 Cal. Handgun. | 59.1 EVIDENCE TECH. CALLED ☒ 1. Y ☐ 2. N |
|---|---|---|

| 60. QUANTITY | 61. STOLEN, RECOVERED, LOST, FOUND OR DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, COLOR, ETC.) | | | 62. SER. NO. | 63. TYPE CODE | DOLLAR VALUE | ST. CODE |
|---|---|---|---|---|---|---|---|
| | BRAND | MODEL | DESCRIPTION | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| TYPE CODE | 1. MOTOR VEH. 2. CURRENCY/NOTES | 3. JEWELRY 4. CLOTHING/FURS | 5. FIREARMS 6. OFFICE EQPT. | 7. ELECTRONICS 8. HOUSEHOLD | 9. CONSUMABLE GOODS 10. LIVESTOCK | 11. MISC. | STATUS CODE | 1. STOLEN 2. RECOVD. | 3. DAMAGED |
|---|---|---|---|---|---|---|---|---|---|

## VEHICLES

| 75. CHECK CATEGORIES ☐ 1. STOLEN ☐ 2. RECOVERED ☐ 3. SUSPECTS VEH. ☐ 4. VICTIMS VEH. ☐ 5. UNAUTH. USE ☐ 6. ABANDONED/FOUND | 75.1. PULL IN # |
|---|---|

| 76. # STOLEN | 77. LIC. | 78. LIS. | 79. LIY. | 80. TAG COLOR | 81. VIN # |
|---|---|---|---|---|---|

| 82. VYR | 83. VMA | 84. VMO | 85. VST | 86. VCO: TOP: BOTTOM: | 87. ADDITIONAL DESCRIPTION |
|---|---|---|---|---|---|

| STOLEN MTR. VEH. ONLY | 88. AREA STOLEN ☐ 1. BUS. ☐ 2. RES. ☐ 3. RUR. | 89. OWNERSHIP VERIFIED BY: ☐ 1. TAG RECEIPT ☐ 2. BILL OF SALE ☐ 3. TITLE ☐ 4. OTHER | 90. WARRANT SIGNED ☐ 1. N ☐ 2. Y # |
|---|---|---|---|

| 91. AUTO INSURER NAME (COMPANY) ADDRESS (STREET, CITY, STATE, ZIP) | 92. PHONE ( ) |
|---|---|

| MOTOR VEH. RECOVERY ONLY | 93. STOLEN IN YOUR JURISDICTION? ☐ 1. Y ☐ 2. N WHERE? | 94. RECOVERED IN YOUR JURISDICTION? ☐ 1. Y ☐ 2. N WHERE? |
|---|---|---|

POLICE - #172-1.93

TYPE OR PRINT IN BLACK INK

INCHES    1    2    EXHIBIT F    4    5    6

| INCIDENT/OFFENSE REPORT CONT'D | 95. DATE AND TIME OF REPORT | 96. CASE # | | 97. SFX | 98. |
|---|---|---|---|---|---|

95. DATE AND TIME OF REPORT: 04.29.7 0300
96. CASE #: 97 047 816 3

98. ☐ 1 DEFENDANT  ☐ 3 MISSING PERSON
☑ 2. SUSPECT  ☐ 4. MULTIPLE

| 99. NAME (LAST, FIRST, MIDDLE) | 100. NICKNAME/ALIAS | 101. RACE ☐ 1 W ☐ 3. A / ☐ 2. B ☐ 4. I | 102. SEX ☐ 1. M ☐ 2. F | 103. DOB M D Y | 104. AGE |
|---|---|---|---|---|---|

| 105. ADDRESS (STREET, CITY, STATE, ZIP) | | 106. HGT | 107. WGT | 108. EYE | 109. HAIR | 110. COMPLEXION |
|---|---|---|---|---|---|---|

| 111. PROBABLE DESTINATION | 112. ARMED? ☐ 1. Y ☐ 2. N ☐ 3. UNK. | 113. WEAPON |
|---|---|---|

| 114. SCARS, MARKS, TATTOOS, CLOTHING | 115. ☐ 1. ARRESTED ☐ 2. WANTED |
|---|---|

| 116. NAME (LAST, FIRST, MIDDLE) | 117. NICKNAME/ALIAS | 118. RACE ☐ 1 W ☐ 3. A / ☐ 2. B ☐ 4. I | 119. SEX ☐ 1. M ☐ 2. F | 120. DOB M D Y | 121. AGE |
|---|---|---|---|---|---|

