**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ANTONIO DAVIS** | ) | |
| | ) | |
| **Plaintiff(s),** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **2:07-CV-574-MEF** |
| **RICHARD ALLEN, ET AL.** | ) | |
| | ) | |
| **Defendant(s).** | ) | |
| | ) | |
| | ) | |

## SPECIAL REPORT

COMES NOW this Defendant, **Richard Allen**[1]**,** by and through undersigned counsel, and in accordance with this Honorable Court's July 3, 2007, Order, offers the following written report.

## PARTIES

1.      The Plaintiff, Antonio Davis, is currently incarcerated as an inmate at Draper Correctional Facility in Elmore County, Alabama.

2.      Defendant Richard Allen is the Commissioner of the Alabama Department of Corrections.

3.      Defendant Deborah Stutts is an employee of the Alabama Board of Pardons and Parole.[2]

---

[1]    The other named Defendants, specifically the Alabama Department of Corrections, the Alabama Board of Pardons and Paroles, and the Jefferson County Probation and Parole Office, were dismissed from this case on July 3, 2007.

[2].    Ms. Stutts is represented by Hugh Davis, Esq.

## EXHIBITS

Exhibit 1 – Petition and Brief in Support of Antonio Davis' Common Law Writ Of Certiorari filed by the Plaintiff on September 22, 2005.

Exhibit 2 - Case Action summary sheet relating to previous Complaint.

## PLAINTIFF'S CLAIMS

The Plaintiff complains that he has been denied a less restrictive custody classification level based on false information contained in a pre-sentence investigation report.

## DEFENDANT'S RESPONSE

1.    This Defendant denies that he violated the Plaintiff's constitutional rights.

2.    This Defendant denies each and every material allegation not specifically admitted herein and demands strict proof thereof.

3.    The Plaintiff has failed to state a claim upon which relief may be granted.

4.    The Plaintiff's suit is barred by the doctrine of res judicata and collateral estoppel.

5.    This Defendant is immune from suit under the Eleventh Amendment to the United States Constitution.

6.    This Defendant is immune from suit due to qualified immunity.

7.    The Plaintiff's suit is untimely and barred by the statute of limitations.

8.    This Defendant is not subject to respondeat superior liability

## STATEMENT OF FACTS

In his Petition  For Common Law Writ Of Certiorari Davis filed on September 22, 2005 against the Alabama Department of Corrections, Davis alleged the following facts:

On April 6, 2004, the Petitioner appeared before a "board of personnels" employed by the Alabama Department of Corrections pursuant to a "special review" that recommended lower custody level (minimum) and to be placed at a lower level institution (level III).  The Petitioner was required to sign a blank "progress review form ..."  After a period of time, Petitioner received a copy of the said form via mail, and discovered that false information was written upon said form concerning his criminal conviction, such false information that can be easily construed as particularly aggravated.  Petitioner made several requests to remove such false information, and has yet to prevail.  The specific false information is alleged that Petitioner struck the victim several times with a pistol until a part of it broke off and then the Petitioner shot him in the head.  (See Statement Of The Facts To The Petition at Ex. 1.)

Davis further alleged that the false information placed in his prison files substantially prejudiced him, arguing that the attached "progress review form" clearly shows that this information was relied upon in denying him the recommendation for a lower level facility and custody level.  The Petitioner claims he made several inquiries as to where this false information was retrieved, and was only told that the "PSI" (pre-sentence investigation report) contained said information.  (See Brief in Support Of The Common Law Writ of Certiorari, p.5 at Ex.1.)  Circuit Court Judge Truman Hobbs Jr. dismissed this case.

Subsequent thereto, on July 22, 2007, Davis filed this lawsuit regarding this same issue i.e., the allegedly false information placed in this PSI report and its impact on his placement.  In particular, Davis states in his Complaint (just as he stated in his 2005 petition) that "on April 6, 2004, the Plaintiff appeared before a review committee

3

employed by the ADOC that recommended your Plaintiff to be placed in a lower custody level (minimum custody) and to be placed at a lower level institution (level II)." The Plaintiff signed the said recommendation upon the progress review form which was submitted before the Central Review Board, whom disapproved the said recommendation.  However, Plaintiff alleges that "upon the said form which contained false statement that your Plaintiff struck the victim (Gary Wade) with a pistol where the force caused a piece of the pistol to break off and afterwards shot the victim with the pistol upon the head.  The foresaid purported fact was quoted from the PSI and relied upon as being true."  (See Complaint, p.3.)  Davis adds that on September 22, 2005, the Plaintiff filed a common law writ of certiorari before the Circuit Court of Montgomery (CV 2005-2463) seeking relief to have the false statement removed from his files, and that subsequently thereto on June 16, 2006, the Circuit Court of Montgomery entered an order that dismissed said case  (See Complaint, p.3.)

## ARGUMENT

**I.   The Court must dismiss Davis' action based upon the doctrines of collateral estoppel and res judicata.**

The Eleventh Circuit has defined the doctrines of res judicata and collateral estoppel in its Opinion in Richardson v Alabama State Board of Education, 935 F.2d 1240 (11th Cir. 1991) as follows:

> The doctrine of res judicata, or claim preclusion, forecloses relitigation of an earlier lawsuit.  See S.E.L. Maduro, Inc. v M/V Antonio de Gastaneta, 833 F.2d 1477, 1481 (11th Cir. 1987).  The doctrine applies only if four elements are present:  1) there is a final judgment on the merits of the first action, 2) the first decision is rendered by a court of competent jurisdiction, 3) the parties to both actions, or those in privity with them, are identical, and 4) the causes of action in both suits are identical.  Id;

Hart v Yamaha-Parts Distributors, Inc., 787 F.2d 1468, 1470 (11th Cir. 1986).

Collateral estoppel traditionally requires that the issue in the second suit be: 1) identical to an issue in the former action, 2) actually litigated and determined by the parties, and 3) necessarily so determined. Barber v International Brotherhood of Boilermakers, 778 F.2d 750, 757 (11th Cir. 1985) (citing Williams v Bennett, 689 F.2d 1370, 1381 (11th Cir. 1982), cert denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983)); Hart, 787 F.2d at 1473.

See also McKinnon v Blue Cross and Blue Shield of Alabama, 935 F.2d 1187 (11th Cir. 1991); Thomas v Evans, 880 F.2d 1235 (11th Cir. 1989); Lary v Ansari, 817 F.2d 1521 (11th Cir. 1987) and First Alabama Bank v Parsons Steel, Inc., 747 F.2d 1367 (11th Cir. 1984).

It is abundantly clear when comparing the Complaint and other documentation[3] filed by Davis in the case at bar with the Petition and Brief In Support of Davis' Common Law Writ Of Certiorari and other documentation filed by Davis in the 2005 Circuit Court action, that Davis is seeking by way of this case to retry the issues which already have been determined adversely against him in Davis v Alabama Department Of Corrections. Applying the four elements of res judicata to the facts of this case, it is clear that (1) there was a final judgment on the merits in the first action, Davis v Alabama Department Of Corrections , CV-05-2463, i.e., the case that was dismissed; (2) the first decision was rendered by a court of competent jurisdiction, i.e., the Montgomery County Circuit Court Judge Truman Hobbs, Jr.; (3) the parties to both actions or *those in privity with them*, are identical; and (4) the causes of action in both suits are identical.

This Court in N.A.A.C.P. v Hunt, 891 F.2d 1555 (11th Cir. 1990) discussed the concept of identity of parties as follows:

---

[3]    In both filings, Davis included the same or similar documents, including a transcript of the preliminary hearing and the toxicology analysis report; as well as a similar affidavit.

Identity of parties concerns two sets of persons. The first set is comprised of those persons who were actual parties in the original action. <u>Lary v Ansari</u>, 817 F.2d 1521, 1523 (11th Cir.), cert denied, 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 3904 (1987). The second set of persons to whom res judicata applies is composed of those persons who are or were in privity with the parties to the original suit. <u>Ansari</u>, 817 F.2d at 1523. Privity is defined as a relationship between one who is a party of record and a nonparty that is sufficiently close so a judgment for or against the party should bind or protect the nonparty. <u>Hart</u>, 787 F.2d at 1492 (citing <u>Southwest Airlines Co. v Texas International Airlines</u>, 546 F.2d 84, 95 (5th Cir. 1977)). Privity exists where the nonparty's interests were represented adequately by the party in the original suit. <u>Id</u>. Privity also exists where a party to the original suit is 'so closely aligned to a nonparty's interests as to be his virtual representative.' <u>United Merchants and Mfrs. v Sanders</u>, 508 So.2d 689, 692 (Ala. 1987). The question of whether sufficient privity exists to warrant application of res judicata is a question of law.

While Commissioner Richard Allen was not in fact a named Respondent in Davis' Petition  as the Commissioner for the Alabama Department of Corrections, his relationship with the Alabama Department of Corrections is sufficiently close so a judgment for or against the Alabama Department of Corrections should bind or protect him in his position as Commissioner. <u>Hart</u>, 787 F.2d at 1492 (citing <u>Southwest Airlines Co. v Texas International Airlines</u>, 546 F.2d 84, 95 (5th Cir. 1977)). Furthermore, Commissioner Allen's interests were represented adequately by the party in the original suit. In light of all the foregoing, Commissioner Allen certainly would be in privity with the Defendant in the original suit namely ADOC.

The final element of res judicata, requiring that the same cause of action be presented in both cases, is clearly present. For example, in the pending Complaint, Davis seeks to hold ADOC as well as Commissioner Richard Allen liable for allegedly basing its decision upon untrue or false statements to deny him eligibility for meeting the criteria to minimum custody or lower level placement of institution.  (See Complaint, p. 18.)

Significantly, in 2005 Davis made much the same argument alleging that the false information placed in his prison files substantially prejudiced him and was relied upon in denying him the recommendation for a lower level facility and custody level. (See Brief in Support Of The Common Law Writ of Certiorari, p.5 at Ex.1.)

Collateral estoppel also applies. The issue in the instant case is identical to the issue in the <u>Davis v Alabama Department Of Corrections</u>, CV-05-2463, i.e., that the false information placed in his PSI report alleged that immediately before Davis shot the victim in the head, Davis had struck the victim several times with a pistol until a part of it broke off. Davis claims this false information was relied upon to his detriment. Under both the doctrines of res judicata and collateral estoppel, Davis' claims in this action are due to be dismissed.

**II.    The Plaintiff's 1983 Complaint is barred by the two year Statute of Limitations.**

This is a civil rights action under 42 U.S.C. §1983. It is well settled that a State's personal injury statute of limitations should be applied to all §1983 claims. <u>Owens v Okure</u>, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d; <u>Wilson v Garcia</u>, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The statute of limitations for personal injury actions in Alabama is two (2) years. <u>Dennis v Threat,</u> 2007 WL 2746641 M.D. Ala. (September 18, 2007.) Thus, clearly the Plaintiff's 1983 Complaint is untimely since the violation upon which the Complaint is based occurred around April 2004, and this Complaint was not filed until well over three (3) years later in June 2007.

