IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
<u>NORTHERN DIVISION</u>

Antonio D. Davis - B/#212703,        )
    Plaintiff,                               )
                                                        )
        vs.                                  )        Civil Action No.:
                                                        )        <u>2.07 - CV - 574 - MEF.</u>
Richard Allen, et al.,                     )
    Defendants.                             )
                                                        )

<u>PLAINTIFF'S TRAVERSE AND RESPONSE TO THE</u>
<u>DEFENDANTS SPECIAL REPORT</u>

    Comes now the Plaintiff , Antonio D. Davis - B/#212703 , prose , by and through himself , in the above style cause , filing responds and traverse to the Defendants special report filed on the 15th day of October , 2007 , in accordance with this Honorable Court's [Order] issued on the 16th day of October , 2007 , and states as follows.

<u>PARTIES</u>

    1. The Plaintiff herein , Antonio D. Davis - B/#212703 , is presently incarcerated as an inmate at Draper Correctional Facility in Elmore County , Alabama.

    2. Defendant Richard Allen is the Commissioner of the Alabama Department of Corrections.

    3. Defendants Debrorah Strutt is an employee of the Alabama Board of Pardons and Paroles.

### PLAINTIFF'S EXHIBITS ATTACHED

4. Affidavit of the Plaintiff (Antonio D. Davis).

5. Alabama Department of Corrections Progress Review Form.

6. Preliminary Hearing Court Records (State v. Antonio Demetrius Davis).

7. Medical Examiner / Coroner Record (Autopsy Report).

### PLAINTIFF CLAIMS

8. The Defendants reliance on false information placed in pre-sentence investigation report (PSI) by Defendant Strutt , violates Plaintiff's right to due process under the 14th Amendment to the United States Constitution.

9.

### PLAINTIFF'S RESPONSE TO THE DEFENDANTS
### ASSERTIONS SUBMITTED IN THEIR
### SPECIAL REPORT

9. Plaintiff denies each and every assertion of the Defendants.

10. Plaintiff contends that the Defendants violated his constitutional rights to due process under the 14th Amendment to the United States Constitution.

11. Plaintiff asserts that he has stated a claim which relief may be granted under 42 U.S.C.A. §1983.

12. Plaintiff asserts that his lawsuit filed under 42 U.S.C.A. §1983 is not barred by the doctrine of res judicata and collateral estoppal.

13. Plaintiff contends that the Defendants is not immune from lawsuit under 42 U.S.C.A. §1983 and the 11th Amendment to the United States Constitution.

14. Plaintiff contends that the Defendants are not immune from laws-uit under 42 U.S.C.A. §1983 to qualified immunity.

15. Plaintiff contends that he is entitled to relief pursuant to 42 U.S.C.A. §1983.

## STATEMENT OF FACTS

16. On September 6, 2000 , the Petitioner herein entered a guilty plea upon a plea agreement made between the State of Alabama and himself for murder in violation of §13A-6-2 Code of Alabama 1975 and was sentenced by the Circuit Court of Jefferson County to a term of twenty (20) years to serve in the State penitentiary.

17. On April 6, 2004 , the Petitioner herein appeared before a board of personnels employed by the Alabama Department of Corrections pursuant to a "special review" that recommended lower custody level (Minimum) and to be placed at a lower level institution (Level II). The Petitioner was required to sign a blank "progress review form" after a few inquiries concerning his religion and whether or not he's on prescribed medication. After a period of time , the Petitioner received a copy of the said form via mail , and discovered that false information was written upon said form concerning his criminal conviction. Such false information that can be easily construed as particularly aggravated. Petitioner made several requests to remove such false information  , but the defendants refused to do so. The specific false information is alleged that Petitioner struck the victim several times with a pistol until a part of it broke off and then the Petitioner shot him in the head. There is no evidence to support that Petitioner struck the victim with a pistol. At the prel-iminary hearing , a witness was specifically asked whether or not Petit-ioner struck the victim with a pistol , and said witness affirmatively answered "NO". The Petitioner struck the victim with his fist only.

## PETITIONER LEGAL ARGUMENT FOR RELIEF

18. The Petitioner hereby argues that , that prisoners do not give up

all constitutional rights when they are confined in penal institutions
; prisoners retain , among other rights , freedom from individious
discrimination and guarantees of due process before they can be deprived
of life , liberty , or property. Teat v. State , 636 So. 2d 697 (Ala.
Crim. App. 1993). This right is guaranteed and protected by the Fourte-
enth Amendment to the United States Constitution , and cannot be deprived
nor infringed by the State government or her department or agents. The
Alabama Department of Corrections is an administrative agency within the
scope of the Administrative Procedure Act (APA) pursuant to §41-22-3(1)
, Code of Alabama 1975.

   19. In the case sub judice where the fact reveals that the Petitioner
was convicted and sentenced by the Circuit Court of Jefferson County for
murder in violation of §13A-6-2 , Code of Alabama 1975. The said judgment
was rendered pursuant to a guilty plea entered and accepted by said Court.
However , the Alabama Department of Corrections has either placed or
relied upon false information to construe that Petitioner's crime is
particularly aggravated. Whereas by alleging that Petitioner "pistol
whipped" the victim and afterwards shot him once in the head. There is
no evidence whatsoever to support the assertion that Petitioner struck
the victim with a pistol until a part of the pistol broke off. This ass-
ertion alone can easily be perceived and construed that Petitioner infli-
cted a beating with the weapon and then used it again by shooting him
with said gun or weapon. The term 'henious' as used by the Alabama Depar-
tment of Corrections is not the same as that utilized by the Code of
Alabama 1975 and was not intended to be. 'Henious' as used in making de-
terminations of internal classification refers to offenses to be only
aggravated. Thomas v. State , 867 So. 2d 367 , 371 (Ala. Crim. App. 2003)
. However , the said department has not specifically used the term 'hen-
ious' but is construed the same. This case is analogous to Monroe v.
Thigpen , 932 F. 2d 1437 (11th Cir. 1991). In Monroe , supra , the
Alabama Board of Pardons and Paroles relied upon false information that
was placed in his prison files to deny him parole. The said Court held
that this act treated Monroe arbitrarily and capriciously in violation
of his due process right pursuant to the Fourteenth Amendment of the
United States Constitution. Further , in Monroe  supra , it was discov-
ered that the false information was fabricated and relied upon as the
truth.

Page 4. of 9

20. The Fourteenth Amendment to the United States Constitution mandates that no state shall prohibit its citizens in its jurisdiction from due process of law and equal protection of the law. The phrase "due process of law" conveys the same meaning as the phrase "law of the land" [nisi per legem terrae]. Ex parte Melof , 735 So. 2d 1172 , 1199 (Ala. 1999). In Malof , supra , the Alabama Supreme Court held that Alabama Constitution has no equal protection guarantee. Therefore , Petitioner invokes his protective rights under the United States Constitution and under Article VI(2) of the foresaid Constitution; and respectfully request that this Court be made aware of Article VI(3) of said Constitution and Article I Section 279 where both said articles required this Court to support said Constitution. The procedural due process and substantive due process which was not afforded unto the Petitioner nor did he have a hearing upon the false information to verify said information was the truth , even after Petitioner attempted several times unto administrative personnels of the Alabama Department of Corrections that the information was false.