| 122. ADDRESS (STREET, CITY, STATE, ZIP) | | 123. HGT | 124. WGT | 125. EYE | 126. HAIR | 127. COMPLEXION |
|---|---|---|---|---|---|---|

| 128. PROBABLE DESTINATION | 129. ARMED? ☐ 1. Y ☐ 2. N ☐ 3. UNK. | 130. WEAPON |
|---|---|---|

| 131. SCARS, MARKS, TATTOOS, CLOTHING | 132. ☐ 1. ARRESTED ☐ 2. WANTED |
|---|---|

| WITNESSES | 133. NAME (LAST, FIRST, MIDDLE) | 134. ADDRESS (STREET, CITY, STATE, ZIP) | 135. RES. PHONE | 136. BUS. PHONE |
|---|---|---|---|---|
| #1 | | | | |
| #2 | | | | |
| #3 | | | | |
| #4 | | | | |

**NARRATIVE**

137.

The officer received a signal 99 (Misc. Call) at the listed location. Upon arrival the officer observed the victim lying on the floor deceased. Units 125, 124 Sgts. Blackwell 104, Parker 106

Lt. Beggs 102

Coroner Ronnie Williams

Homicide – Lt. Curry

V. Cunningham

Evidence Tech Persons

Were all at the Scene.

CONTINUED ON SUPPLEMENT ☐ Y ☑ N

138. PROPERTY RECEIPT #

139. STATE USE

I hereby affirm that I have read this report and that all information given by me is correct to the best of my knowledge. I will assume full responsibility for notifying this agency if any stolen property or missing person hereby reported is returned. I agree to assist in the prosecution of this offense.

SIGNATURE _____

| RELATED CASES | 140. CASE # | 141. SFX | 142. CASE # | 143. SFX | 144. CASE # | 145. SFX | 146. |
|---|---|---|---|---|---|---|---|

| ADMINISTRATION | 147. CASE STATUS | 148. CASE DISPOSITION: | EXCEPTIONAL CLEARANCE: | 149. REPORTING OFFICER | ID# |
|---|---|---|---|---|---|

147. CASE STATUS:
☐ 1. PENDING
☐ 2. INACTIVE
☐ 3. CLOSED

148. CASE DISPOSITION:
☐ 1. CLEARED BY ARREST (JUV.)
☐ 2. CLEARED BY ARREST (ADULT)
☐ 3. UNFOUNDED

EXCEPTIONAL CLEARANCE:
☐ 4.1 SUSPECT/OFFENDER DEAD
☐ 4.2 OTHER PROSECUTION
☐ 4.3 EXTRADITION DENIED
☐ 4.4 LACK OF PROSECUTION
☐ 4.5 JUVENILE NO REFERRAL
☐ 4.6 DEATH OF VICTIM

149. REPORTING OFFICER: Rouse, J    ID#: 25417

150. ASSISTING OFFICER    ID#

151. SUPERVISOR APPROVAL ID#: B 200

152. ☐ 1. DRUGS RELATED
☐ 2. COMPUTER RELATED
☐ 3. GANG RELATED

153. DATA ENTRY CLERK ID#

154. DATE AND TIME OF DATA ENTRY

# BIRMINGHAM POLICE PROPERTY
## INCIDENT/OFFENSE REPORT SUPPLEMENT

PAGE | OF |

| 1. ORI # | 2. COMMAND | SECTOR # | 3. DATE AND TIME OF REPORT | 4. CASE # | 5. SFX |
|---|---|---|---|---|---|
| 0 0 1 1 0 2 0 0 | North | N 1 2 3 | 0 4 2 9 97 0 0 0 MT | 9 7 0 4 7 8 6 2 8 | |