**III.    This Defendant is immune from suit in his official and individual capacity.**

This case should also be dismissed because this Defendant, who is being sued in his official and individual capacity, is immune from suit.  The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  The Amendment therefore not only bars suits against a state by citizens of another state, but also bars suits against a state by that state's own citizenry. *See* Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 1355 (1974) and Hans v. Louisiana, 134 U.S. 1, 13-15, 10 S. Ct. 504, 33 L.Ed. 842 (1890).  The Eleventh Amendment also prohibits suit against state officials and employees where the state is the real, substantial party in interest. *See* Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02, 104 S. Ct. 900, 908-09, 79 L.Ed.2d 67 (1984).  "For example, if a lawsuit seeks to order the state officer to pay funds directly from the state treasury for the wrongful acts of the state, then the state is the real party in interest and the Eleventh Amendment bars the suit."  Summit Medical Associates, P.C. v. Pryor, 180 F.3d 1326, 1336 (11th Cir. 1999). This suit is in reality a suit against the State; thus, the Defendant should be dismissed based on immunity.

In addition, this Defendant is protected by qualified immunity.  As stated by the Eleventh Circuit, "[q]ualified immunity protects government officials from civil trials and liability when their conduct in performing discretionary functions 'violates no clearly established statutory or constitutional rights of which a reasonable person would have

known.'"   Wilson v. Blankenship, 163 F.3d 1284, 1288 (11th Cir. 1998) (quoting Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)). Wilson, *supra* (holding that the marshal, wardens, and corrections officer were protected by qualified immunity); *see also* Pinkney v. Davis, 952 F. Supp. 1561 (M.D. Ala. 1997) (holding that wardens, deputy warden, and other prison officials were entitled to qualified immunity).   The Eleventh Circuit has held that "[p]rison officials have 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"  Wilson, 163 F.3d at 1295, *quoting* Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878 (1979).   This Defendant has not violated Davis' clearly established rights; thus, he is entitled to qualified immunity.

## IV.   Defendant Cannot Be Liable Based on Supervisory Status.

Another ground supporting a summary judgment in favor of Commissioner Allen is the lack of respondeat superior liability in Section 1983 cases.   Because Commissioner Allen had no personal knowledge regarding the alleged incident upon which the Plaintiff's complaint is based, the Plaintiff may be attempting to hold him liable based on the status of his position.   To the extent Plaintiff seeks to hold Commissioner Allen liable because of his supervisory status, his claims must be dismissed as there is no respondeat superior liability in Section 1983 cases.  Dean v Barber, 951 F.2d 1210 (11th Cir. 1992).

## <u>CONCLUSION</u>

There are no genuine issues of material fact, and this Defendant is entitled to judgment as a matter of law. This Complaint is due to be dismissed based on the doctrines of collateral estoppel and res judicata. In addition, Davis' Complaint is untimely, and thus barred by the statute of limitations. Finally Commissioner Allen is entitled to the protection of immunity in both his individual and official capacity and cannot be held liable under respondeat superior.

WHEREFORE, this Defendant respectfully requests that this Honorable Court dismiss with prejudice the claims against him.

Respectfully submitted,


TROY KING (KIN047)
Attorney General


  /s/ MARY GOLDTHWAITE
Mary Goldthwaite (GOL013)
Assistant Attorney General



ADDRESS OF COUNSEL:


OFFICE OF THE ATTORNEY GENERAL
11 South Union Street
Montgomery, AL 36130
(334) 242-7300
(334) 242-2433 (fax)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have, this the 15th day of October, 2007, served a copy of the foregoing upon the following parties, by placing same in the United States Mail, postage prepaid and properly addressed as follows:

Antonio Davis, #212703
Draper Correctional Facility
PO Box 1107
Elmore, AL  36025

Hugh Davis, Esq.
PO Box 302405
Montgomery, AL  36130

　　　　　　　　　　　　　　　/s/ MARY GOLDTHWAITE_____
　　　　　　　　　　　　　　　OF COUNSEL

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA


CIVIL ACTION NO. _____ Cv- 05 - 2463 _____

(To be inserted by Clerk)


ANTONIO D. DAVIS,

PETITIONER,


VS.


ALABAMA DEPARTMENT OF CORRECTIONS,

RESPONDENT.


_____

COMMON LAW WRIT OF CERTIORARI
_____


**PETITION AND BRIEF IN SUPPORT**


ANTONIO D. DAVIS, PRO SE
A.I.S. NO. 212703
DRAPER CORRECTIONAL CENTER
POST OFFICE BOX 1107
ELMORE, ALABAMA 36025-1107


EXHIBIT
1

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ANTONIO D. DAVIS,                    )

    Petitioner,                  )

vs.                                  )          Case No. CV-05-2463

ALABAMA DEPARTMENT OF CORRECTIONS,   )

    Respondent.                  )

PETITION FOR COMMON LAW WRIT OF CERTIORARI

COMES NOW your Petitioner, Antonio D. Davis, by and through himself the above-styled cause petitions this Court for a common law writ of certiorari to issue to the Alabama Department of Corrections pursuant to Section 6-6-642 Code of Alabama, 1975, and in support shows the following"

VENUE

This Honorable Court has the proper venue to entertain this instant request pursuant to Sections 6-3-9 and 41-22-20(b) Code of Alabama, 1975 wherein the Respondent is an 'administrative agency' within the scope of the Administrative Procedure Act (APA) Section 41-22-3(1) Code of Alabama, 1975.

JURISDICTION

This Honorable Court retains jurisdiction under the authority of Ex parte Boykins, 862 So.2d 587 (Ala. 2002) and has the authority to issue such said writ pursuant to Section 12-17-26 Code of Alabama, 1975.

## STATEMENT OF THE FACTS

On April 6, 2004, the Petitioner appeared before a board of personnels employed by the Alabama Department of Corrections pursuant to a "special review" that recommended lower custody level (minimum) and to be placed at a lower level institution (level II).  The Petitioner was required to sign a blank "progress review form" after a few inquiries concerning his religion and whether or not he's on medication.  After a period of time, Petitioner received a copy of the said form via mail, and discovered that false information was written upon said form concerning his criminal conviction.  Such false information that can be easily construed as particularly aggravated. Petitioner made several requests to remove such false information, and has yet to prevail.  The specific false information is alleged that Petitioner struck the victim several times with a pistol until a part of it broke off and then the Petitioner shot him in the head.  There is no evidence to support that Petitioner struck the victim with a pistol.

## BASIS OF THIS PETITION

The basis of this Petition is that Petitioner is guaranteed and protected under the Fourteenth (XIV) Amendment to the United States Constitution of not only equal protection of the law, but also the right to substantive due process of law that prohibits the State government and its agencies from arbitrary and unreasonable actions, including relying upon false information that is used for catergorization to prohibit certain benefits and placements offered by the Alabama Department of Corrections.

## CONCLUSION

Petitioner respectfully requests that after a preliminary examination, the writ of certiorari be granted and that this Court proceed under its rules to review the matters complained of, and to reverse the decision entered by the State agency and to issue an order to compel the removal of the false information from Petitioner's prison records, and for such other relief as Petitioner may be entitled.

Done this the ___20ᵗʰ___ day of September, 2005.

Respectfully Submitted,

*Antonio D. Davis*
Antonio D. Davis, pro se
A.I.S. No. 212703
Draper Correctional Center
P.O. Box 1107
Elmore, Al. 36025-1107

## VERIFICATION

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge pursuant to Title 28 U.S.C.A. Section 1746.

*Antonio D. Davis*
Antonio D. Davis, pro se

[3]

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

CIVIL ACTION NO. _____CV- 05- 2463_____

(To be inserted by Clerk)

ANTONIO D. DAVIS,

PETITIONER,

vs.

ALABAMA DEPARTMENT OF CORRECTIONS,

RESPONDENT.



SEP 2005
Filed
Melissa Rittenour
Circuit Clerk

---

### COMMON LAW WRIT OF CERTIORARI

---

BRIEF IN SUPPORT

ANTONIO D. DAVIS, PRO SE
A.I.S. NO. 212703
DRAPER CORRECTIONAL CENTER
POST OFFICE BOX 1107
ELMORE, ALABAMA 36025-1107

# TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS _____ i

TABLE OF AUTHORITY _____ ii

STATEMENT OF FACTS _____ 1

ISSUES PRESENTED FOR REVIEW _____ 2

ARGUMENT _____ 3

REASON WHY WRIT SHOULD ISSUE _____ 6

RELIEF SOUGHT _____ 8

CONCLUSION _____ 9

CERTIFICATE OF SERVICE _____ 10

APPENDIX _____ 11

## TABLE OF AUTHORITY

PAGE(S)

Armstrong v. Manzo, 380 US 545,
552, 85 S.Ct. 1187, 14 L.Ed.2d (1965) .............................. 7

Boykins, Ex parte, 862 So.2d 587 (Ala. 2002) ....................... 6

Edwards v. State, 866 So.2d 609 (Ala.Crim.App. 2003) .............. 6

Kirby v. Siegelman, 195 F.3d 1285 (11th Cir. 1999) ................ 4

Mathews v. Elridge, 424 US 319,
333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) .......................... 7

Melof, Ex parte, 735 So.2d 1172 (Ala. 1999) ....................... 4

Monroe v. Thigpen, 932 F.2d 1437 (11th Cir. 1991) ................. 3,4,5

Teat v. State, 636 So.2d 697 (Ala.Crim.App. 1993) ................. 3

Thomas v. State, 867 So.2d 367 (Ala.Crim.App. 2003) .............. 3

U.S. v. Cruikshank, 92 US 542, 23 L.Ed. 588 (1876) ............... 5

Wolff v. McDonnell, 418 US 539,
41 L.Ed.2d. 935, 94 S.Ct. 2963 (1974) ............................ 6


12-19-70    Code of Alabama, 1975
13A-6-2     Code of Alabama, 1975
14-3-47     Code of Alabama, 1975
14-8-2      Code of Alabama, 1975
41-22-3     Code of Alabama, 1975


U.S. Constitution XIV Amendment
U.S. Constitution Article VI [2][3]
Alabama Constitution of 1901

## REASON WHY WRIT SHOULD ISSUE

The Petitioner asserts that this writ should issue is because Petitioner has no other available remedy to rectify the wrong made against him. Specifically, the false and erroneous information that has been placed in his prison records which is perceived and relied upon as the truth. In the absence of a right of appeal, a party seeking review of a ruling by an administrative agency may petition the circuit court for a common law writ of certiorari. Ex parte Boykins, 862 So.2d 587 (Ala. 2002). A petition for a writ of certiorari is the proper vehicle for chalenging the administrative decision of a state agency. Edwards v. State, 866 So.2d 609 (Ala.Crim.App. 2003).