21. Once it is determined that due process applies , the question remains what process is due; that inquiry must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action. Kirby v. Siegelman , 195 F. 3d 1285 (11th Cir. 1999). The Petitioner provides this Court with court documents and medical examiners report (autopsy) for this Court to take JUDICIAL NOTICE pursuant to Rule 201 Alabama Rules of Evidence , and review the same. The Court records shall show that the eyewitness gave testimony under oath when asked whether or not Petitioner struck the victim with the pistol , and said affirmatively stated "NO".

22. The Petitioner avers that the false information placed in his prison files substantially prejudiced him. In fact , the attached "progress review form" clearly shows that this information was relied upon in denying him the recommendation for a lower level facility and custody level. The Petitioner made several inquiries as where this false information was retrieved , and was only told that the "PSI" pre-sentence investigation report  contained said information. Therefore , again , Petitioner asserts that this instant case is analogous to Monroe v.

**Thigpen** , supra. The Eleventh Circuit recognized the rationale and rea-
son made by **Monroe** in his argument , and respectfully request that this
Court consider the same.

23. The Petitioner contends that he has the equal rights guaranteed
by the Fourteenth Amendment to the United States to be treated the same
as other prisoners whom have like crimes and sentences who are placed
at lower level facilities and lower custody levels. The Fourteenth
Amendment prohibits a state from denying to any person within its juris-
diction , the equal protection of the laws , the equality of the rights
of citizens is a principle of republicanism. Every republican government
is in duty bound to protect all of its States , and it still remains there
. The only obligation resting upon the United States is to see that the
States do not deny the right. **U.S. v. Cruikshank** , 92 U.S. 542 , 23 L.
Ed. 588 (1876). The Petitioner prays that this Court ensure that this
principle is not abridged not forsaken under **Article VI(2)** U.S. Constit-
ution.

24. In **Thomas** , supra , at 370 , the Court stated that "the procedu-
res required for due process vary depending on the circumstances ; how-
ever , '[t[he fundamental requirement of due process is the opportunity
to be heard at a meaningful time and in a meaningful manner.'"**Mathews
v. Elridge** , 424 U.S. 319 , 333 , 96 S. Ct. 893 , 47 L. Ed. 2d 18 (1976)
, quoting **Armstrong v. Manzo** , 380 U.S. 545 , 552 , 85 S. Ct. 1187 , 14
L. Ed. 2d (1965). The Petitioner was not afforded a due process hearing
to determine whether or not the information written upon the "progress
review form" was true or not. Evidently , it is perceived to be true
according to the Alabama Department of Corrections. The fore said depa-
rtment or its personnels failed to provide Petitioner such a hearing
nor was Petitioner "reclassified" after the false information was retr-
ieved and placed in his prison files. According to Title 14 Section 14-
8-2 , **Code of Alabama 1975** ; the Alabama Legislature prescribed and pro-
mulgated said provision for the Alabama Department of Corrections full
authority to adopt regulations and policies to impliment programs. See
also Section 14-3-47 , **Code of Alabama 1975**. Such programs are available
if a prisoner first meets certain criterias such as the one recommended
on the "progress review form" for any level II facility and 'minimum
custody'. Now , the said department has (5) types of custody levels:

maximum , close , medium , minimum , and community custodies. According
to the Alabama Department of Corrections Classification Manual , each
said custody requires a certain security level and criteria. The Petit-
ioner meets the criteria for minimum custody , and recognized by his
classification specialist whom made the recommendation to be placed in
said catagory. However , the major factor in deciding to approve or deny
such recommendation rested upon false and erroneous information , and
said recommendation was denied. See attached "Progress Review Form".

25. The Plaintiff reasserts and argues that , Defendant Allen and
ADOC should be held liable for relying its decision upon untrue and
false information to deny him eligibility for meeting the criterias for
minimum custody or lower ~~level~~ level placement of institution. Its deci-
sion was made arbitrarily and capricious in violation of his right to
due process of law under the Fourteenth Amendment to the United States
Constitution.

26. The Plaintiff reasserts and argues that , Defendant Stutts should
be held liable for preparing PSI containing untrue and false information
where no documentary evidence existed that supports the notion that
Plaintiff ever struck the victim with the pistol prior to shooting him.
In doing so , Defendant Stutts deprived the Plaintiff of his substantive
due process rights under the Fourteenth Amendant to the United States C
Constitution.

27. The Plaintiff reasserts and argues that , the Alabama Board of
Pardons and Paroles has yet to render a decision to grant or deny Plaint-
iff's parole. However , its decisions shall be influenced upon the untrue
and false information contained in the PSI and his prison files , that
the Plaintiff struck the victim with his pistol in a manner that caused
a piece of the gun to break off. Thus , causing the crime to be aggrav-
ated and henious. The Board's decision shall violate in the future Plain-
tiff's due process rights afforded him under the United States Constitut-
ion.

## CONCLUSION

28. WHEREFORE , premises , considered , and for good cause shown , the
Plaintiff herein , Antonio D. Davis , request that , based upon the
facts and authorities cited , he be granted the following relief:

A. Issue a declaratory judgment in the Plaintiff's favor stating that
:

(1) Defendant violated the United States Constitution and the State of Alabama law when they failed to prepare a true and accurate statement and failed to correct the same when informed that it was incorrect , and still remain to rely upon the false statement.

B. Issue an injunction directing the Dendants or their agents:

(1) Investigate the cause of false information and expunge the same upon all files and records that contain Plaintiff's criminal case.

(2) Prepare a true and correct PSI that reflects the actual facts of the case involved.

(3) To reconsider the recommendation of lower level custody (minimum) and lower level institution (Level II) upon the true and correct PSI report.

C. Grant any and all attorney fees.

D. Grant such other relief as it may appear that Plaintiff is entitled . Also , the cost of this civil action to be taxed against the Defendants jointly and severally.

DONE ON THIS  13th  DAY OF  Nov.  , 2007.

Respectfully submitted,

s/ Antonio D. Davis

[Prose/Plaintiff]:

Antonio Demetrius Davis - B/#212703
Draper Correctional Facility
Post Office Box 1107
Elmore , Alabama 36025-1107

Page 8, of 9

I , inmate Antonio Demetrius Davis - B/#212703 , hereby certify that
I have on this _13ᵗʰ_ day of ___Nov.___ , 2007 , served a copy of the
foregoing pleading upon the Defendants attornies as the following states:

      (1) Hon. Mary Goldthwaite (GOL013)
         Assistant Attorney General
         Office of the Attorney General
         11 South Union Street
         Montgomery , Alabama 36130-1107;

   and,

         Hon. Hugh Davis,Esq.
         P.O. Box 302405
         Montgomery , Alabama 36130,

by placing a copy of the same in the United States Mail , postage prepaid
and properly addressed.

                      s/ Antonio D. Davis

                      Antonio D. Davis - B/#212703
                         [Prose/Plaintiff]



Antonio D Davis · B/#212703
Draper Corr. Fac. / B2-4A
P.O. Box 1107
Elmore, AL 36025-1107

"This correspondence is forwarded from an Alabama State Prison. The contents have not been evaluated, and the Alabama Department of Corrections is not responsible for the substance or content of the enclosed communication"

LEGAL USE ONLY

Hon. Debra P. Hackett - Clerk
Middle Dist. of Ala.
U S District Court
P.O. Box 711
Montgomery, AL 36101-0111

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
<u>NORTHERN DISTRICT</u>

Antonio D. Davis - B/#212703,    )
      Plaintiff,          )
                     )
          vs.          )
                     )
Richard Allen, et al.,     )
      Defendants.        )

Civil Action No.:
<u>2.07 - CV - 574 - MEF</u>.