**EVENT**

| 6. VICTIM'S NAME (ORIGINAL REPORT) | 7. DATE OF ORIGINAL REPORT | 8. TYPE REPORT |
|---|---|---|
| Waite, Gary | 04 29 97 | ☐ 1 CONTINUATION ☑ 2 FOLLOW–UP |

| 9. ORIGINAL INCIDENT/OFFENSE | 10. NCIC/UCR | 11. STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| Homicide | 09 | |

| 12. NEW INCIDENT/OFFENSE | 13. NCIC/UCR | 14. STATE CODE/LOCAL ORDINANCE |
|---|---|---|
| | | |

| 15. HAS AN ARREST BEEN MADE? | 16. DATE OF ARREST | 17. HAS WARRANT BEEN OBTAINED? | 18. DATE OF WARRANT | 19. PRIOR YEAR | |
|---|---|---|---|---|---|
| ☐ 1 YES ☑ 2 NO | M D Y | ☐ 1 YES NO ☐ 2 NO | M D Y | | PREMISE _____ WEAPON _____ |

| 20. ☐ 1 DEFENDANT ☑ 2 SUSPECT   AKA | 21. ☐ 1 DEFENDANT ☐ 2 SUSPECT | 22. PROPERTY RECEIPT # |
|---|---|---|
| NAME Louis Antonio . Tony | NAME | |

**NARRATIVE/PROPERTY**

| 60. QUANTITY | 61. STOLEN, RECOVERED LOST FOUND DESTROYED (INCLUDE MAKE, MODEL, SIZE, TYPE, COLOR. ETC.) | | | 62. SER. NO. | 63. TYPE CODE | DOLLAR VALUE | ST. CODE |
|---|---|---|---|---|---|---|---|
| | BRAND | MODEL | DESCRIPTION | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 23. STATE USE |
|---|

☐ NARRATIVE CONTINUED ON BACK

| TYPE CODE | 1. MOTOR VEH. 2. CURRENCY/NOTES | 3. JEWELRY 4. CLOTHING/FURS | 5. FIREARMS 6. OFFICE EQPT. | 7. ELECTRONICS 8. HOUSEHOLD | 9. CONSUMABLE GOODS 10. LIVESTOCK | 11. MISC. | STATUS CODE | 1. STOLEN 2. RECOVD. | 3. DAMAGED |
|---|---|---|---|---|---|---|---|---|---|

| MOTOR VEH. RECOVERY ONLY | 35. MOTOR VEH. STOLEN IN YOUR JURISDICTION?  ☐ 1. Y  ☐ 2. N  WHERE? | 36. RECOVERED IN YOUR JURISDICTION?  ☐ 1. Y  ☐ 2. N  WHERE | | | |
|---|---|---|---|---|---|

| RELATED CASES | 37. CASE # | 38. SFX | 39. CASE # | 40. SFX | 41. CASE # | 42. SFX | 43. |
|---|---|---|---|---|---|---|---|

**ADMINISTRATIVE**

| 44. CASE STATUS | 45. CASE DISPOSITION: | EXCEPTIONAL CLEARANCE: | 46. REPORTING OFFICER | ID # |
|---|---|---|---|---|
| ☐ 1. PENDING ☐ 2. INACTIVE ☐ 3. CLOSED | ☐ 1. CLEARED BY ARREST (JUV.) ☐ 2. CLEARED BY ARREST (ADULT) ☐ 3. UNFOUNDED | ☐ 4.1 SUSPECT/OFFENDER DEAD ☐ 4.2 OTHER PROSECUTION ☐ 4.3 EXTRADITION DENIED ☐ 4.4 LACK OF PROSECUTION ☐ 4.5 JUVENILE NO REFERRAL ☐ 4.6 DEATH OF VICTIM | Rowell, J | 21547 |

| 47. ASSISTING OFFICER | ID# |
|---|---|

| 48. SUPERVISOR APPROVAL ID # | 49. DATA ENTRY CLERK ID # | 49.1 DATE/TIME DATA ENTRY |
|---|---|---|

POLICE # 207 - 6.89

## TYPE OR PRINT IN BLACK INK ONLY

OFFICERS WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

**ADDITIONAL INCIDENT/OFFENSE NARRATIVE CONTINUED**

| 50. DATE AND TIME REPORT | | 51. CASE # | | 52. SFX |
|---|---|---|---|---|
| 0 4 2 9 9 7 0 3 0 0 | | 9 1 7 4 7 8 6 2 8 | | 1 |

53. TYPE REPORT: ☐ 1. CONTINUATION ☐ 2. FOLLOW—UP

54.