The Petitioner has a clear constitutional right to be free from arbitrary and capricious actions, especially from state governmental actions. The United States Supreme Court held the same in Wolff v. McDonnell, 418 US 539, 41 L.Ed.2d 935, 94 S.Ct. 2963 (1974), "The touchstone of due process is protection of the individual against arbitrary action of government." The Alabama Department of Corrections is recognized as a state government agency under Section 41-22-3(1) Code of Alabama, 1975; and thus, must provide and acknowledge the constitutional provisions mandated by the U.S. Constitution under the Fourteenth Amendment. Furthermore, the Alabama Department of Corrections should not rely upon false and erroneous information when making an administrative decision nor deny the equal participation of programs offered such as a lower level facility and custody level, if Petitioner meets the criteria as understood when Petitioner was recommended for the same in his "progress review form." This Court should issue said writ where Petitioner has a clear right to due process of law and to be made free from arbitrary actions that rely upon false and erroneous information that denied equal opportunity to participate in programs offered by the Alabama Department of Corrections.

## STATEMENT OF FACTS

On September 6, 2000, Petitioner entered a guilty plea upon a plea agreement made between the State of Alabama and himself for murder in violation of Section 13A-6-2 Code of Alabama, 1975; and was sentenced by the Circuit Court of Jefferson County to a term of twenty (20) years to serve in the State penitentiary.

On April 6, 2004, Petitioner appeared before a board of personnels employed by the Alabama Department of Corrections pursuant to a "special review" that recommended lower custody level (minimum) and to be placed at a lower level institution (level II). The Petitioner was required to sign a blank "progress review form" after a few inquiries concerning his religion and whether or not he's on prescribed medication. After a period of time, Petitioner received a copy of the said form via mail, and discovered that false information was written upon said form concerning his criminal conviction. Such false information that can be easily construed as particularly aggravated. Petitioner made several requests to remove such false information, and has yet to prevail. The specific false information is alleged that Petitioner struck the victim several times with a pistol until a part of it broke off and then the Petitioner shot him in the head. There is no evidence to support that Petitioner struck the victim with a pistol. At the preliminary hearing, a witness was specifically asked whether or not Petitioner struck the victim with a pistol, and said witness affirmatively answered, "no." The Petitioner struck the victim with his fist only.

1.

## ISSUES PRESENTED FOR REVIEW

I.    WHETHER OR NOT PETITIONER HAS A SUBSTANTIVE AND PROCEDURAL DUE PROCESS
      RIGHT PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTI-
      TUTION FROM ARBITRARY AND UNREASONABLE ACTIONS OF THE STATE GOVERNMENT OR
      HER AGENCIES OR AGENTS?


II.   WHETHER OR NOT PETITIONER'S RIGHT TO EQUAL PROTECTION OF THE LAW AND DUE
      PROCESS OF LAW PURSUANT TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES
      CONSTITUTION WAS VIOLATED WHEN FALSE AND ERRONEOUS INFORMATION WAS RELIED
      UPON A STATE ADMINISTRATIVE DECISION TO BE TREATED NOT ONLY DIFFERENTLY,
      BUT ALSO TO DENY HIM STATUTORY/DEPARTMENTAL RIGHTS TO A LOWER LEVEL SE-
      CURITY INSTITUTION AND/OR CUSTODY LEVEL?

2.

## ARGUMENT

The Petitioner avers that prisoners do not give up all constitutional rights when they are confined in penal institutions; prisoners retain, among other rights, freedom from invidious discrimination and guarantees of due process before they can be deprived of life, liberty, or property. Teat v. State, 636 So.2d 697 (Ala.Crim.App. 1993). This right is guaranteed and protected by the Fourteenth Amendment to the United States Constitution, and cannot be deprived nor infringed by state government or her department or agents. The Alabama Department of Corrections is an administrative agency within the scope of the Administrative Procedure Act (APA) pursuant to Section 41-22-3(1) Code of Alabama, 1975.

In the case sub judice where the fact reveals that the Petitioner was convicted and sentenced by the Circuit Court of Jefferson County for murder in violation of Section 13A-6-2 Code of Alabama, 1975. The said judgment was rendered pursuant to a guilty plea entered and accepted by said Court. However, the Alabama Department of Corrections has either placed or relied upon false information to construe that Petitioner's crime is particularly aggravated. How? By alleging that Petitioner "pistol whipped" the victim and afterwards shot him once in the head. There is no evidence whatsoever to support the assertion that Petitioner struck the victim with a pistol until a part of the pistol broke off. This assertion alone can easily be perceived and construed that Petitioner inflicted a beating with the weapon and then used it again by shooting him with said weapon. The term 'heinous' as used by the Alabama Department of Corrections is not the same as that utilized by the Code of Alabama and was not intended to be. 'Heinous' as used in making determinations of internal classification refers to offenses to be particularly aggravated. Thomas v. State, 867 So.2d 367, 371 (Ala.Crim.App. 2003). However, the said department has not specifically used the term 'heinous' but is construed the same. This case is analogous to Monroe v. Thigpen, 932 F.2d 1437 (11th Cir. 1991). In Monroe, supra, the Alabama Board of Pardons and Paroles relied upon false information that was placed in his prison files to deny him parole. The said Court held that this act treated Monroe arbitrarily

3.

and capriciously in violation of his due process right pursuant to the Four-
teenth Amendment of the United States Constitution. Furthermore, in Monroe,
supra, it was discovered that the false information was fabricated and relied
upon as the truth.

The Fourteenth Amendment to the United States Constitution mandates that
no state shall prohibit its citizens in its jurisdiction from due process of
law and the equal protection of the law. The phrase "due process of law"
conveys the same meaning as the phrase "law of the land" [nisi per legem
terrae]. Ex parte Melof, 735 So.2d 1172, 1199 (Ala. 1999). In Melof, supra,
the Alabama Supreme Court held that the Alabama Constitution has no equal
protection guarantee. Therefore, Petitioner invokes his protective rights
under the United States Constitution and under **Article VI [2]** of the foresaid
Constitution; and respectfully request that this Court be mande aware of
**Article VI[3]** of said Constitution and **Article I Section 279**[1] where both said
articles required this Court to support said Constitution. The "procedural
due process" and "substantive due process" which was not afforded unto the
Petitioner nor did he have a hearing upon the false information to verify said
information was the truth, even after Petitioner attempted several times unto
administrative personnels of the Alabama Department of Corrections that the
information was false.

Once it is determined that due process applies, the question remains what
process is due; that inquiry must begin with a determination of the precise
nature of the government function involved as well as of the private interest
that has been affected by governmental action. Kirby v. Siegelman, 195 F.3d
1285 (11th Cir. 1999). The Petitioner provides this Court with court docu-
ments and the medical examiner's report (autopsy) for this Court to take
**JUDICIAL NOTICE** pursuant to Rule 201 Alabama Rules of Evidence, and review
the same. The Court records shall show that the eyewitness gave testimony
under oath when asked whether or not Petitioner struck the victim with the
pistol, and said witness affirmatively stated, "no."

---

1. The Alabama Constitution of 1901.

4.

The Petitioner avers that the false information placed in his prison files substantially prejudice him.  In fact, the attached "progress review form" clearly shows that this information was relied upon in denying him the recommendation for a lower level facility and custody level.  The Petitioner made several inquiries as where this false information was retrieved, and was only told that the "PSI" (pre-sentence investigation report) contained said information.  Therefore, again, Petitioner assert that this instant case is analogous to Monroe v. Thigpen, supra.  The Eleventh Circuit recognized the rationale and reason made by Monroe in his argument, and respectfully request that this Court consider the same.

The Petitioner contends that he has the equal rights guaranteed by the Fourteenth Amendment to the United States to be treated the same as other prisoners whom have like crimes and sentences who are placed at lower level facilities and lower custody levels.  The Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction, the equal protection of the laws; the equality of the rights of citizens is a principle of re-publicanism.  Every republican government is in duty bound to protect all its citizens in the enjoyment of this principle.  That duty was originally assumed by the States, and it still remains there.  The only obligation resting upon the United States is to see that the States do not deny the right.  U.S. v. Cruikshank, 92 US 542, 23 L.Ed. 588 (1876).  The Petitioner prays that this Court ensure that this principle is not abridged not forsaken under Article VI[2] U.S. Constitution.

In Thomas, supra at 370, the Court stated that "the procedures required for due process vary depending on the circumstances; however, '[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" Mathews v. Elridge, 424 US 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), quoting Armstrong v. Manzo, 380 US 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d (1965). The Petitioner was not afforded a "due process hearing" to determine whether or not the information written upon the "progress review form" was true or not. Evidently, it is perceived to be true according to the Alabama Department of Corrections. The foresaid department or its personnels failed to provide Petitioner such a hearing nor was Petitioner "reclassified" after the false information was retrieved and placed in his prison records. According to Title 14 Section 14-8-2 Code of Alabama, 1975; the Alabama Legislature prescribed and promulgated said provision for the Alabama Department of Corrections full authority to adopt regulations and policies to implement programs. See also Section 14-3-47 Code of Alabama, 1975. Such programs are available if a prisoner first meets certain criterias such as the one recommended on the "progress review form" for 'any level II facility and 'minimum custody'. Now, the said department has five (5) types of custody: "maximum, close, medium, minimum, and community custodies. According to the Alabama Department of Corrections Classification Manual, each said custody requires a certain security level and criteria. The Petitioner meets the criteria for minimum custody, and recognized by his classification specialist whom made the recommendation to be placed in said category. However, the major factor in deciding to approve or deny such recommendation rested upon false and erroneous information, and said recommendation was denied. See "progress review form."

So I pray that this Honorable Court grant and issue said writ done on this _20th_ day of September, 2005.

Respectfully Requested,

Antonio D. Davis

Antonio D. Davis, pro se

7.

## RELIEF SOUGHT

1.    That this Honorable Court grant Petitioner's affidavit of substantial hardship for indigency status pursuant to Title 12 Section 12-19-70(a)(b) Code of Alabama, 1975 and to waive the initial filing fee whereby Petitioner may proceed and invoke the jurisdiction of this Court.

2.    That this Honorable Court require the Alabama Department of Corrections to respond to the averments herein and to produce any and all material documents to corroborate the false and erroneous information complained herein.

3.    That this Honorable Court review the documentary evidence disclosed by both parties and to determine the truth of the matter, and if more evidence is required to discern, order such requirement necessary.

4.    That this Honorable Court grant and issue the writ of certiorari and reverse the judgment made on April 14, 2004 (See "progress review form"); and order that the Alabama Department of Corrections review the recommendation without the false and erroneous information concerning the minimum custody and level II institution (lower security facility).

5.    That this Honorable Court issue the appropriate order to have the Alabama Department of Corrections and any other State department to expunge from its records, the erroneous and false information (pistol whipped victim or any other conjectures of the same).

6.    That this Honorable Court tax the Respondent all court costs and fees.

7.    That this Honorable Court grant any other relief Petitioner may be entitled as this Court deems just and appropriate.

8.