<u>AFFIDAVIT</u>

STATE OF ALABAMA)
<u>COUNTY OF ELMORE</u>)

    Before me , the undersigned Notary Public , in and for said State
and County, personally appeared Antonio Demetrius Davis - B/#212703 ,
whom is known to me as such , first being duly sworn and deposes and
states as follows:

    On September 6, 2000 , I entered a negotiated guilty plea for murder
in violation of §13A-6-2 , <u>Code of Alabama 1975</u> and was sentenced to a
term of twenty (20) years in the penitentiary.

    On September 6, 2000 , I appeared before a board of personnels empl-
oyed by the Alabama Department of Corrections pursuant to a "Special
Progress Review" that recommended lower custody level (Minimum) and to
be placed at a lower level institution (Level II). I was required to
sign a blank "Progress Review Form". After a period of time , I received
a copy of the said form that was filled out , and specifically stated
that I had got into an argument with the victim in my case which escalat-
ed into a fight. Thereafter , I supposed have left and came back with a
pistol and "pistle whipped" the victim until a part of the pistol broke
off; stepped back and then shot the victim once in the head.

On April 29, 1997 , Gary Wade (victim) and I got into argument that escalated into a fight. I left and came back with a pistol wherein I was enraged and under the influence of alcohol. I exchanged a few words with Gary Wade and I punched him with my fist and shot him once upon the head area. I did not at no time strike Gary Wade with the pistol on any part of his body before or after the pistol discharged. The presentence investigation (PSI) was incorrectly prepared to state untrue and false information. Specifically , that I allegedly struck Gary Wade with the pistol to the point that part of the pistol broke off. This is false information . Whereas , their are no evidence whatsoever to support the foresaid false allegations of the Defendants. However , there is court documents and transcripts from the Plaintiff's preliminary hearing that offers the eyewitness (Donald David) whom was present throughout the entire incident . Donald Davis is related to Gary Wade as 'half brothers' and he was specifically asked by the prosecutor whether or not I struck Gary Wade with the pistol and affirmatively answered "No". Donald Davis informed the said that I struck Gary Wade with my fist. See attached as EXHIBITS-A , B , and C.: (1) Alabama Department of Corrections Progress Review Form; (2) Preliminary Hearing Court Records (State v. Antonio Demetrius Davis); and (3) Medical Examiner/Coroner Record (Autopsy Report).

DONE ON THIS _8th_ DAY OF _Nov_ , 2007.

Sworn and subscribed before me on this _8_ day of _Nov_ , 2007.

Notary: _____

Comm. Exp.: _____

MY COMMISSION EXPIRES APRIL 9, 2011.

s/ _Antonio D. Davis_
Antonio D. Davis - B/#212703
[AFFIANT]

ALABAMA DEPARTMENT OF CORRECTIONS

DISC: HAS RECEIVED NO DISCIPLINARIES PRE-CONS ____ 04/01/2007 EDUCAT LEV: 12

WL/PGM: _____

RECOMMENDED INSTITUTION: _____ RECOMMENDED CUSTODY: __

JUSTIFICATION: _____
_____
_____
_____
_____
_____
_____

I CERTIFY ENEMY LIST WAS REVIEWED AND UPDATED: _____ APP. S/L: ____

CLASSIFICATION SPECIALIST ____ DATE     WARDEN OR DESIGNEE ____ DATE

PSYCHOLOGIST/PSYCHOLOGIST'S ASSOC. DATE   CLASSIFICATION COORDINATOR DATE

CENTRAL REVIEW BOARD ACTION

APPROVED _ DENIED; DIVERTED TO: ____ REASONS: _____
_____

APPROVED _ DENIED; DIVERTED TO: ____ REASONS: _____
_____

APPROVED _ DENIED; DIVERTED TO: ____ REASONS: _____

RECEIVED APR 21 2004 CLASSIFICATION UNIT DRAPER C.

FINAL DECISION: INST ____ CUSTODY ____ DATE ____

DATE INMATE INFORMED: ____ INMATE'S SIGNATURE: ____

EXHIBIT-B

DAVIS PRELIMINARY HEARING
PAGE 1

ERM:  I'm going to record this.

DA:  If there is a stipulation for the court as to the identity of
the victim in this case which is very vague, _____gunshot wound to
the head and this incident happened in the Birmingham District of
Jefferson County.  State your name please.

DD:  Donald Davis.

DA:  And Mr. Davis _____on April 29, 1997,_____April 28, 1997, did
you have an occasion to see Gary Wade?

DD:  Yes.

DA:  And how do you know Gary Wade?

DD:  It's my brother.

DA:  Is he a half brother?

DD:  Yes.

DA:  And what name did he go by?

DD:  Gary.  They called him Gabe.

DA:  Gabe?  And that was like a nickname?

DD:  Yes.

DA:  OK.  On the early morning hours of April 29, 1997 did you have
an occasion to be at the house where Gabe was?

DD:  Yes.

DA:  Can you tell us what happened _____at that time?

DD:  That guy right there, Tony, yeah Antonio.

DA:  Are you kin to Antonio?

DD: No.

DA:  OK.  And you and Antonio, had yall been together earlier that
evening?

DD:  Yes.  We had been over at his mother's house working on her
car and then we was out riding around and came back, they start
arguing with me, Tony jumped up in the middle, I guess he thought
Gary was arguing with him but it wasn't...

DAVIS PRELIMINARY HEARING
PAGE 2

DA:

DD:  Yes.

DA:  And was there anyone else there with yall at that time?

DD:  Yeah, J_____.  J_____ Foster.

DA:  _____together, it was an argument between who first?

DD:  Me and Gabe.

DA:  You and Gabe?

DD:  Yeah.

DA:  After yall got into an argument what _____happened next?

DD:  Nothin, Tony just jumped up and started arguing with him and
Tony just start arguing, and he went to harrassing him, and stopped
that, he left out the house, went up there and got the gun, come
back punched him a couple times, and then he shot him.

DA:  And _____

DD:  Tony.

DA:  The man who is sitting here?

DD:  Yeah.

DA:  OK.  Once the argument insued between Tony and Gabe, was there
any words exchanged before he went out of the house?

DD:  He was harassing him, no I don't believe so.

DA:  OK.  When he went out of the house, how long did he stay out
of the house?

DD:  It couldn't have been no more than about 10 seconds or
something like that.