The officer received A SIGNAL 99 (Misc Call) AT 1737 33rd ST No. Upon Arrival The officer observed The Victim Lying in The Hallway with what Appeard To be A GunShot wound To The head. The Victim was D.O.S The officer Spoke with Kenneth Foster (b/m 8-11-68 1737 33rd ST No ) who STATED That The Victim Got into An Argument with TONy (Antonio Davis b/m 05-18-71 Soc 424-98 3297 Address 1755 33rd ST No) And TONy Shot Gary And Then ran out The door. The Victims brother Donald Davis (b/m Address 1737 33rd ST No.) And he STATED That The Victim And Suspect had been ArGuing for Two MonThs And when The Victim STArted ArGuing with The Suspect, The Suspect pulled out A Gun And Shot The Victim in The head. The Suspect Fled The Scene with An Unknown Black female. The Scene was released To Archie Robinson Kneighbor of 1934 37th STreet No.

☐ CONTINUE ON ADDITIONAL SUPPLEMENT

**TYPE OR PRINT IN BLACK INK ONLY**

# BIRMINGHAM POLICE
## ARREST REPORT

| | | |
|---|---|---|
| 1. ORI # 0 0 1 0 2 0 0 | 2. COMMAND No | UNIT # 3. CASE # N1120 97104 7186 218 | 4. SFX |

**IDENTIFICATION**

| 5. LAST, FIRST, MIDDLE NAME | DAVIS, ANTONIO DEMETRIUS |
| 6. ALIAS AKA | |

| 7. SEX ☑1 M ☐2 F | 8. RACE ☐1 W ☐2 B ☑3 A ☐4 I | 9. HGT. 602 | 10. WGT. 218 | 11. EYE BRO | 12. HAIR BLK | 13. SKIN COMPLX. DARK | 14. SCARS, MARKS, TATTOOS, AMPUTATIONS |

| 15. PLACE OF BIRTH (CITY, COUNTY, STATE) JEFFERSON Co | 16. SSN 424-9181-312917 | 17. DATE OF BIRTH 0511817 | 18. AGE 25 | 19. MISCELLANEOUS ID # |

| 20. SID # | 21. FINGERPRINT CLASS  KEY  MAJOR  PRIMARY  SCDV  SUB-SECONDARY  FINAL | 22. DL # | 23. ST |
| 24. FBI # | HENRY CLASS / NCIC CLASS | 25. IDENTIFICATION COMMENTS |

| 26. ☑1 RESIDENT ☐2 NON—RESIDENT | 27. HOME ADDRESS (STREET, CITY, STATE, ZIP) 1755 - 33rd ST No B'ham, Al | 28. RESIDENCE PHONE 322-8433 | 29. OCCUPATION (BE SPECIFIC) Floor Tech |

| 30. EMPLOYER (NAME OF COMPANY/SCHOOL) Norwood Hospital | 1600 - Carraway Blvd | 32. BUSINESS PHONE 250-6403 |
| 31. BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | | |

**ARREST**

| 33. LOCATION OF ARREST (HOUSE #/STREET NAME/STREET TYPE/STREET DIRECTION/APT-CITY/ZIP) 710 1st AVE No B'ham Al | 34. SECTOR # N1121 | 35. ARRESTED FOR YOUR JURISDICTION? ☑YES ☐2 NO ☐2.1 IN STATE ☐2.2 OUT STATE  AGENCY |

| 36. CONDITION OF ARRESTEE: ☐1 DRUNK ☐3 SOBER ☐2 DRINKING ☐4 DRUGS | 37. RESIST ARREST? ☐1 YES ☐2 NO | 38. INJURIES? ☐1 NONE ☐2 OFFICER ☐3 ARRESTEE | 39. ARMED? ☐1 Y ☐2 N | 40. DESCRIPTION OF WEAPON ☐1 HANDGUN ☐4 OTHER FIREARM ☐2 RIFLE ☐5 OTHER WEAPON ☐3 SHOTGUN |

| 41. DATE OF ARREST 042997 | 42. TIME OF ARREST 1310 MT | 43. ☐1 S ☐2 M ☑T ☐4 W ☐5 T ☐6 F ☐7 S | 44. TYPE ARREST ☐1 ON VIEW ☑2 CALL ☐3 WARRANT | 45. ARRESTED BEFORE? ☐1 Y ☐2 N ☐3 UNK |