CONCLUSION

WHEREFORE, premises considered, Petitioner prays that this Honorable Court grant this instant request and the sought relief herein, and consider the allegations made by the Petitioner.  The Petitioner does not seek nor desire to pursue a civil suit against the Alabama Department of Corrections or her personnels, but only desire to be reconsidered for the minimum custody recommendation without the false and erroneous information as a basis for said recommendation, and to have the false information expunged permanently from all state department records (including Alabama Board of Pardons & Paroles) for the purpose and interest of truth and justice.

Done this the  20th day of September, 2005.

Respectfully Submitted,

*Antonio D. Davis*

Antonio D. Davis, pro se
A.I.S. No. 212703
Draper Correctional Center
P.O. Box 1107
Elmore, Al. 36025-1107

9.

## CERTIFICATE OF SERVICE

I hereby certify that on this ___20th___ day of September 2005, I personal-
ly served this petition for common law writ of certiorari unto:

> Honorable Melissa A. Rittenour, Clerk
> Montgomery County Circuit Court
> 251 S. Lawrence Street
> Montgomery, Al. 36104

by placing this instant petition in the U.S. Mail, First Class, postage pre-
paid and correctly addressed.

*Antonio D. Davis*
Antonio D. Davis, pro se

10.

<u>APPENDIX</u>


<u>Affidavit of Antonio D. Davis</u>

<u>Alabama Department of Corrections Progress Review Form</u>

<u>Preliminary Hearing Court Records (State v. Antonio Demetrius Davis)</u>

<u>Medical Examiner/Coroner Record (Autopsy Report)</u>

11.

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA


ANTONIO D. DAVIS #212703,         )

   Petitioner,             )

vs.                      )   Case No. _CV-05-2443_

ALABAMA DEPARTMENT OF CORRECTIONS,   )

   Respondent.          )

AFFIDAVIT


STATE OF ALABAMA          )

COUNTY OF ELMORE        )   ss: Affidavit of Antonio D. Davis

Before me, the undersigned Notary Public, in for said State and county, personally appeared Antonio D. Davis whom is known to me as such, first being duly sworn and deposes and states the following:

I am the Petitioner in the above entitled case and make this affidavit in good faith to support my common law writ of certiorari. I am presently imprisoned pursuant to a criminal judgment and in the custody of the Alabama Department of Corrections ("ALDOC") at Draper Correctional Center under the custodes of James DeLoach.

On April 6, 2004, I appeared before an open board for the purpose of an "annual review" or "special review" whereby I was recommended to be placed at any level II facility and recommended minimum custody. I was asked some specific questions such as my religion and prescribed medications. I was required to sign the "progress review form" wherein the 'justification' part was blank without any written words. However, I received a copy of the said form back later wherein I discovered the 'justification' part was written and untrue details of my criminal case was written upon said form. The specific

false information states that: "details reflects inmate and victim getting into an argument after the witness and inmate had been writing around drinking. The argument escalated into a fight. Inmate left and came back to the victim's residence w/a pistol. <u>Inmate pistol whipped the victim until part of the pistol broke off.</u> Inmate then stepped back and shot the victim once in the head. The victim died at the scene."

The above portion where it is emphasized is the untrue part that has been fabricated purposely. I personally do not know how this false information was obtained from, but it is definitely contrary to the truth of the matter wherein I have attached court records as well as the autopsy report that refute the above emphasized conjecture. I did not at any time "pistol whipped" the victim in the case for which I was convicted and sentenced upon.

AFFIANT FURTHER SAYETH NAUGHT!

SWORN TO and SUBSCRIBED before me this _17th_ day of September, 2005.

_____
Affiant

_____
Notary Public

My Commission Exp: _03-11-06_

2.

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ANTONIO D. DAVIS #212703,         )

    Petitioner,                )

vs.                         )    Case No. __CV-05-2463__

ALABAMA DEPARTMENT OF CORRECTIONS,  )

    Respondent.              )

<u>AFFIDAVIT</u>

STATE OF ALABAMA           )

COUNTY OF ELMORE          )    ss: Affidavit of Antonio D. Davis

Before me, the undersigned Notary Public, in for said State and County, personally appeared Antonio D. Davis whom is known to me as such, first being duly sworn and deposes and states the following:

I am the Petitioner in the above entitled case and make this affidavit in good faith to support my common law writ of certiorari. I am presently imprisoned pursuant to a criminal judgment and in the custody of the Alabama Department of Corrections ("ALDOC") at Draper Correctional Center under the custodes of James DeLoach.

On April 6, 2004, I appeared before an open board for the purpose of an "annual review" or "special review" whereby I was recommended to be placed at any level II facility and recommended minimum custody. I was asked some specific questions such as my religion and prescribed medications. I was required to sign the "progress review form" wherein the 'justification' part was blank without any written words. However, I received a copy of the said form back later wherein I discovered the 'justification' part was written and untrue details of my criminal case was written upon said form. The specific

false information states that: "details reflects inmate and victim getting into an argument after the witness and inmate had been writing around drinking. The argument escalated into a fight. Inmate left and came back to the victim's residence w/a pistol. <u>Inmate pistol whipped the victim until part of the pistol broke off.</u> Inmate then stepped back and shot the victim once in the head. The victim died at the scene."

The above portion where it is emphasized is the untrue part that has been fabricated purposely. I personally do not know how this false information was obtained from, but it is definitely contrary to the truth of the matter wherein I have attached court records as well as the autopsy report that refute the above emphasized conjecture. I did not at any time "pistol whipped" the victim in the case for which I was convicted and sentenced upon.

AFFIANT FURTHER SAYETH NAUGHT!

SWORN TO and SUBSCRIBED before me this ___17th___ day of September, 2005.

Antonio D. Davis
Affiant

John K. Boulon
Notary Public

My Commission Exp: 03-11-04

2.

ALABAMA DEPARTMENT OF CORRECTIONS

DISC: HAS RECEIVED NO DISCIPLINARIES

WL/PGM: _____

RECOMMENDED INSTITUTION: _____ RECOMMENDED CUSTODY: _____

JUSTIFICATION: Inmate is being considered for a lesser restraint placement per Directive of the Director of Classification. Detail reflects inmate and Victim getting into an argument after the witness and inmate had been drinking. Disagreement escalated into a fight. Inmate left and came back to the Victim's residence w/ a pistol. Inmate pistol whipped the Victim until part of the pistol broke off. Inmate then stepped back and shot the Victim once in the head. The Victim died at the scene.

I CERTIFY ENEMY LIST WAS REVIEWED AND UPDATED: _____ APP. S/L: _____

CLASSIFICATION SPECIALIST ____ DATE    WARDEN OR DESIGNEE ____ DATE

PSYCHOLOGIST/PSYCHOLOGIST'S ASSOC. DATE    CLASSIFICATION COORDINATOR DATE

CENTRAL REVIEW BOARD ACTION

_____ APPROVED __X__ DENIED; DIVERTED TO: _____ REASONS: _____

_____ APPROVED __X__ DENIED; DIVERTED TO: _____ REASONS: _____

_____ APPROVED _____ DENIED; DIVERTED TO: _____ REASONS: _____

CRB MEMBER

RECEIVED APR 21 2004 CLASSIFICATION DRAPER C. CENTER

FINAL DECISION: INST DCC CUSTODY _____ DATE _____

DATE INMATE INFORMED: _____ INMATE'S SIGNATURE: _____

DAVIS PRELIMINARY HEARING
PAGE 1

ERM:  I'm going to record this.

DA:  If there is a stipulation for the court as to the identity of
the victim in this case which is very vague, _____gunshot wound to
the head and this incident happened in the Birmingham District of
Jefferson County.  State your name please.

DD:  Donald Davis.

DA:  And Mr. Davis _____on April 29, 1997,_____April 28, 1997, did
you have an occasion to see Gary Wade?

DD:  Yes.

DA:  And how do you know Gary Wade?

DD:  It's my brother.

DA:  Is he a half brother?

DD:  Yes.

DA:  And what name did he go by?

DD:  Gary.  They called him Gabe.

DA:  Gabe?  And that was like a nickname?

DD:  Yes.

DA:  OK.  On the early morning hours of April 29, 1997 did you have
an occasion to be at the house where Gabe was?

DD:  Yes.

DA:  Can you tell us what happened _____at that time?

DD:  That guy right there, Tony, yeah Antonio.

DA:  Are you kin to Antonio?

DD: No.

DA:  OK.  And you and Antonio, had yall been together earlier that
evening?

DD:  Yes.  We had been over at his mother's house working on her
car and then we was out riding around and came back, they start
arguing with me, Tony jumped up in the middle, I guess he thought
Gary was arguing with him but it wasn't...

DAVIS PRELIMINARY HEARING
PAGE 2

DA:

DD:  Yes.

DA:  And was there anyone else there with yall at that time?

DD:  Yeah, J_____.  J_____ Foster.

DA:  _____together, it was an argument between who first?

DD:  Me and Gabe.

DA:  You and Gabe?

DD:  Yeah.

DA:  After yall got into an argument what _____happened next?

DD:  Nothin, Tony just jumped up and started arguing with him and
Tony just start arguing, and he went to harrassing him, and stopped
that, he left out the house, went up there and got the gun, come
back punched him a couple times, and then he shot him.

DA:  And _____

DD:  Tony.

DA:  The man who is sitting here?

DD:  Yeah.

DA:  OK.  Once the **argument** insued between Tony and Gabe, was there
any words exchanged before he went out of the house?

DD:  He was harassing him, no I don't believe so.

DA:  OK.  When he went out of the house, how long did he stay out
of the house?

DD:  It couldn't have been no more than about 10 seconds or
something like that.

DA:  OK.  Once he went out of the house what did you find about him
different when he came back in the house?

DD:  He had a gun in his hand, and he was pointing it.

DA:  OK.  Who did he point it at first?

DD:  He pointed it first at Kenneth(?).

DAVIS PRELIMINARY HEARING
PAGE 3

DA:  OK.  What did he tell Kenneth when he pointed it at him?

DD:  That he was gonna bust him if he moved.

DA:  OK.  And where was Kenneth at this time?

DD:  Sitting on the couch by the door.

DA:  And _____told him that, who did he point the gun at next?

DD:  Then he pointed the gun at me.

DA:  OK.  And what did he tell you?

DD:  He told me he was gonna bust me.  He told me that three times.

DA:  OK.  And where were you in proximity to Gary and Kenneth at
that time?  Were yall in the same rooom?

DD:  Yeah. I was like standing in the bedroom door, then I started
walking towards him and he pointed the gun at me like three times
and when I took a step to him, and he raised the gun and said, "I'm
gonna bust you,"  I took another step, "I'm gonna bust you,".  I
was like, "Tony! What's wrong, man?"  "I'm gonna bust you Don."

DA:  And after he said that three times....

DD:  Then I walked back, he held a gun on Gabe, punched him___ and
then pulled the trigger, that's what he did.

DA:  Ok, when he punched him, did he hit him with the gun?

DD:  No.  With his fist.

DA:  Did you see the part of the gun_____.

DD:  What do you mean by that?

DA:  Did you see the features of the gun?

DD:  No.

DA:  You didn't.

DD:  No.