DA:  OK.  Once he went out of the house what did you find about him
different when he came back in the house?

DD:  He had a gun in his hand, and he was pointing it.

DA:  OK.  Who did he point it at first?

DD:  He pointed it first at Kenneth(?).

DAVIS PRELIMINARY HEARING
PAGE 3

DA:  OK.  What did he tell Kenneth when he pointed it at him?

DD:  That he was gonna bust him if he moved.

DA:  OK.  And where was Kenneth at this time?

DD:  Sitting on the couch by the door.

DA:  And ____told him that, who did he point the gun at next?

DD:  Then he pointed the gun at me.

DA:  OK.  And what did he tell you?

DD:  He told me he was gonna bust me.  He told me that three times.

DA:  OK.  And where were you in proximity to Gary and Kenneth at
that time?  Were yall in the same rooom?

DD:  Yeah.  I was like standing in the bedroom door, then I started
walking towards him and he pointed the gun at me like three times
and when I took a step to him, and he raised the gun and said, "I'm
gonna bust you,"  I took another step, "I'm gonna bust you,".  I
was like, "Tony! What's wrong, man?"  "I'm gonna bust you Don."

DA:  And after he said that three times....

DD:  Then I walked back, he held a gun on Gabe, punched him___ and
then pulled the trigger, that's what he did.

DA:  Ok, when he punched him, did he hit him with the gun?

DD:  No.  With his fist.

DA:  Did you see the part of the gun_____.

DD:  What do you mean by that?

DA:  Did you see the features of the gun?

DD:  No.

DA:  You didn't.

DD:  No.

DA:  After he punched him a few times, tell us how he shot him.

DD:  Right there in the head.  He pulled the trigger, pow.  He put
the gun down there and shot him, boom.

DAVIS PRELIMINARY HEARING
PAGE 4

DA:  In the head?

DD:  Yeah, and that was it.

DA:  OK.  And _____.

DD:  Right by the bathroom, it's a little hallway like.  The bathroom here and my bedroom here, and he was standing right in the doorway.

DA:  And you could see into the livingroom from that area.

DD:  Yeah.

DA:  Once Tony shot him, what do you think happened next?

DD:  Then he said, "Oh I done shot Gary," I say, "No you didn't, you killed my brother."  For no reason.

DA:  And then what did you do?

DD:  I don't know, I just...my mind just...

DA:  OK.  At that point, did Tony leave, or did he stay in the house?

DD:  He left.  He left.

DA:  And did the police come at that time?

DD:  Yeah.

DA: There's no further questions at this point, your honor.

ERM:  Mr. Davis, what time that day did you and Tony first get together?

DD:  About 1:00, 12:30-1:00 that afternoon.  His mother had called over to the house saying her car wouldn't start up.  So I got and went over to his mother's house, cranked her car up for her.  Then we left, and did a little bit of drinking....

ERM:  Prior to this incident happening, you and Antonio, your family and Antonio's family were friends, is that not true?

DD:  Correct.

ERM:  Alright.  As a matter of fact, yall still stay in ____with his mother, is that correct?

DAVIS PRELIMINARY HEARING
PAGE 5

DD: Yeah.

ERM: Alright. When yall got together around 1:00 to work on her car, was that over at her house?

DD: Yeah.

ERM: How long did yall work on the car that day?

DD: Until probably about 4:30 or 5:00, right around in there.

ERM: Alright. What was wrong with it that you know?

DD: I really didn't know, it was a deisel, I, like, told them when I first went over there, I really didn't think I could start the car, but then I thought about something else might've been_____with the starter fluid so I went and bought some of that and the car cranked up.

ERM: So you got it running?

DD: Yeah.

ERM: And it was 4:00 or 4:30 when yall got through. Where did yall go then?

DD: Ah, ok. Where did we go? We went, we went to the store, that's where we went after that, we went to the store.

ERM: Did yall buy, what did yall buy at the store?

DD: Two fifths of Grape Rose.

ERM: Is that wine?

DD: Yes.

ERM: Who all was with you? Just you and Antonio?

DD: Just me and Antonio.

ERM: Did yall drink the two fifths of Grape Rose?

DD: Yes.

ERM: When did yall get through drinking the two fifths?

DAVIS PRELIMINARY HEARING
PAGE 6


DD: Probably about 6:00 or 6:30, I really don't know the time, but it was still daylight then. We went down, somewhere down on the other side of...I don't know the street, but it's a little apartment complex down at ____Gardens down there, they had went and ah...bought some kind of liquor. I don't know what he was drinking. Two other guys. And we just stood around talking to them and then we went and got...the guy got in the car with us...

ERM: Were yall drinking down there too?

DD: Yeah.

ERM: What were yall drinking down there?

DD: The Rose.

ERM: Yall hadn't finished the Rose?

DD: NO.

ERM: OK. When you finished drinking the Rose, did yall get anything else to drink?

DD: Yes.

ERM: When was that and where did you get it?

DD: I don't know where they got it...The guy that was with...that Tony had picked up down there, he went and bought a fifth, and another liter of Red Rose.

ERM: Did yall drink that?

DD: Yes we did.

ERM: When did yall finish drinking that other fifth and that other liter of Red Rose?

DD: Probably about....I think it was about....about an hour after...there was...maybe two hours.

ERM: So it was about 8:00?

DD: Yeah, I figure it was about 8:00 or 9:00.

ERM: Did yall drink anything else?

DD: Yes.

ERM: Where did yall go to get it?

DAVIS PRELIMINARY HEARING
PAGE 7

DD:  We went and bought another thing of Rose.

ERM:  Another fifth or another liter?

DD:  It was a pint.

ERM:  It was a pint.  Was that Red Rose?

DD:  No.  Yeah that was the Red again.

ERM:  OK.  And where did yall drink that?

DD:  It was about 11:00 or 11:30 when we was drinking on that.

ERM:  Alright.  Did yall drink anything else?

DD:  No.  We was...we had that when we came to the house.

ERM:  OK.

DD:  And so, why we came to the house, we had left with a guy name
Carlton.  He was with us in the car at the time when we went and
bought that last one just before he shot my brother.

ERM:  Who is Carlton?  Who is he?

DD:  He stay like two doors away from his mother, grandmother.

ERM:  Is Carlton his first name or his last name?

DD:  His first name.

ERM:  Do you know his last name?

DD:  I think it's Finley.

ERM:  Alright.  Yall came to your house and yall had that pint of
Red Rose that yall were drinking then, is that right?

DD:  Yeah, because the cops was following us when we was drinking
it so when we got in the parking lot, we just got out the car and
started walking.  After that.

ERM:  That was about 11:00 or 11:30?

DD:  That was probably about 12:00.

ERM:  OK.  About 12:00.  And when you got to your house, who was
there?

DAVIS PRELIMINARY HEARING
PAGE 8

DD:  Gary and Kenneth.

ERM:  Gary and Kenneth?  Did they know Antonio and did he know them?

DD:  Yeah.

ERM:  And had`they known one another a long time?

DD:  Well just as long as we been up here.

ERM:  Which is how long?