| 46. CHARGE—1 ☑1 FEL ☐2 MISD Homicide (Murder) | 47. NCIC/UCR CD. 09 | 48. CHARGE—2 ☐1 FEL ☐2 MISD | 49. NCIC/UCR CD. |

| 50. STATE CODE/LOCAL ORDINANCE | 51. WARRANT # | 52. DATE ISSUED M D Y | 53. STATE CODE/LOCAL ORDINANCE | 54. WARRANT # | 55. DATE ISSUED M D Y |

| 56. CHARGE—3 ☐1 FEL ☐2 MISD | 57. NCIC/UCR CD. | 58. CHARGE—4 ☐1 FEL ☐2 MISD | 59. NCIC/UCR CD. |

| 60. STATE CODE/LOCAL ORDINANCE | 61. WARRANT # | 62. DATE ISSUED M D Y | 63. STATE CODE/LOCAL ORDINANCE | 64. WARRANT # | 65. DATE ISSUED M D Y |

| 66. ARREST DISPOSITION ☐1 HELD ☐4 TOT-LE ☐2 BAIL ☐5 OTHER ☐3 RELEASED | 67. IF OUT ON RELEASE WHAT TYPE? | 68. ARRESTED WITH (1) ACCOMPLICE (FULL NAME) | 68.1 DATE OF BIRTH M D Y |
| | | 69. ARRESTED WITH (2) ACCOMPLICE (FULL NAME) | 69.1 DATE OF BIRTH M D Y |

**VEHICLE**

| 70. VYR | 71. VMA | 72. VMO | 73. VST | 74. VCO TOP BOTTOM | 75. TAG # | 76. LIS | 77. LIY |
| 78.VIN | | | | 79. IMPOUNDED? ☐1 YES ☐2 NO | 80. STORAGE LOCATION/IMPOUND # | 80.1 PULL-IN # |

| 81. OTHER EVIDENCE SEIZED/PROPERTY SEIZED | ☐ CONTINUED IN NARRATIVE |

**JUVENILE**

| 82. JUVENILE DISPOSITION: ☐1 HANDLED AND RELEASED ☐2 REF TO JUVENILE COURT ☐3 REF TO WELFARE AGENCY ☐4 REF TO OTHER POLICE AGENCY ☐5 REF TO ADULT COURT | 83. RELEASED TO |
| 84. PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85. ADDRESS (STREET, CITY, STATE, ZIP) | 86. PHONE |
| 87. PARENTS EMPLOYER | 88. OCCUPATION | 89. ADDRESS (STREET, CITY, STATE, ZIP) | 90. PHONE |

**RELEASE**

| 91. DATE AND TIME OF RELEASE M D Y MT | 92. RELEASING OFFICER NAME | 93. AGENCY/DIVISION | 94. ID # |
| 95. RELEASED TO: | 96. AGENCY/DIVISION | 97. AGENCY ADDRESS |
| 98. PERSONAL PROPERTY RELEASED TO ARRESTEE #1 YES ☐2 NO ☐3 PARTIAL | 99. PROPERTY NOT RELEASED/HELD AT: | 100. PROPERTY # |
| 101. REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) | | |

| 101.1 MISD COURT DATE TIME AND DOCKET # | | ID # |
| 102. SIGNATURE OF RECEIVING OFFICER | 103. SIGNATURE OF RELEASING OFFICER |

| RELATED CASES | 104. CASE # | 105. SFX | 106. CASE # | 107. SFX | 108. CASE # | 109. SFX | 110. RELATED CASE IN NARRATIVE ☐1 Y ☐2 N |

| 111. ARRESTING OFFICER (LAST, FIRST, M.) HARBIN, WILLIE | 112. ID # 21104 | 113. ARRESTING OFFICER (LAST, FIRST, M.) | 114. ID # | 115. TRANSPORTING OFF. ID # 2104 | 116. SUPERVISOR ID # 1262 |

| ADDITIONAL ARREST NARRATIVE CONTINUED | 117. DATE AND TIME OF ARREST | 118. CASE # | 119. SFX |
|---|---|---|---|
| | 04299.7 | TIME 310 | MT 97047816218 |

**120. ADDITIONAL ARREST INFORMATION**

The Arresting Officer was Called To 710-1ST Ave No. 5TH Fl (Homicide) To Make A Arrest Report & Transport The Defendant To The B'ham City Jail. The Defendant Was Charge With Murder. Det. Cunningham #711 (Homicide) Is Working The Case.