DA:  After he punched him a few times, tell us how he shot him.

DD:  Right there in the head.  He pulled the trigger, pow.  He put
the gun down there and shot him, boom.

DAVIS PRELIMINARY HEARING
PAGE 4

DA:  In the head?

DD:  Yeah, and that was it.

DA:  OK.  And _____.

DD:  Right by the bathroom, it's a little hallway like.  The bathroom here and my bedroom here, and he was standing right in the doorway.

DA:  And you could see into the livingroom from that area.

DD:  Yeah.

DA:  Once Tony shot him, what do you think happened next?

DD:  Then he said, "Oh I done shot Gary,"  I say, "No you didn't, you killed my brother."  For no reason.

DA:  And then what did you do?

DD:  I don't know, I just...my mind just...

DA:  OK.  At that point, did Tony leave, or did he stay in the house?

DD:  He left.  He left.

DA:  And did the police come at that time?

DD:  Yeah.

DA:  There's no further questions at this point, your honor.

ERM:  Mr. Davis, what time that day did you and Tony first get together?

DD:  About 1:00, 12:30-1:00 that afternoon.  His mother had called over to the house saying her car wouldn't start up.  So I got and went over to his mother's house, cranked her car up for her.  Then we left, and did a little bit of drinking....

ERM:  Prior to this incident happening, you and Antonio, your family and Antonio's family were friends, is that not true?

DD:  Correct.

ERM:  Alright.  As a matter of fact, yall still stay in ____with his mother, is that correct?

DAVIS PRELIMINARY HEARING
PAGE 5

DD:  Yeah.

ERM:  Alright.  When yall got together around 1:00 to work on her car, was that over at her house?

DD:  Yeah.

ERM:  How long did yall work on the car that day?

DD:  Until probably about 4:30 or 5:00, right around in there.

ERM:  Alright.  What was wrong with it that you know?

DD:  I really didn't know, it was a deisel, I, like, told them when I first went over there, I really didn't think I could start the car, but then I thought about something else might've been_____with the starter fluid so I went and bought some of that and the car cranked up.

ERM:  So you got it running?

DD:  Yeah.

ERM:  And it was 4:00 or 4:30 when yall got through.  Where did yall go then?

DD:  Ah, ok.  Where did we go?  We went, we went to the store, that's where we went after that, we went to the store.

ERM:  Did yall buy, what did yall buy at the store?

DD:  Two fifths of Grape Rose.

ERM:  Is that wine?

DD:  Yes.

ERM:  Who all was with you?  Just you and Antonio?

DD:  Just me and Antonio.

ERM:  Did yall drink the two fifths of Grape Rose?

DD:  Yes.

ERM:  When did yall get through drinking the two fifths?

DAVIS PRELIMINARY HEARING
PAGE 6

DD:  Probably about 6:00 or 6:30, I really don't know the time, but
it was still daylight then.  We went down, somewhere down on the
other side of...I don't know the street, but it's a little
apartment complex down at ____Gardens down there, they had went and
ah...bought some kind of liquor.  I don't know what he was
drinking.  Two other guys.  And we just stood around talking to
them and then we went and got...the guy got in the car with us...

ERM:  Were yall drinking down there too?

DD:  Yeah.

ERM:  What were yall drinking down there?

DD:  The Rose.

ERM:  Yall hadn't finished the Rose?

DD:  NO.

ERM:  OK.  When you finished drinking the Rose, did yall get
anything else to drink?

DD:  Yes.

ERM:  When was that and where did you get it?

DD:  I don't know where they got it...The guy that was with...that
Tony had picked up down there, he went and bought a fifth, and
another liter of Red Rose.

ERM:  Did yall drink that?

DD:  Yes we did.

ERM:  When did yall finish drinking that other fifth and that other
liter of Red Rose?

DD:  Probably about....I think it was about....about an hour
after...there was...maybe two hours.

ERM:  So it was about 8:00?

DD:  Yeah, I figure it was about 8:00 or 9:00.

ERM:  Did yall drink anything else?

DD:  Yes.

ERM:  Where did yall go to get it?

DAVIS PRELIMINARY HEARING
PAGE 7

DD:  We went and bought another thing of Rose.

ERM:  Another fifth or another liter?

DD:  It was a pint.

ERM:  It was a pint.  Was that Red Rose?

DD:  No.  Yeah that was the Red again.

ERM:  OK.  And where did yall drink that?

DD:  It was about 11:00 or 11:30 when we was drinking on that.

ERM:  Alright.  Did yall drink anything else?

DD:  No.  We was...we had that when we came to the house.

ERM:  OK.

DD:  And so, why we came to the house, we had left with a guy name Carlton.  He was with us in the car at the time when we went and bought that last one just before he shot my brother.

ERM:  Who is Carlton?  Who is he?

DD:  He stay like two doors away from his mother, grandmother.

ERM:  Is Carlton his first name or his last name?

DD:  His first name.

ERM:  Do you know his last name?

DD:  I think it's Finley.

ERM:  Alright.  Yall came to your house and yall had that pint of Red Rose that yall were drinking then, is that right?

DD:  Yeah, because the cops was following us when we was drinking it so when we got in the parking lot, we just got out the car and started walking.  After that.

ERM:  That was about 11:00 or 11:30?

DD:  That was probably about 12:00.

ERM:  OK.  About 12:00.  And when you got to your house, who was there?

DAVIS PRELIMINARY HEARING
PAGE 8

DD:  Gary and Kenneth.

ERM:  Gary and Kenneth?  Did they know Antonio and did he know them?

DD:  Yeah.

ERM:  And had they known one another a long time?

DD:  Well just as long as we been up here.

ERM:  Which is how long?

DD:  Gary probably beeen up here about a year and a half, probably. And I haven't been up here about a year.

ERM:  Alright.  But yall were all friends.

DD:  Yeah.

ERM:  Kenneth was a ____?  ____?

DD:  No.

ERM:  What was he doing?

DD:  He was sitting on the couch.

ERM:  When yall walked in did Gary get on to you about smoking his cigarettes and yall had some kind of argument?

DD:  Yeah.

ERM:  What was it about?

DD:  Just nothing.  He just normally argue with me like every day or every other day he argue with me.

ERM:  He hadn't been drinking though, had he?

DD:  No.

ERM:  But you had?

DD:  Right.

ERM:  Alright.  Do you remember what the argument was about?

DD:  What that me and Gary had?

DAVIS PRELIMINARY HEARING
PAGE 9

ERM:  Yeah.

DD:  No.  What brothers would normally have.  Just like you go on argue with your brother when he did something you thought was wrong.

ERM:  But you don't remember what it was?

DD:  Probably cigarettes or something like that.

ERM:  Well.  Did you argue back?

DD:  No I wasn't going to argue back, I just looked at him and laughed and start walking toward the bathroom.

ERM:  And you went in another room didn't you?

DD:  Right.

ERM:  Do you know whether Gary accused Antonio of smoking his cigarettes?

DD:  No.  He didn't accuse him.

ERM:  While you were out of the room could you hear him?

DD:  No, I didn't hear that.

ERM:  OK.  But what I mean is while you were out of the room, you would not have been able to hear sny discussion the two of them had while you were gone.  Is that correct?

DD:  They were arguing, they weren't discussing.  They weren't talking low, they were arguing loud, sir.

ERM:  OK.  What were they arguing about?

DD:  I don't know why Tony start arguing with Gary.  They arguing about something that happened four or five months ago.

ERM:  You don't know what it was?

DD:  I don't have no idea.  He know.  He know.

ERM:  How long were you in the bathroom?

DD:  Long enough to use the bathroom and come back out.

ERM:  Alright, when you came back out, what was happening?

DD:  They was wrestling on the floor.  They were at each other...

DAVIS PRELIMINARY HEARING
PAGE 10

ERM: They were fighting.

DD: No, wrestliing...yeah, you could call it fighting if that's what you call it, I call it wrestling.

ERM: OK. The two of them were down in the floor.

DD: Yeah. Then they got up, looked at each other, about ten seconds Tony looked at Gabe, Gabe looked at Tony, he walked out the house and then he ran back in with the gun.

ERM: You weren't in there when they started wrestling were you?

DD: Yeah. When they started wrestling....This is what happened:

ERM: Alright.

DD: They was standing up by the couch. Alright. And they were in each other's face. Then they ran into my next door neighbor's wall which knocked down they stuff. Then I told them, "Yall need to stop." They was on the floor. Then Tony pushed him back towards the couch. Then they was on the floor. They got up, Tony looked at him, Gary looked at him, and then he walked out the door and come back with the gun.

ERM: _____. When they were standing there arguing, isn't it true that Gary rushed Tony? ____him all the way up against the other wall, and that's when they ended up in the floor?

DD: Alright.

ERM: Is that true?

DD: They was wrestling, yeah.

ERM: Isn't it true that Gary rushed Tony right until he was up against the wall and that's when they went to the floor. They wrestled on the floor and then Tony shoved Gary back toward the couch and that's when they separated.

DD: Alright.

ERM: Is that correct?

DD: Correct.

ERM: So Gary was the first one to engage in any physical touching of the other. He rushed Tony and knocked him up against the wall, isn't that the way it started?

DD: No.

DAVIS PRELIMINARY HEARING
PAGE 11

ERM:  How did it start?

DD: Tony started it.

ERM:  Well, didn't you testify just a minute ago that Tony was rushed against the far wall?

DD:  They was wrestling, right.  They was both touching each other at the same time.  Gary did not grab him or touch him before Tony...they both ran, and they was wrestling to the wall, and they came back and fell on the floor.

ERM:  So they just decided at the same time to start that?  Is that what you are saying?

DD:  Yeah.

ERM:  They both got up and Tony went outside?

DD:  Right.

ERM:  Do yall have a porch outside the house, was he out on the porch?

DD:  You could say...yeah there's a porch.  It's just like a little concrete slab, that's all it is.

ERM:  Well isn't that where he went?  Out there on the concrete slab?

DD:  Yeah, he went outside.  Then he came back.

ERM:  I understand.  But he wasn't out there but about 10 seconds was all he was out there then?

DD:  Yeah, that's all prob...

ERM:  He wasn't out there long enough to go to the car or go next door or go over to a friend's house or anything then?

DD:  No, I don't believe so.

ERM:  He wasn't out there long enough to go somewhere else and get a gun, was he?

DD:  He had the gun.

ERM:  He already had it?

DD:  He had the gun with him.

DAVIS PRELIMINARY HEARING
PAGE 12

ERM:  How did you know that?

DD:  I seen it with him all day that day.  Yeah.

ERM:  Where did he have it?

DD:  He had it in his..he had it in his back.

ERM:  In the back of his waistband?  In his pants?

DD:  Right.

ERM:  You had seen it earlier that day.

DD:  Right.

ERM:  So we're not talking about him going outside and going somewhere and getting a gun and coming back, he already had a gun.

DD:  He went out the door and come back in the door with the gun.

ERM:  Alright.  But he had the gun all the time.

DD:  He had the gun all the time.