DD:  Gary probably beeen up here about a year and a half, probably.  And I haven't been up here about a year.

ERM:  Alright.  But yall were all friends.

DD:  Yeah.

ERM:  Kenneth was a ___? ____?

DD:  No.

ERM:  What was he doing?

DD:  He was sitting on the couch.

ERM:  When yall walked in did Gary get on to you about smoking his cigarettes and yall had some kind of argument?

DD:  Yeah.

ERM:  What was it about?

DD:  Just nothing.  He just normally argue with me like every day or every other day he argue with me.

ERM:  He hadn't been drinking though, had he?

DD:  No.

ERM:  But you had?

DD:  Right.

ERM:  Alright.  Do you remember what the argument was about?

DD:  What that me and Gary had?

DAVIS PRELIMINARY HEARING
PAGE 9

ERM:  Yeah.

DD:  No.  What brothers would normally have.  Just like you go on argue with your brother when he did something you thought was wrong.

ERM:  But you don't remember what it was?

DD:  Probably cigarettes or something like that.

ERM:  Well.  Did you argue back?

DD:  No I wasn't going to argue back, I just looked at him and laughed and start walking toward the bathroom.

ERM:  And you went in another room didn't you?

DD:  Right.

ERM:  Do you know whether Gary accused Antonio of smoking his cigarettes?

DD:  No.  He didn't accuse him.

ERM:  While you were out of the room could you hear him?

DD:  No, I didn't hear that.

ERM:  OK.  But what I mean is while you were out of the room, you would not have been able to hear sny discussion the two of them had while you were gone.  Is that correct?

DD:  They were arguing, they weren't discussing.  They weren't talking low, they were arguing loud, sir.

ERM:  OK.  What were they arguing about?

DD:  I don't know why Tony start arguing with Gary.  They arguing about something that happened four or five months ago.

ERM:  You don't know what it was?

DD:  I don't have no idea.  He know.  He know.

ERM:  How long were you in the bathroom?

DD:  Long enough to use the bathroom and come back out.

ERM:  Alright, when you came back out, what was happening?

DD:  They was wrestling on the floor.  They were at each other...

DAVIS PRELIMINARY HEARING
PAGE 10

ERM: They were fighting.

DD: No, wrestliing...yeah, you could call it fighting if that's what you call it, I call it wrestling.

ERM: OK. The two of them were down in the floor.

DD: Yeah. Then they got up, looked at each other, about ten seconds Tony looked at Gabe, Gabe looked at Tony, he walked out the house and then he ran back in with the gun.

ERM: You weren't in there when they started wrestling were you?

DD: Yeah. When they started wrestling....This is what happened:

ERM: Alright.

DD: They was standing up by the couch. Alright. And they were in each other's face. Then they ran into my next door neighbor's wall which knocked down they stuff. Then I told them, "Yall need to stop." They was on the floor. Then Tony pushed him back towards the couch. Then they was on the floor. They got up, Tony looked at him, Gary looked at him, and then he walked out the door and come back with the gun.

ERM: _____. When they were standing there arguing, isn't it true that Gary rushed Tony? ___him all the way up against the other wall, and that's when they ended up in the floor?

DD: Alright.

ERM: Is that true?

DD: They was wrestling, yeah.

ERM: Isn't it true that Gary rushed Tony right until he was up against the wall and that's when they went to the floor. They wrestled on the floor and then Tony shoved Gary back toward the couch and that's when they separated.

DD: Alright.

ERM: Is that correct?

DD: Correct.

ERM: So Gary was the first one to engage in any physical touching of the other. He rushed Tony and knocked him up against the wall, isn't that the way it started?

DD: No.

DAVIS PRELIMINARY HEARING
PAGE 11

ERM: How did it start?

DD: Tony started it.

ERM: Well, didn't you testify just a minute ago that Tony was rushed against the far wall?

DD: They was wrestling, right. They was both touching each other at the same time. Gary did not grab him or touch him before Tony...they both ran, and they was wrestling to the wall, and they came back and fell on the floor.

ERM: So they just decided at the same time to start that? Is that what you are saying?

DD: Yeah.

ERM: They both got up and Tony went outside?

DD: Right.

ERM: Do yall have a porch outside the house, was he out on the porch?

DD: You could say...yeah there's a porch. It's just like a little concrete slab, that's all it is.

ERM: Well isn't that where he went? Out there on the concrete slab?

DD: Yeah, he went outside. Then he came back.

ERM: I understand. But he wasn't out there but about 10 seconds was all he was out there then?

DD: Yeah, that's all prob...

ERM: He wasn't out there long enough to go to the car or go next door or go over to a friend's house or anything then?

DD: No, I don't believe so.

ERM: He wasn't out there long enough to go somewhere else and get a gun, was he?

DD: He had the gun.

ERM: He already had it?

DD: He had the gun with him.

DAVIS PRELIMINARY HEARING
PAGE 12

ERM:  How did you know that?

DD:  I seen it with him all day that day.  Yeah.

ERM:  Where did he have it?

DD:  He had it in his..he had it in his back.

ERM:  In the back of his waistband?  In his pants?

DD:  Right.

ERM:  You had seen it earlier that day.

DD:  Right.

ERM:  So we're not talking about him going outside and going somewhere and getting a gun and coming back, he already had a gun.

DD:  He went out the door and come back in the door with the gun.

ERM:  Alright.  But he had the gun all the time.

DD:  He had the gun all the time.

ERM:  He came back in when you were in the doorway of the bedroom next to the room where Gabe is.

DD:  Gabe was in the bathroom, I was in my bedroom, correct.

ERM:  And Kenneth was on the couch?

DD:  Correct.

ERM:  And after he came back in did he first point the gun at Gary?

DD:  No.

ERM:  He didn't?

DD:  No.

ERM:  Is it your testimony that he first pointed the gun at Kenneth?

DD:  Correct.

ERM:  Told Kenneth he would bust him if he came any closer?

DD:  If he got up he would bust him.  He was sitting down.

DAVIS PRELIMINARY HEARING
PAGE 13

ERM:  Then he pointed it at you.

DD:  Right, cause I was walking towards him.

ERM:  Were you on one side of the room and Kenneth on the other side and Gary somewhere in the middle?

DD:  I'm right here and Gary's standing like right there.

ERM:  Where's Kenneth?

DD:  Kenneth sitting right about where you sitting at.

ERM:  And where was Antonio then?

DD:  He was standing about right there in the middle pointing the gun at everybody.

ERM:  So who would be between...would Gabe be between you and Kenneth or you in between Gary and Kenneth or would Kenneth be between you and Gary.

DD:  I would be between Gary and Kenneth.  I would say that.  In the angle that...You need to come to my apartment and look and then you would understand what I'm saying.

ERM:  Yes sir.

DD:  But me and Gary was standing like side by side, Kenny he_____.

ERM:  How close together were yall?  Was it a small room?

DD:  How close?  I'd say like maybe four feet apart maybe.

ERM:  OK.  Did you have a gun?

DD:  No.

ERM:  Did Kenneth have a gun?

DD:  No.

ERM:  Did Gary have a gun?