**NARRATIVE**

**NARRATIVE**

121. IF APPLICABLE PURSUANT TO ACT NO. 95-583, I HAVE BEEN ADVISED OF MY RIGHTS AS A VICTIM OF A CRIMINAL OFFENSE AS DEFINED IN SECTION 1, ACT. NO. 95-583 AT THIS TIME, I INVOKE MY VICTIM'S RIGHTS _____ , DO NOT INVOKE MY RIGHTS _____ ACCORDING TO ACT. NO. 95-583.

SIGNATURE _____     ☐ CONTINUE ON ADDITIONAL ARREST NARRATIVE

| 122. DATA ENTRY CLERKS ID # | 123. DATE AND TIME REPORT ENTERED | MT |
|---|---|---|

POLICE #205-8.96                    TYPE OR PRINT IN BLACK INK ONLY

970478628

CALL: TIME 0115 DATE 4-29-97 RADIO ☐ PHONE ☑ OTHER ☐

LOCATION Home

CALLED BY Disp.

DATE AND TIME OF ARRIVAL 0149
RECEIPT ☐

PROCESSED AT Scene

RECEIVED SCENE ☑ EVIDENCE ☐ FROM _____

DATE 4-29-97 OFFENCE Death Investigation CASE #

VICTIM GARY WADE, B/M 7-29-67

ADDRESS 1737-33rd ST No.

PROCESSED BY R. Persons 1951 DATE 4-29-97 DAY Tue

LOCATION _____

PROCESSES: P- POWDER: M- MAGNA: I- IODINE: C-CHEMPRINT
S- SILVER NITRATE: O-OTHER _____

PICTURES

# FOCUS   F STOP   SHUTTER   BULB                    SUBJECT

---

Present AT Scene:

R. Williams - Deputy Coroner

Off. J. Rouse

Det. Cunningham - Homicide

---

0230 - Collected From Under victim's Body In Hallway 21" No - 3" West one "Win" .380 CAL casing with Red Stains.

---

0241 - Same Area 1" No - 3" West one metal piece. Piece is Approx 3" Long & 1.5" Wide And Appears To Be from A Handgun (The Trigger guard & Lower Slide Assembly)

---

Prop Rec # 97-2518

---

Photos:

Roll -1        8-24

Roll-2        1-24

All Photos Taken At Scene.

5-1-97

0930 - Collected from Det. V. Cunningh. At Homicide One "F.I.E." .380 CAL Semi- Auto pistol Unk. S.N. Weapon was missing The Bottom Slide Assembly & Trigger guard. In Chamber one "Win". 380 CAL Live Round. Clip Contained five "Win". 380 Live Rounds. Weapon: Blue Steel finish with wood grips.

All items Taken To State Tox.

---

DISPOSITION:

LIST OTHER EVIDENCE AND DISPOSITION ON BACK

DISPOSITION:

BIRMINGHAM POLICE DEPARTMENT                                    CASE # 9704178628

Before asking you any questions, it is the law that you must be advised of your following Constitutional rights:

1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
5. If you wish to answer questions now without a lawyer present you still have the right to stop answering at any time.
6. It is not necessary that you answer questions posed by a detective or any other Birmingham Police Department official, prior to having a bond set by the court.

_____
Police Officer, City of Birmingham

I have read the above and understand fully each of these rights. Having these rights in mind I wish to make a voluntary statement and answer any questions without contacting an attorney or having one present. No force, threats, or promises have been used by anyone in any way to make me sign this, and I sign this statement after having been orally advised of my Constitutional rights set out above, and understanding them in full.