ERM:  He came back in when you were in the doorway of the bedroom next to the room where Gabe is.

DD:  Gabe was in the bathroom, I was in my bedroom, correct.

ERM:  And Kenneth was on the couch?

DD:  Correct.

ERM:  And after he came back in did he first point the gun at Gary?

DD:  No.

ERM:  He didn't?

DD:  No.

ERM:  Is it your testimony that he first pointed the gun at Kenneth?

DD:  Correct.

ERM:  Told Kenneth he would bust him if he came any closer?

DD:  If he got up he would bust him.  He was sitting down.

DAVIS PRELIMINARY HEARING
PAGE 13

ERM:  Then he pointed it at you.

DD:  Right, cause I was walking towards him.

ERM:  Were you on one side of the room and Kenneth on the other side and Gary somewhere in the middle?

DD:  I'm right here and Gary's standing like right there.

ERM:  Where's Kenneth?

DD:  Kenneth sitting right about where you sitting at.

ERM:  And where was Antonio then?

DD:  He was standing about right there in the middle pointing the gun at everybody.

ERM:  So who would be between...would Gabe be between you and Kenneth or you in between Gary and Kenneth or would Kenneth be between you and Gary.

DD:  I would be between Gary and Kenneth.  I would say that.  In the angle that...You need to come to my apartment and look and then you would understand what I'm saying.

ERM:  Yes sir.

DD:  But me and Gary was standing like side by side, Kenny he_____.

ERM:  How close together were yall?  Was it a small room?

DD:  How close?  I'd say like maybe four feet apart maybe.

ERM:  OK.  Did you have a gun?

DD:  No.

ERM:  Did Kenneth have a gun?

DD:  No.

ERM:  Did Gary have a gun?

DD:  No.

ERM:  And your testimony is that after he pointed his pistol at Kenneth he told he'd bust him, then you took a step toward him and he pointed it at you.

DD:  Right.

DAVIS PRELIMINARY HEARING
PAGE 14

ERM:  And he told you three different times, "I'll bust you if you come any closer."

DD:  Right.  I took three steps.  Each time I took a step he pointed that gun at me.

ERM:  Is it your testimony that he approached Gary and pulled a pistol on him?

DD:  After he came in the house?

ERM:  Yes.

DD:  Yeah.

ERM:  How close was he to Gabe while he held the pistol on him?

DD:  From about...from here to about right there.  Maybe five feet. Four or five feet.

✳ ERM:  Was there a time, according to your testimony earlier, that he held a pistol on Kenneth and also hit Kenneth with his fist?

DD:  He didn't hit Kenneth.

✳ ERM:  I meant Gary.  I beg your pardon.  He held the pistol on Gary and hit Gary with his fist?

DD:  Right.

ERM:  How many times did he hit him?

DD:  Three times.

ERM:  _____he was holding the gun while he was hitting him.

DD:  Right here.

ERM:  He was holding the gun at his head?

DD:  Righ here, pointed it at his head, right.

✳ ERM:  How far was the pistol from Gary while he was puching him with his other fist?

DD:  About like that.

ERM:  About six inches.

DD:  Like that.

DAVIS PRELIMINARY HEARING
PAGE 15

ERM:  Where was he hitting Gary?

DD:  In the face.

ERM:  Was it with his right hand or his left hand or do you recall?

DD:  With his right hand.

ERM:  He was hitting him with his right hand in the face, he was holding the pistol with his left hand.

DD:  Right.

ERM:  After he hit him the third time, what if anything happened then?

DD:  He pulled the trigger.

ERM:  And what did he do when he pulled the trigger?

DD: "Oh, I done shot Gary."  That's the exact words came out his mouth.  "No, you killed my brother," that's what I told him.

ERM: Let me ask you this:  Considering that this on tape, isn't it possible that while he was hitting your brother that the gun went off accidently?

DD:  NO!  NO!  NO!

ERM:  Would that not explain his response when he looked at you and said..

DD:  NO!

ERM:  "Oh, I done shot Gary."

DD:  No that wasn't it.  He wanted to shoot my brother.  He wanted to do that.  Cause he had all the opportunities to stop before it even got that far.  He wanted to do that.

ERM:  He hit him three times while he was holding the pistol on him.

DD:  Right.

ERM:  Was that three quick times, or was there a space in between or just pap, pap, pap.

DD:  There you go, that's how it is.

ERM:  Like that?

DAVIS PRELIMINARY HEARING
PAGE 16

DD:  Like that.

ERM:  And the next thing that happened, the gun goes off?

DD:  Then he held the gun then he just did like that.

ERM:  Tell me what he did.

DD:  He hit him 3 times and he pulled the trigger.  I was like,"You killed my brother."  You know you did it!  And it wasn't no accident.  It was no accident.  That what he want you to.... but it was not an accident.  Ain't no way.  No accident.

ERM:  What did he do at that point?

DD:  After he shot my brother?  He stared there.  Then he went out the door, got in the car with some little girl, I don't know her name, and they left.

ERM:  What happened with the gun?

DD:  He took the gun with him.

ERM:  Did part of the gun fall off in the floor?

DD:  Aint no part of the gun fell off in the floor...no.

ERM:  If it did, you didn't see?

DD:  The gun aint fell apart.

ERM:  Was there another gun there?

DD:  No there was no nother gun in the house.

ERM:  The gun that he fired do you know if it was an automatic or a revolver.

DD:  Automatic.

ERM:  What color was it?

DD:  Brown and black.

ERM:  Brown and black.  Can you describe it any further.

DD:  380. Luger.

ERM:  Have you had occasion to see that gun, or a gun similar to that since that incident occurred?

DAVIS PRELIMINARY HEARING
PAGE 17

DD:  No, I haven't seen the gun since that.

ERM:  Your description of the gun is from your memory of what happened that night.

DD:  And before.  He always flashed the gun around.

ERM:  So you knew it.

DD:  Yeah.

ERM:  How old was Gary?

DD:  29, I believe.

ERM:  Is it your testimony that this pistol was no more than 6 inches from him when he was shot?

DD:  Correct.

ERM:  Would Kenneth have been on Antonio's left at the time this happened.

DD:  Yes, I would say so.

ERM:  Would you have been on Antonio's right?

DD:  Correct.

ERM:  And that's when _____up there hitting him.  Gary.

DD;  Yeah.

ERM:  Thank you Mr. Davis.

DD:  Yeah.

JUDGE:  Anything else you want_____you may leave or you may remain in the courtroom, it's up to you.

ERM:  Judge, I don't recall whether the state ____or not but we did have a situation_____copies of_____not going to call any witnesses_____.

Judge:  _____to the Grand Jury_____.


DD:  Correct.

# JEFFERSON COUNTY CORONER
## MEDICAL EXAMINER OFFICE
1515 South 6th Avenue
Birmingham, Alabama 35233

*Gillia* (signature)

**AUTOPSY NO:** 97-568

**NAME:  GARY WADE**

**DEATH:**  Date:  _4/29/97_

Hour:  _0110_

**AUTOPSY:**  Date:  _4/29/97_

Hour:  _0800_

**AGE:** 29  **RACE:** Black  **SEX:** Male  **HEIGHT:** ____ inches  **WEIGHT:** ____ pounds

**PATHOLOGIST:** Dr. Falzon/Dr. Simmons     **DEPUTY CORONER:** Ronnie Williams

## FINAL ANATOMICAL DIAGNOSIS

1.  Penetrating gunshot wound to the head with subsequent perforation of the left cerebral hemisphere.

2.  Superficial lip mucosal lesions and skin abrasion foci as described.

**CAUSE OF DEATH:**     Gunshot wound to the head.

**MANNER OF DEATH:**     Homicide.

_(signature)_ 5/7/97.
Andrew L. Falzon, M.D.
**Forensic Pathology Fellow**

_(signature)_ 5/7/97
Gary T. Simmons, M.D.
**Associate Coroner/Medical Examiner**

GTS/cy

# CORONER/MEDICAL EXAMINER
## JEFFERSON COUNTY, ALABAMA

*Copy*

FILE NO: __97-568__

IMMEDIATE CAUSE OF DEATH _____

AUTOPSY: _____ YES _____ NO

(1) DUE TO: _____

EXTERNAL ONLY: _____ YES _____ NO

BY: __DR. SIMMONS__
      Pathologist

(2) DUE TO: _____

MANNER OF DEATH: _____

DECEDENT __GARY WADE__

AGE/RACE/SEX __29 B/M__    MARITAL STATUS _____

ADDRESS __1737 33RD. ST. NO. B'HAM. 35234__

D.O.B. __07-29-67__

DATE OF INJURY __04-29-97__    TIME __APPROX. 0105__    HOW INJURED __G.S.W. (HEAD)__

INJURY AT WORK? __NO__    PLACE OF INJURY __RESIDENCE__

DATE & TIME FD. __SEE TIME OF INJURY__    TIME LAST SEEN ALIVE _____

DATE & TIME OF DEATH __04-29-97 PRO. 0110__    PLACE OF DEATH __SCENE__

CONDITION OF PREMISES __SEE NARRATIVE__    RIGOR _____    LIVOR _____    TEMP __WARM__

HOSPITAL CHART # _____    GUN TYPE __H-380-A__    SCENE VISITED __YES__    TIME __0126__

__04-29-97__
Date

__RONNIE WILLIAMS__
Deputy Coroner

## PARTICULARS SURROUNDING DEATH

File        97-568

Page No.        1

See attached sheet for "Particulars Surrounding Death"

PEG-1 (REVISED 81)



PARTICULARS SURROUNDING DEATH

File        97-568

Page No.        2

ACCORDING TO POLICE, A WITNESS STATED THAT DEC AND THE SUSPECT WERE ARGUING AND FIGHTING. SAID WITNESS STATED THAT HE GOT UP TO SEE WHAT WAS GOING ON WHEN HE SAW THE SUSPECT SHOOT DEC. POLICE AND PARAMEDICS WERE CALLED AT THAT TIME AND DEC WAS PRONOUNCED DEAD ON THE SCENE. DEC AND THE SUSPECT WERE SAID TO HAVE BEEN STANDING APPROX. 3' APART AT THE TIME OF THE INCIDENT.

SCENE EXAMINATION: DEC WAS OBSERVED IN A SITTING POSITION ON THE HALL FLOOR, JUST OUTSIDE THE BATHROOM DOOR. HIS BACK WAS RESTING AGAINST A CLOSET DOOR. A DEFECT CONSISTENT WITH A GUNSHOT WOUND WAS NOTED TO HIS HEAD. BLOOD SPATTERS IN THE HALLWAY WERE CONSISTENT WITH DEC BEING IN A STANDING POSITION, NEAR THE BATHROOM DOORWAY, FACING THE HALL AT THE TIME OF THE SHOOTING. WHEN DEC WAS MOVED, A SPENT CASING (WINCHESTER 380) WAS OBSERVED NEAR WHERE HIS RIGHT ARM WAS RESTING. A PIECE OF THE SUSPECT WEAPON (PART OF THE TRIGGER GUARD) WAS OBSERVED NEAR WHERE HIS LEFT ARM WAS RESTING.