DD:  No.

ERM:  And your testimony is that after he pointed his pistol at Kenneth he told he'd bust him, then you took a step toward him and he pointed it at you.

DD:  Right.

DAVIS PRELIMINARY HEARING
PAGE 14

ERM:  And he told you three different times, "I'll bust you if you come any closer."

DD:  Right.  I took three steps.  Each time I took a step he pointed that gun at me.

ERM:  Is it your testimony that he approached Gary and pulled a pistol on him?

DD:  After he came in the house?

ERM:  Yes.

DD:  Yeah.

ERM:  How close was he to Gabe while he held the pistol on him?

DD:  From about...from here to about right there.  Maybe five feet.  Four or five feet.

✱ ERM:  Was there a time, according to your testimony earlier, that he held a pistol on Kenneth and also hit Kenneth with his fist?

DD:  He didn't hit Kenneth.

✱ ERM:  I meant Gary.  I beg your pardon.  He held the pistol on Gary and hit Gary with his fist?

DD:  Right.

ERM:  How many times did he hit him?

DD:  Three times.

ERM:  _____he was holding the gun while he was hitting him.

DD:  Right here.

ERM:  He was holding the gun at his head?

DD:  Righ here, pointed it at his head, right.

✱ ERM:  How far was the pistol from Gary while he was puching him with his other fist?

DD:  About like that.

ERM:  About six inches.

DD:  Like that.

DAVIS PRELIMINARY HEARING
PAGE 15

ERM:  Where was he hitting Gary?

DD:  In the face.

ERM:  Was it with his right hand or his left hand or do you recall?

DD:  With his right hand.

ERM:  He was hitting him with his right hand in the face, he was holding the pistol with his left hand.

DD:  Right.

ERM:  After he hit him the third time, what if anything happened then?

DD:  He pulled the trigger.

ERM:  And what did he do when he pulled the trigger?

DD:  "Oh, I done shot Gary."  That's the exact words came out his mouth.  "No, you killed my brother," that's what I told him.

ERM:  Let me ask you this:  Considering that this on tape, isn't it possible that while he was hitting your brother that the gun went off accidently?

DD:  NO!  NO!  NO!

ERM:  Would that not explain his response when he looked at you and said..

DD:  NO!

ERM:  "Oh, I done shot Gary."

DD:  No that wasn't it.  He wanted to shoot my brother.  He wanted to do that.  Cause he had all the opportunities to stop before it even got that far.  He wanted to do that.

ERM:  He hit him three times while he was holding the pistol on him.

DD:  Right.

ERM:  Was that three quick times, or was there a space in between or just pap,pap, pap.

DD:  There you go, that's how it is.

ERM:  Like that?

DAVIS PRELIMINARY HEARING
PAGE 16

DD:  Like that.

ERM:  And the next thing that happened, the gun goes off?

DD:  Then he held the gun then he just did like that.

ERM:  Tell me what he did.

DD:  He hit him 3 times and he pulled the trigger. I was like,"You
killed my brother."  You know you did it!  And it wasn't no
accident. It was no accident. That what he want you to.... but it
was not an accident. Ain't no way. No accident.

ERM:  What did he do at that point?

DD:  After he shot my brother? He stared there.  Then he went out
the door, got in the car with some little girl, I don't know her
name, and they left.

ERM:  What happened with the gun?

DD:  He took the gun with him.

ERM:  Did part of the gun fall off in the floor?

DD:  Aint no part of the gun fell off in the floor...no.

ERM:  If it did, you didn't see?

DD:  The gun aint fell apart.

ERM:  Was there another gun there?

DD:  No there was no nother gun in the house.

ERM:  The gun that he fired do you know if it was an automatic or
a revolver.

DD:  Automatic.

ERM:  What color was it?

DD:  Brown and black.

ERM:  Brown and black.  Can you describe it any further.

DD:  380. Luger.

ERM:  Have you had occasion to see that gun, or a gun similar to
that since that incident occurred?

DAVIS PRELIMINARY HEARING
PAGE 17

DD:  No, I haven't seen the gun since that.

ERM:  Your description of the gun is from your memory of what happened that night.

DD:  And before.  He always flashed the gun around.

ERM:  So you knew it.

DD:  Yeah.

ERM:  How old was Gary?

DD:  29, I believe.

ERM:  Is it your testimony that this pistol was no more than 6 inches from him when he was shot?

DD:  Correct.

ERM:  Would Kenneth have been on Antonio's left at the time this happened.

DD:  Yes, I would say so.

ERM:  Would you have been on Antonio's right?

DD:  Correct.

ERM:  And that's when _____up there hitting him.  Gary.

DD:  Yeah.

ERM:  Thank you Mr. Davis.

DD:  Yeah.

JUDGE:  Anything else you want_____you may leave or you may remain in the courtroom, it's up to you.

ERM:  Judge, I don't recall whether the state _____or not but we did have a situation_____copies of_____not going to call any witnesses_____.

Judge:  _____to the Grand Jury_____.


DD:  Correct.

EXHIBIT C

# JEFFERSON COUNTY CORONER
## MEDICAL EXAMINER OFFICE
### 1515 South 6th Avenue
### Birmingham, Alabama 35233

AUTOPSY NO: 97-568

**NAME:  GARY WADE**

**DEATH:**  Date: _4/29/97_

Hour: _0110_

**AUTOPSY:**  Date: _4/29/97_

Hour: _0800_

**AGE:** 29  **RACE:** Black  **SEX:** Male  **HEIGHT:** inches  **WEIGHT:** pounds

**PATHOLOGIST:** Dr. Falzon/Dr. Simmons     **DEPUTY CORONER:** Ronnie Williams

### FINAL ANATOMICAL DIAGNOSIS

1.  Penetrating gunshot wound to the head with subsequent perforation of the left cerebral hemisphere.

2.  Superficial lip mucosal lesions and skin abrasion foci as described.


**CAUSE OF DEATH:**    Gunshot wound to the head.

**MANNER OF DEATH:**    Homicide.


_Andrew L. Falzon_ as 5/7/97.
**Andrew L. Falzon, M.D.**
**Forensic Pathology Fellow**

_Gary T. Simmons_ 5/7/97
**Gary T. Simmons, M.D.**
**Associate Coroner/Medical Examiner**

GTS/cy

# CORONER/MEDICAL EXAMINER
## JEFFERSON COUNTY, ALABAMA

*Copy*

FILE NO:  97-568                          IMMEDIATE CAUSE OF DEATH _____

AUTOPSY: _____ YES _____ NO         (1) DUE TO: _____

EXTERNAL ONLY: _____ YES _____ NO

BY:  DR. SIMMONS _____         (2) DUE TO: _____
            Pathologist

                                     MANNER OF DEATH: _____

DECEDENT   GARY WADE _____       AGE/RACE/SEX  29 B/M   MARITAL STATUS _____

ADDRESS   1737 33RD. ST. NO. B'HAM. 35234 _____   D.O.B.  07-29-67 _____

DATE OF INJURY   04-29-97 _____   TIME APPROX. 0105   HOW INJURED  G.S.W. (HEAD) ___

INJURY AT WORK?  NO   PLACE OF INJURY  RESIDENCE _____

DATE & TIME FD.  SEE TIME OF INJURY _____   TIME LAST SEEN ALIVE _____

DATE & TIME OF DEATH  04-29-97 PRO. 0110 ____   PLACE OF DEATH  SCENE _____

CONDITION OF PREMISES  SEE NARRATIVE ____   RIGOR _____   LIVOR _____   TEMP  WARM

HOSPITAL CHART # _____   GUN TYPE  B-380-A ____   SCENE VISITED  YES   TIME  0126

_____04-29-97_____                    RONNIE WILLIAMS _____
         Date                                  Deputy Coroner