SIGNATURE _Antonio Davis_____    DATE _4-29-97_    TIME _11:00 a.m_

WITNESS _David Marable 2429___    DATE _4-29-97_    TIME _11:00 am_

SIGNATURE REFUSED    (   )         ADULT              POLICE - #144 - 4.6



DEATH INVESTIGATION
970478628    04-29-97
GARY WADE   B/M 07-29-67
SCENE:1737 - 33RD ST NO.
DIAGRAM BY R. PERSONS
NOT TO SCALE P 2 OF 2

***(The detective refers to Antonio Davis as 'Gary Wade', the victim in the first few questions)***

## POLICE INTERVIEW WITH ANTONIO DAVIS

This is Detective David Marable.  Today's date is 4-29-97, the time is now 10:57 am .  This statement will be taken from Mr. Gary Wade in reference to a homicide that occurred at 1734 33rd Street North.  Case #970478628.  Mr Wade, before I ask you any questions, I'm gonna read you your rights.  Before I ask you any questions, it is the law that you must be advised of the following Constitutional Rights:  You have the right to remain silent. .Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.  If you wish to answer questions right now without a lawyer present, you still have the right to stop answering at any time.  It is not necessary that you answer questions posed by a detective or any other Birmingham Police Department Official prior to having bond set by the court.  Do you understand that?

AD:  Yeah.

DM:  Do you want to answer any questions?

AD:  _____

DM:  OK.  Read that paragraph down there for me.

AD:  I have read the book and understand thoroughly, each of these rights.  With these rights in mind, I wish to make a voluntary statement and answer any questions without  contacting an attorney or having one present.  No force, threats or promises have been used by anyone in any way to make me sign this.  I sign this statement after being thoroughly advised  of my Constitutional Rights set out above and understand them in full.

DM:  Sign that right there.  429.  OK.  Mr. Wade, go ahead and tell me to the best of your recollection what happened involving this case.

AD:  Me and Gary Wade had got in a fight and his brother and his cousin was in the house too.  And they was walking up on me and I was forced to use the pistol and shot him.

DM:  You were forced to use a pistol?  What kind of gun did you use?

EXHIBIT  G

**POLICE INTERVIEW WITH ANTONIO DAVIS
PAGE 2**

AD:  380.

DM:  Was it your gun?

AD:  ____

DM:  Who's gun was it?

AD:  I found it.

DM:  You found it?  Do you remember where you found it at?

AD:  ____

DM:  How many times did you shoot?

AD:  Just one.

DM:  Do you remember where you shot him at?

AD:___

DM:  After you shot him, then what happened?

AD:  I left and _____police car____.

DM:  You ran off?  You just walked away?

AD:

DM:  Did you know Mr. Wade was dead when you left?

AD:  I don't know I just seen _____walked outside.

DM:  Where did you go?

AD:  I left with this girl, she came and got me._____County.  Went down there and turned myself in____Birmingham police.

DM:  So you turned yourself in to the County?  And they called Birmingham Police and they brought you here to the headquarters building?

**POLICE INTERVIEW WITH ANTONIO DAVIS**
**PAGE 3**

AD:_____

DM: OK. So when they started coming up on you, where did you have the gun at?

AD:_____

DM: Was yall in some kind of argument or fight?

AD: Fight.

DM: About what?

AD: I mean, I don't know.. he act like he had some animosity against me...I thought we was just playin... just tussling at first, but then it started getting serious. You know what I'm saying?

DM: Was it just you and him alone?

AD: Fighting. Yeah, at first yeah. And then his brother and them started walking up on me.

DM: Did his brother or any of them strike you in any way?

AD: They didn't get a chance to.

DM: So when you shot him, what did the brothers do?

AD: I mean, one walked out, the other walked with him next door, then they went to they house.

DM: Everybody just walked out like casually?

AD: _____you know, a man just got shot, you know.

DM: OK. You got anything else you want to add to this statement? Did he have anything in his hand?

AD: Gary?

DM: Yeah. Did he have anything in his hand?

**POLICE INTERVIEW WITH ANTONIO DAVIS**
**PAGE 4**

AD:  He had walked into the bathroom.  That's all I know.

DM:  So, was...I mean, before you shot him, did he have anything in his hand?

AD:  I can't remember.

DM:  But you did shoot him?

AD:  Yeah.

DM:  OK.  And you have nothing else to add to this statement?

AD:  ____

DM:  OK.  This concludes this statement from Mr. Antonio Davis.  The time is now 11:03.