NO CLOTHING NEEDED TO BE RETAINED AS EVIDENCE.

97-568
GARY WADE

**DESCRIPTION OF CLOTHING:** The decedent has on a white T-shirt. There is diffuse blood staining involving the right upper shoulder area which extends down the right axillary line covering a total area measuring approximately 14 x 12 inches. This staining also involves the entire right sleeve. The front of the shirt is otherwise remarkable for widely scattered blood stains which are documented photographically with the front of the shirt in total being approximately 25% involved by blood staining. The back of the shirt is remarkable for diffuse blood staining involving the right half of the back. Additionally, along the entire inferior aspect of the right sleeve and extending approximately half way down the right axillary line there is an approximate 14 inch long defect. The back of the shirt is otherwise remarkable for irregular blood staining involving the left back which is discontinuous with the back of the shirt in total being approximately 70% involved by blood staining.

The decedent has on a pair of tan boxer type shorts. The shorts are remarkable for generally circular discontinuous blood staining on the front of the shorts, particularly on the right side. The front of the shorts in total are approximately 25% involved by such blood staining. Essentially the entire back of the shorts are involved by blood staining with essentially the only spared areas being the waistband focally and the left lateral side focally. Additionally, the blood staining overlying the left lateral buttock region has a somewhat linear pattern type arrangement covering a total area measuring approximately 7 x 4 inches. This is all documented photographically.

**EXTERNAL EXAMINATION:** This is the body of a 67 inch 132 pound black male. The head is covered by short black hair with there being a penetrating gunshot wound injury in the region of the forehead at the approximate hairline which will be subsequently described. Additionally, involving the right forehead there is a .4 inch superficial laceration. The eyes are brown with the conjunctivae and sclerae being unremarkable. The sclerae however do appear to be slightly "muddy". The nasal septum is intact to inspection. The nose is intact to palpation. The teeth are natural and are intact. There is a .3 x .1 inch area of maroon discoloration involving the buccal mucosa of the lower lip in the

1

97-568
GARY WADE

approximate midline with there being a .3 inch laceration with a surrounding .5 inch contusion on the buccal mucosa in the region of the left corner of the mouth. There is a neatly trimmed facial mustache and goatee with a moderate amount of growth of hair overlying the chin. The ears are remarkable for there being blood coming out of both external auditory canals. Overlying the right chin there is a 1.5 x 1.0 inch area contains discontinuous somewhat linear scars.

The skin of the neck is remarkable for there being .1 and .2 inch superficial abrasion foci on the left side of the lower neck immediately superior to the left clavicle.

The chest and abdomen are unremarkable.

The genitalia are remarkable for depigmentation focally involving the glans penis and the foreskin. This pigmentation appears to be natural in etiology.

All of the extremities are intact to palpation. There is a trivial roughly circular scar involving the lateral aspect of the left upper arm with there being .7 x .1 inch area of faint maroon discoloration overlying the left biceps. The left upper extremity is otherwise unremarkable. The fingernails extend .1 inch past the fingertips and generally have dirt underneath them with the fingernails generally being intact and unremarkable. Involving the dorsal aspect of the dorsal aspect of the right hand there is a .2 inch abrasion foci. The right upper extremity is otherwise unremarkable.

Overlying the region of the right knee there is a 3.5 x 1.5 inch area containing discontinuous approximate .3 to .6 inch abrasions. Overlying the region of the left knee there is a 3 x .6 inch area containing discontinuous abrasions. The lower extremities are otherwise remarkable for there being a coroner's tag around the left foot identifying the decedent as Gary Wade. Additionally, on the dorsal aspect of the left foot immediately proximal to the left toe there are .2, .2, and .1 inch superficial abrasion foci.

2

97-568
GARY WADE

The back is remarkable for there being 1.5 x .4 inch abrasion overlying the right upper shoulder immediately lateral to which there are superficial .4 and .2 inch abrasions. Immediately to the left of the midline of the back there is a 2.7 inch linear scar with the buttocks and anus being unremarkable.

There are no palpable axillary lymph nodes with there being "shotty" inguinal lymph nodes. There are no acute needle puncture marks or track marks appreciated.

EVIDENCE OF INJURY: Located 3.3 inches below the top of the head and centered .3 inch to the left of the midline there is a 2.2 x 1.1 inch stellate skin gunshot wound. Along the superior border of this stellate wound there is .35 x .15 inch focal area of soot/gunpowder residue deposition with there being a .45 x .15 inch area of soot/gunpowder residue deposition laterally on the skin of the edge of the wound. Along an inferior skin flap there is a .25 inch roughly circular abrasion. When the skin flaps are re-approximated this abrasion is separated from the inferior edge of the apparent main entrance defect by an approximate .15 inch segment of skin. In the soft tissue immediately underlying the wound track there is obvious gunpowder residue deposition. There is no obvious significant gunshot residue deposition on the outer table of the skull. There is a .6 x .4 inch underlying bony defect in the skull with inward beveling. There are no bony fractures directly radiating from the entrance gunshot wound. Additionally, on the inner aspect of the calvarium there is approximately a .7 x .3 inch band of light gunpowder residue deposition immediately to the right of the entrance defect. This is documented photographically. Additionally, immediately superior to the main entrance defect on the inner table of the calvarium there is approximately a .3 inch area of light brown apparent gunpowder residue deposition separated from the main entrance defect by a .2 inch segment of uninvolved bone. There is a rim of gunpowder residue deposition on the outer aspect of the dura around an underlying corresponding defect in the dura. There is however no significant gunpowder residue deposition on the corresponding inner aspect of the dura. There is an underlying gunshot wound track which enters the medial aspect of the left frontal lobe. The wound track is essentially horizontal and moves to the left through the

3

97-568
**GARY WADE**

white matter of the anterior aspect of the left cerebral hemisphere. The wound track leaves the left cerebral hemisphere laterally at the approximate level of the basal ganglia (in the coronal plane). The projectile then apparently ricochets along the inner aspect of the skull with the projectile being recovered superficially embedded in the medial aspect of the region of the pole of the left occipital lobe. There is no definitive intraparenchymal wound track connecting where the wound track exits the left cerebral hemisphere to where the projectile is subsequently recovered in the medial aspect of the left occipital lobe. The brain is furthermore remarkable for there appearing to be punctate hemorrhages within the pons and, to a greater extent, within the medulla. The dura is reflected revealing extensive fractures involving the anterior middle cranial fossae bilaterally as well as hairline type fractures involving both middle cranial fossae. The skull is otherwise intact, including the calvarium.

**INTERNAL EXAMINATION:** There no significant pleural or abdominal fluid accumulations. The rib cage and vertebral column are intact. There are a few flimsy left sided pleural adhesions.

**NECK:** A stepwise neck dissection is performed. It is unremarkable. The hyoid bone and thyroid cartilage are intact. The tongue is unremarkable to external and internal examination.

**CARDIOVASCULAR SYSTEM:** The epicardial surface of the 300 gram heart is unremarkable. The coronary artery ostia are unremarkable. The coronary arteries are widely patent. The myocardium is homogeneously maroon and is unremarkable with the valves being unremarkable. The aorta is free of any significant atherosclerosis.

**RESPIRATORY SYSTEM:** The larynx and trachea are generally maroon. The secondary bronchi of the 430 gram right lung and 400 gram left lung are remarkable for being moderately to completely occluded by mucoid maroon material. The pulmonary vasculature is unremarkable with the pulmonary parenchyma on internal examination otherwise being unremarkable.

**HEPATOBILIARY SYSTEM:** The 1530 gram liver has an intact

4

97-568
**GARY WADE**

capsule. The parenchyma internally is brown and of unremarkable consistency with no gross fatty change or fibrosis. The gallbladder is present and is unremarkable.

**SPLEEN:** The 70 gram spleen has an intact capsule with homogeneously maroon parenchyma upon internal examination.

**ENDOCRINE SYSTEM:** The adrenals are unremarkable to external and internal examination. The pancreas is of normal size with lobulated tan parenchyma. The thyroid gland is of normal size with spongy maroon parenchyma.

**GASTROINTESTINAL TRACT:** The esophageal, gastric, and duodenal mucosae are unremarkable. The small and large bowels are unremarkable to external and internal examination. An appendix is present.

**GENITOURINARY SYSTEM:** The right and left kidneys are 110 grams apiece. The cortical surfaces are smooth and internally the cortices and medullary rays are unremarkable. The bladder mucosa is tan and unremarkable with the prostate gland being of normal size with spongy tan parenchyma. The testes are unremarkable to external and internal examination.

**CENTRAL NERVOUS SYSTEM:** There are no galeal hemorrhages except for those immediately associated with the previously described gunshot wound injury. The brain in the fresh state is 1200 grams. The brain upon internal examination is completely unremarkable except as was previously described.

5

97-568
**GARY WADE**

### CASE SUMMARY

An autopsy was performed on the body of Gary Wade on 4/29/97 at the Jefferson County Coroner/Medical Examiner Morgue after due authorization by the Jefferson County Coroner/Medical Examiner.

Examination revealed the presence of penetrating gunshot wound injury to the head with subsequent perforation of the left cerebral hemisphere. Also present were superficial lip mucosal lesions and skin abrasion foci as described. No other significant gross findings were appreciated with microscopic studies still pending at this time. Toxicological studies were negative for ethanol and drugs of abuse.

It is our opinion on the basis of the history and postmortem findings that the cause of death is best listed as gunshot wound to the head with the manner of death being homicide.

Andrew L. Falzon, M.D.           8/7/97
**Andrew L. Falzon, M.D.**
**Forensic Pathology Fellow**

Gary T. Simmons, M.D.           8/7/97
**Gary T. Simmons, M.D.**
**Associate Coroner/Medical Examiner**

GTS/cy

# JEFFERSON COUNTY CORONER/
## MEDICAL EXAMINER OFFICE

### BODY DIAGRAM

Front

Back



Decedent's Height ___67___ inches

Weight ___132___ pounds

Name ___Gary Ware___ (97-568)

Examined By _____ Date _____

# UAB

The University of Alabama at Birmingham
**Department of Pathology**
**Division of Forensic Pathology**
**Toxicology Section**

## TOXICOLOGICAL ANALYSIS REPORT

NAME: **Wade, Gary**

CASE NO: **97-568**

RECEIVED FROM: Jefferson County Medical Examiner - Dr. Simmons

RECEIPT DATE: **5/1/97**

REPORT DATE: 5/2/97

ANALYSIS OF SPECIMENS REVEALED THE FOLLOWING:

| SPECIMEN | ANALYSIS | METHOD | RESULTS* |
|----------|----------|--------|----------|
| **Blood** | **Ethanol** | GC | ND |
| Urine | **DA** | EMIT | NDD |

DA  =  Drugs of abuse (Amphetamine, Barbiturates, Benzodiazepines, Cocaine
        Metabolite, Opiates, Propoxyphene, Tricyclic Antidepressants)
NA  =  Not analyzed
ND  =  Not detected
NDD =  No drugs detected
P   =  Present, not quantified
QNS =  Quantity not sufficient for analysis
*Units = Alcohol and Volatiles, gm/dL; Blood, mg/L; and Tissue, mg/kg.