========================================================================

## PARTICULARS SURROUNDING DEATH

File        97-568                          Page No.        1

_____                           _____


### See attached sheet for "Particulars Surrounding Death"

IME-2 (REVISED 81)

PARTICULARS SURROUNDING DEATH

File        97-568                                    Page No.        2

ACCORDING TO POLICE, A WITNESS STATED THAT DEC AND THE SUSPECT WERE
ARGUING AND FIGHTING. SAID WITNESS STATED THAT HE GOT UP TO SEE WHAT WAS
GOING ON WHEN HE SAW THE SUSPECT SHOOT DEC. POLICE AND PARAMEDICS WERE
CALLED AT THAT TIME AND DEC WAS PRONOUNCED DEAD ON THE SCENE. DEC AND THE
SUSPECT WERE SAID TO HAVE BEEN STANDING APPROX. 3' APART AT THE TIME OF
THE INCIDENT.

SCENE EXAMINATION: DEC WAS OBSERVED IN A SITTING POSITION ON THE HALL
FLOOR, JUST OUTSIDE THE BATHROOM DOOR. HIS BACK WAS RESTING AGAINST A
CLOSET DOOR. A DEFECT CONSISTENT WITH A GUNSHOT WOUND WAS NOTED TO HIS
HEAD. BLOOD SPATTERS IN THE HALLWAY WERE CONSISTENT WITH DEC BEING IN A
STANDING POSITION, NEAR THE BATHROOM DOORWAY, FACING THE HALL AT THE TIME
OF THE SHOOTING. WHEN DEC WAS MOVED, A SPENT CASING (WINCHESTER 380) WAS
OBSERVED NEAR WHERE HIS RIGHT ARM WAS RESTING. A PIECE OF THE SUSPECT
WEAPON (PART OF THE TRIGGER GUARD) WAS OBSERVED NEAR WHERE HIS LEFT ARM
WAS RESTING.

NO CLOTHING NEEDED TO BE RETAINED AS EVIDENCE.

97-568
GARY WADE

DESCRIPTION OF CLOTHING: The decedent has on a white T-shirt. There is diffuse blood staining involving the right upper shoulder area which extends down the right axillary line covering a total are measuring approximately 14 x 12 inches. This staining also involves the entire right sleeve. The front of the shirt is otherwise remarkable for widely scattered blood stains which are documented photographically with the front of the shirt in total being approximately 25% involved by blood staining. The back of the shirt is remarkable for diffuse blood staining involving the right half of the back. Additionally, along the entire inferior aspect of the right sleeve and extending approximately half way down the right axillary line there is an approximate 14 inch long defect. The back of the shirt is otherwise remarkable for irregular blood staining involving the left back which is discontinuous with the back of the shirt in total being approximately 70% involved by blood staining.

The decedent has on a pair of tan boxer type shorts. The shorts are remarkable for generally circular discontinuous blood staining on the front of the shorts, particularly on the right side. The front of the shorts in total are approximately 25% involved by such blood staining. Essentially the entire back of the shorts are involved by blood staining with essentially the only spared areas being the waistband focally and the left lateral side focally. Additionally, the blood staining overlying the left lateral buttock region has a somewhat linear pattern type arrangement covering a total area measuring approximately 7 x 4 inches. This is all documented photographically.

EXTERNAL EXAMINATION: This is the body of a 67 inch 132 pound black male. The head is covered by short black hair with there being a penetrating gunshot wound injury in the region of the forehead at the approximate hairline which will be subsequently described. Additionally, involving the right forehead there is a .4 inch superficial laceration. The eyes are brown with the conjunctivae and sclerae being unremarkable. The sclerae however do appear to be slightly "muddy". The nasal septum is intact to inspection. The nose is intact to palpation. The teeth are natural and are intact. There is a .3 x .1 inch area of maroon discoloration involving the buccal mucosa of the lower lip in the

1

97-568
GARY WADE

approximate midline with there being a .3 inch laceration with a surrounding .5 inch contusion on the buccal mucosa in the region of the left corner of the mouth. There is a neatly trimmed facial mustache and goatee with a moderate amount of growth of hair overlying the chin. The ears are remarkable for there being blood coming out of both external auditory canals. Overlying the right chin there is a 1.5 x 1.0 inch area contains discontinuous somewhat linear scars.

The skin of the neck is remarkable for there being .1 and .2 inch superficial abrasion foci on the left side of the lower neck immediately superior to the left clavicle.

The chest and abdomen are unremarkable.

The genitalia are remarkable for depigmentation focally involving the glans penis and the foreskin. This pigmentation appears to be natural in etiology.

All of the extremities are intact to palpation. There is a trivial roughly circular scar involving the lateral aspect of the left upper arm with there being .7 x .1 inch area of faint maroon discoloration overlying the left biceps. The left upper extremity is otherwise unremarkable. The fingernails extend .1 inch past the fingertips and generally have dirt underneath them with the fingernails generally being intact and unremarkable. Involving the dorsal aspect of the dorsal aspect of the right hand there is a .2 inch abrasion foci. The right upper extremity is otherwise unremarkable.

Overlying the region of the right knee there is a 3.5 x 1.5 inch area containing discontinuous approximate .3 to .6 inch abrasions. Overlying the region of the left knee there is a 3 x .6 inch area containing discontinuous abrasions. The lower extremities are otherwise remarkable for there being a coroner's tag around the left foot identifying the decedent as Gary Wade. Additionally, on the dorsal aspect of the left foot immediately proximal to the left toe there are .2, .2, and .1 inch superficial abrasion foci.

2

97-568
GARY WADE

The back is remarkable for there being 1.5 x .4 inch abrasion overlying the right upper shoulder immediately lateral to which there are superficial .4 and .2 inch abrasions. Immediately to the left of the midline of the back there is a 2.7 inch linear scar with the buttocks and anus being unremarkable.

There are no palpable axillary lymph nodes with there being "shotty" inguinal lymph nodes. There are no acute needle puncture marks or track marks appreciated.