C.A. Robinson, Ph.D., DNBCC
Director, Forensic Toxicology

MAY 1997
RECEIVED

Mr. Antonio R.O. Davis #212703
Draper Correctional Center
P.O. Box 1107 [I-38]
Elmore, Al 36025-1107

This correspondence is forwarded
from Alabama State Prison. The contents
have not been evaluated and the Alabama
Department of Corrections is not responsible
for the substance or content of the enclosed
communication.



Honorable Melissa R...
Montgomery County Circuit Clerk
251 S. Lawrence Street
Montgomery, Al 36104



Melissa Rittenour
Circuit Clerk

7003

## ALABAMA SJIS CASE DETAIL

**OFFICE**                                            **PREPARED FOR: RENEE WHYARD**


alacourt.com

County: **03**    Case Number: **CV 2005 002463 00**    Court Action: **D**
Style: **ANTONIO D DAVIS AIS # 212703 VS ALABAMA DEPARTMENT OF CORRECTIONS**

### Case

#### Case Information

| | |
|---|---|
| County: | 03 - MONTGOMERY |
| Case Number: | CV 2005 002463 00 |
| JID: | TMH TRUMAN M HOBBS |
| Trial: | B |
| Style: | ANTONIO D DAVIS AIS # 212703 VS ALABAMA DEPARTMENT OF CORRECTIONS |
| Filed: | 09/22/2005 |

#### Case Type

| | |
|---|---|
| Code: | CVXX |
| Type: | WRIT OF CERTIORARI |
| Track | |
| Status: | D |
| Plaintiffs: | 001 |
| Defendants: | 001 |

#### Court Action

| | |
|---|---|
| DJID: | TMH TRUMAN M HOBBS |
| Court Action: | D DISMISSED W/O PREJUDICE/JURIS. OR PROS. |
| Judgment For: | N No Judgment |
| Trial days: | 0 |
| Lien: | 0 |

#### Damages

| | |
|---|---|
| Amount: | $0.00 |
| Compensatory: | $0.00 |
| Punitive: | $0.00 |
| General: | $0.00 |
| None: | |

#### Other Actions

| | | | |
|---|---|---|---|
| Con Date: | | Cont #: | Why: |
| RevJmt: | | Admin Date: | Why: |
| Appeal Date: | 07/18/2006 | Court: A | Case: |
| Mistrial: | | | |
| TBNV2: | | DSDT: 10/23/2006 | DTYP: |

#### Comments

| |
|---|
| Comment 1: |
| Comment 2: |

### Settings

#### Court Dates

| | Date: | Que: | Time: | Description: |
|---|---|---|---|---|
| 1: | | | - | |
| 2: | | | - | |
| 3: | | | - | |
| 4: | | | - | |

### Party 1 - C 001 - DAVIS ANTONIO D

#### Party Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Party: | C 001 | Name: | DAVIS ANTONIO D | | | Type: | I Individual |
| Index: | Y | Alt Name: | | | | JID: | TMH |
| SSN: | | DOB: | | | Sex: | | Race: |
| Address 1: | AIS #212703 | | | Address 2: | P O BOX 1107 | | |
| Phone: | 334 | City: | ELMORE | State: | AL | Zip: 36025-1107 | Country: US |
| Dock: | | Notice: | | Entered: | | | |

#### Attorneys

| | | | |
|---|---|---|---|
| Attorney 1: | Name: | | City: | State: |

EXHIBIT
2
tabbies®

| Attorney 2: | Name: | | City: | State: |
| Attorney 3: | Name: | | City: | State: |
| Attorney 4: | Name: | | City: | State: |
| Attorney 5: | Name: | | City: | State: |
| Attorney 6: | Name: | | City: | State: |

### Service Information

| Issued: | Type: | Reissue: | Type: |
| Return: | Type: | Return: | Type: |
| Service: | Type: | Service On: | By: |
| Answer: | Type: | NS Not: | NA Not: |
| Warrant | Type: | Arrest: | |

### Court Action

CACT:    D  DISMISSED W/O PREJUDICE Date:    06/19/2006    For    N  No judgment    Exempt:
Amount:    $0.00    Cost:    $0.00    Other:    $0.00    Satisfied:
Comment:

## Party 2 - D 001 - CORRECTIONS DEPT STATE OF ALABAMA

### Party Information

| Party: | D 001 | Name: | CORRECTIONS DEPT STATE OF ALABAMA | | Type: | G |
| Index: | Y | Alt Name: | | | JID: | Government |
| SSN: | | DOB: | | Sex: | | Race: |
| Address 1: | % LEGAL DIVISION | | Address 2: | 101 S UNION STREET | | |
| Phone: | 334 | City: | MONTGOMERY | State: | AL | Zip: | 36104-0000 | Country: | US |
| Dock: | | Notice: | | Entered: | | |

### Attorneys

| Attorney 1: | KNE003 | Name: | KNEE TARA SMELLEY | | City: | MONTGOMERY | State: AL |
| Attorney 2: | Name: | | City: | State: |
| Attorney 3: | Name: | | City: | State: |
| Attorney 4: | Name: | | City: | State: |
| Attorney 5: | Name: | | City: | State: |
| Attorney 6: | Name: | | City: | State: |

### Service Information

| Issued: 10/07/2005 | Type: S Sheriff | Reissue: | Type: |
| Return: | Type: | Return: | Type: |
| Service: 10/14/2005 | Type: S Served personally | Service On: | By: |
| Answer: 06/13/2006 | Type: M Motion to dismiss | NS Not: | NA Not: |
| Warrant | Type: | Arrest: | |

### Court Action

CACT:    D  DISMISSED W/O PREJUDICE Date:    06/19/2006    For    N  No judgment    Exempt:
Amount:    $0.00    Cost:    $0.00    Other:    $0.00    Satisfied:
Comment:

## Case Action Summary - 03CVCV200500246300

| Date | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 09/22/2005 | 3:06:02 | TEXT | HARDSHIP FILED | KAR |
| 09/29/2005 | 3:04:43 | FILE | FILED THIS DATE: 09/22/2005        (AV01) | KAR |
| 09/29/2005 | 3:04:44 | ASSJ | ASSIGNED TO JUDGE: TRUMAN M HOBBS JR        (AV01) | KAR |

| 09/29/2005 | 3:04:45 | TDMN | BENCH/NON-JURY TRIAL REQUESTED          (AV01) | KAR |
|---|---|---|---|---|
| 09/29/2005 | 3:04:46 | STAT | CASE ASSIGNED STATUS OF: ACTIVE          (AV01) | KAR |
| 09/29/2005 | 3:04:47 | ORIG | ORIGIN: INITIAL FILING          (AV01) | KAR |
| 09/29/2005 | 3:05:21 | PART | DAVIS ANTONIO D ADDED AS C001          (AV02) | KAR |
| 09/29/2005 | 3:05:22 | ATTY | LISTED AS ATTORNEY FOR C001: PRO SE          (AV02) | KAR |
| 09/29/2005 | 3:05:31 | PART | CORRECTIONS DEPT STATE OF ALABAMA ADDED AS D001 | KAR |
| 09/29/2005 | 3:05:32 | ATTY | LISTED AS ATTORNEY FOR D001: PRO SE          (AV02) | KAR |
| 09/29/2005 | 3:07:31 | STYL | ANTONIO D DAVIS VS ALABAMA DEPARTMENT OF CORRECTIO | KAR |
| 09/29/2005 | 3:07:32 | STYL | NS          (AV01) | KAR |
| 10/07/2005 | 9:18:29 | TEXT | ORDER SIGNED DTD 10-4-05 GRANTING HARDSHIP AFF | LAW |
| 10/07/2005 | 9:25:31 | SUMM | SHERIFF ISSUED: 10/07/2005 TO D001          (AV02) | LAW |
| 10/25/2005 | 3:07:20 | SERC | SERVICE OF SERVED PERSON ON 10/14/2005 FOR D001 | JAG |
| 10/27/2005 | 9:24:27 | TEXT | SENT PLTF CAS | KAR |
| 12/12/2005 | 3:12:03 | TEXT | PLTFS MO FOR DEFAULT JUDGMENT | REW |
| 02/21/2006 | 11:25:29 | TEXT | SENT PLTF CAS | KAR |
| 06/07/2006 | 1:42:42 | TEXT | DOC IS ORDERED TO RESPOND WITHIN 15 DAYS | REW |
| 06/13/2006 | 1:04:57 | ATTY | LISTED AS ATTORNEY FOR D001: KNEE TARA SMELLEY | MIA |
| 08/13/2006 | 1:04:58 | ANSW | ANSWER OF MOTION DISMIS ON 06/13/2006 FOR D001 | MIA |
| 06/16/2006 | 3:25:25 | TEXT | PLTFS MOTION TO ALTER OR AMEND ORDER | LAW |
| 06/20/2006 | 12:39:27 | TEXT | ORDER DENYING MO TO ALTER OR AMEND ORDER | REW |
| 06/28/2006 | 1:20:17 | TEXT | PLTFS MOTION TO ALTER, AMEND OR VACATE JGMT AND/ | JAG |
| 06/28/2006 | 1:20:18 | TEXT | ...OR  MOTION FOR RELIEF FORM JGMT OR ORDER | JAG |
| 07/07/2006 | 2:27:09 | TEXT | ORDER DENYING MOTION TO ALTER, AMEND ETC | JAM |
| 07/10/2006 | 4:10:12 | STAT | CASE ASSIGNED STATUS OF: DISPOSED          (AV01) | JAM |
| 07/10/2006 | 4:10:13 | CACJ | COURT ACTION JUDGE: TRUMAN M HOBBS JR          (AV01) | JAM |
| 07/10/2006 | 4:10:14 | DISP | DISPOSED ON: 06/19/2006 BY (DISM W/O PREJ)  (AV01) | JAM |
| 07/10/2006 | 4:10:15 | PDIS | C001 DISPOSED BY (DISM W/O PREJ)  ON 06/19/2006 | JAM |
| 07/10/2006 | 4:10:16 | PDIS | D001 DISPOSED BY (DISM W/O PREJ)  ON 06/19/2006 | JAM |
| 07/19/2006 | 11:03:41 | APPL | APPEALED ON: 07/18/2006 IN COURT OF CIVIL APPEALS | JAM |
| 07/19/2006 | 11:03:57 | TEXT | LETTER OF TRANSMITTAL OF NOTICE OF APPEAL | JAM |
| 08/10/2006 | 1:03:20 | TEXT | MOTION TO OBTAIN CLERK'S RECORD OR TRANSCRIPT | JAM |
| 08/21/2006 | 11:22:07 | TEXT | ORDER DENYING MOTION TO OBTAIN CLERK'S RECORD | JAM |

 *END OF THE REPORT*