EVIDENCE OF INJURY: Located 3.3 inches below the top of the head and centered .3 inch to the left of the midline there is a 2.2 x 1.1 inch stellate skin gunshot wound. Along the superior border of this stellate wound there is .35 x .15 inch focal area of soot/gunpowder residue deposition with there being a .45 x .15 inch area of soot/gunpowder residue deposition laterally on the skin of the edge of the wound. Along an inferior skin flap there is a .25 inch roughly circular abrasion. When the skin flaps are re-approximated this abrasion is separated from the inferior edge of the apparent main entrance defect by an approximate .15 inch segment of skin. In the soft tissue immediately underlying the wound track there is obvious gunpowder residue deposition. There is no obvious significant gunshot residue deposition on the outer table of the skull. There is a .6 x .4 inch underlying bony defect in the skull with inward beveling. There are no bony fractures directly radiating from the entrance gunshot wound. Additionally, on the inner aspect of the calvarium there is approximately a .7 x .3 inch band of light gunpowder residue deposition immediately to the right of the entrance defect. This is documented photographically. Additionally, immediately superior to the main entrance defect on the inner table of the calvarium there is approximately a .3 inch area of light brown apparent gunpowder residue deposition separated from the main entrance defect by a .2 inch segment of uninvolved bone. There is a rim of gunpowder residue deposition on the outer aspect of the dura around an underlying corresponding defect in the dura. There is however no significant gunpowder residue deposition on the corresponding inner aspect of the dura. There is an underlying gunshot wound track which enters the medial aspect of the left frontal lobe. The wound track is essentially horizontal and moves to the left through the

3

**97-568**
**GARY WADE**

white matter of the anterior aspect of the left cerebral hemisphere. The wound track leaves the left cerebral hemisphere laterally at the approximate level of the basal ganglia (in the coronal plane). The projectile then apparently ricochets along the inner aspect of the skull with the projectile being recovered superficially embedded in the medial aspect of the region of the pole of the left occipital lobe. There is no definitive intraparenchymal wound track connecting where the wound track exits the left cerebral hemisphere to where the projectile is subsequently recovered in the medial aspect of the left occipital lobe. The brain is furthermore remarkable for there appearing to be punctate hemorrhages within the pons and, to a greater extent, within the medulla. The dura is reflected revealing extensive fractures involving the anterior middle cranial fossae bilaterally as well as hairline type fractures involving both middle cranial fossae. The skull is otherwise intact, including the calvarium.

**INTERNAL EXAMINATION:** There no significant pleural or abdominal fluid accumulations. The rib cage and vertebral column are intact. There are a few flimsy left sided pleural adhesions.

**NECK:** A stepwise neck dissection is performed. It is unremarkable. The hyoid bone and thyroid cartilage are intact. The tongue is unremarkable to external and internal examination.

**CARDIOVASCULAR SYSTEM:** The epicardial surface of the 300 gram heart is unremarkable. The coronary artery ostia are unremarkable. The coronary arteries are widely patent. The myocardium is homogeneously maroon and is unremarkable with the valves being unremarkable. The aorta is free of any significant atherosclerosis.

**RESPIRATORY SYSTEM:** The larynx and trachea are generally maroon. The secondary bronchi of the 430 gram right lung and 400 gram left lung are remarkable for being moderately to completely occluded by mucoid maroon material. The pulmonary vasculature is unremarkable with the pulmonary parenchyma on internal examination otherwise being unremarkable.

**HEPATOBILIARY SYSTEM:** The 1530 gram liver has an intact

4

97-568
GARY WADE

capsule. The parenchyma internally is brown and of unremarkable consistency with no gross fatty change or fibrosis. The gallbladder is present and is unremarkable.

SPLEEN: The 70 gram spleen has an intact capsule with homogeneously maroon parenchyma upon internal examination.

ENDOCRINE SYSTEM: The adrenals are unremarkable to external and internal examination. The pancreas is of normal size with lobulated tan parenchyma. The thyroid gland is of normal size with spongy maroon parenchyma.

GASTROINTESTINAL TRACT: The esophageal, gastric, and duodenal mucosae are unremarkable. The small and large bowels are unremarkable to external and internal examination. An appendix is present.

GENITOURINARY SYSTEM: The right and left kidneys are 110 grams apiece. The cortical surfaces are smooth and internally the cortices and medullary rays are unremarkable. The bladder mucosa is tan and unremarkable with the prostate gland being of normal size with spongy tan parenchyma. The testes are unremarkable to external and internal examination.

CENTRAL NERVOUS SYSTEM: There are no galeal hemorrhages except for those immediately associated with the previously described gunshot wound injury. The brain in the fresh state is 1200 grams. The brain upon internal examination is completely unremarkable except as was previously described.

97-568
GARY WADE

### CASE SUMMARY

    An autopsy was performed on the body of Gary Wade on 4/29/97 at the Jefferson County Coroner/Medical Examiner Morgue after due authorization by the Jefferson County Coroner/Medical Examiner.

    Examination revealed the presence of penetrating gunshot wound injury to the head with subsequent perforation of the left cerebral hemisphere. Also present were superficial lip mucosal lesions and skin abrasion foci as described. No other significant gross findings were appreciated with microscopic studies still pending at this time. Toxicological studies were negative for ethanol and drugs of abuse.

    It is our opinion on the basis of the history and postmortem findings that the cause of death is best listed as gunshot wound to the head with the manner of death being homicide.


Andrew L. Falzon, M.D.          Gary T. Simmons, M.D.
Forensic Pathology Fellow       Associate Coroner/Medical Examiner


GTS/cy

# JEFFERSON COUNTY CORONER/ MEDICAL EXAMINER OFFICE

## BODY DIAGRAM

Front                                    Back



Decedent's Height  67  inches

Weight  132  pounds

Name  Gary Wade  (97-568)

Examined By _____  Date _____

**UAB**    The University of Alabama at Birmingham
Department of Pathology
Division of Forensic Pathology
Toxicology Section

## TOXICOLOGICAL ANALYSIS REPORT

NAME: **Wade, Gary**                    CASE NO: **97-568**

RECEIVED FROM: Jefferson County Medical Examiner - Dr. Simmons

RECEIPT DATE:  **5/1/97**                    REPORT DATE: **5/2/97**

ANALYSIS OF SPECIMENS REVEALED THE FOLLOWING:

| SPECIMEN | ANALYSIS | METHOD | RESULTS* |
|----------|----------|--------|----------|
| Blood | Ethanol | GC | ND |
| Urine | DA | EMIT | NDD |

DA =  Drugs of abuse (Amphetamine, Barbiturates, Benzodiazepines, Cocaine
        Metabolite, Opiates, Propoxyphene, Tricyclic Antidepressants)
NA  = Not analyzed
ND  = Not detected
NDD = No drugs detected
P   =  Present, not quantified
QNS = Quantity not sufficient for analysis
*Units = Alcohol and Volatiles, gm/dL; Blood, mg/L; and Tissue, mg/kg.

C.A. Robinson, Ph.D., DNBCC
Director, Forensic Toxicology



7003 1

Mr. Antonio W. Davis #212703
Draper Correctional Center
P.O. Box 1107  [7-38]
Elmore, Al 36025-1107

Honorable Melissa A. Rittenour
Montgomery County Circuit Court
251 S. Lawrence Street
Montgomery, Al. 36104

his correspondence is forwarded
Alabama State Prison. The contents
been evaluated and the Alabama
ent of Corrections is not responsible
ubstance or content of the enclosed
icense.

